Dan Stormer, Esq. [S.B. # 101967]
Morgan Ricketts, Esq. [S.B. #268892]
Hadsell Stormer Renick & Dai LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile:  (626) 577-7079
Emails: dstormer@hadsellstormer.com
        mricketts@hadsellstormer.com

Barrett Litt, Esq. [S.B. # 45527]
Lindsay Battles, Esq. [S.B. # 26286]
Laura Donaldson, Esq. [S.B. #307638]
McLane, Bednarski & Litt, LLP
975 E. Green Street
Pasadena, CA 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
Email: blitt@mbllegal.com
       lbattles@mbllegal.com
       ldonaldson@mbllegal.com

Jenny Huang, Esq. [S.B. #223596]
Justice First
490 43rd Street, # 108
Oakland, California  94609
Telephone: (510) 628-0695
Facsimile: (510) 605-3903
Email: jhuang@justicefirst.net

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

California Coalition for Women Prisoners, JANE DOES # 1 – 6, individually and on behalf of others similarly situated,

Plaintiffs,

v.

SCOTT LEE, M.D.; JAMES ELLIOTT; KENNETH MAXWELL; JEFF MACOMBER; DIANA TOCHE, M.D.; CONNIE GIPSON; ANGELA KENT; JENNIFER CORE; MONA HOUSTON; RICHARD MONTES; MOLLY HILL; M.A. MESVEEN CHAND; R.N. ROSA LOPEZ; and Does 1-20,

Defendants.

Case No.: 5:25-cv-00283-SP

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Complaint filed: February 2, 2025

# **TABLE OF CONTENTS**

Page(s)

INTRODUCTION ........................................................................................... 1-3

JURISDICTION AND VENUE ......................................................................... 3

PARTIES........................................................................................................ 3-13

    A.  Plaintiffs ............................................................................................ 3-8

    B.  Defendants......................................................................................... 9-13

EXHAUSTION OF REMEDIES..................................................................... 14

STATUTE OF LIMITATIONS ................................................................... 14-15

FACTUAL ALLEGATIONS ...................................................................... 16-27

I.  For Decades, CDCR Has Subjected Patients in California's Women's Prisons to Sexual Abuse, Assault and Harassment Under the Guise of Gynecology Care ..................................................................................... 16-27

    A.  Allegations of Sexual Abuse by Dr. Ernest Reeves, Gynecologist at the Central California Women's Facility............................................ 17-19

    B.  Allegations of Sexually Abusive Examinations by Robert Bowman, Gynecologist at the Valley State Prison for Women............................. 19-21

    C.  For Years, Defendants Ignored Complaints by Patients at the California Institution for Women about Sexually Abusive Gynecology Care ................................................................................ 21-22

    D.  Defendants had Prior Notice that Dr. Scott Lee was Sexually Abusing Patients and Failed to Take Action to Prevent Further Harm to Patients .................................................................................. 23-27

II.  Plaintiff Jane Does # 1-6 ........................................................................ 27-43

III.  For Years, Dr. Lee Subjected Patients at CIW to Sexual and Physical Abuse, Sexual Assault, Emotional Trauma and Retrauma, Unlawful Restraint, Withholding and Deprivation of Safe Gynecology Care, and Retaliation for Complaining about his Abuse ..................................... 43-50

A.  Abusive pelvic exams and sexualized digital penetration....................43-44

B.  Abusive pap smears, biopsies, or other procedures............................44-45

C.  Coerced exams or procedures……………….……………….............45-46

D.  Excessive or unnecessary examinations...........................................46-47

E.  Anal examinations.......................................................................... 47

F.  Examinations and procedures without the presence of or observation
    by a chaperone.............................................................................. 48

G.  Withholding medical treatment ................................................... 48

H.  Inappropriate and sexualized comments ..................................48-49

I.  Abusive breast/chest exams ......................................................... 49

J.  Failure to use trauma-informed gynecology care ........................ 49

K. Remained in exam room while patients undressed  .................... 49

L.  Retaliation with negative charting .........................................49-50

M.  Falsely accused patients of dishonesty to justify more invasive exams... 50

IV.  Dr. Lee's Well-Known Abuse of Gynecology Patients Deprived the
     Incarcerated Population at CIW of Gynecology Care .............................50-51

V.  The California Institution for Women is Known for Protecting
    Its Staff Who are Accused of Sexual Misconduct and for Retaliating
    Against Those who Report Sexual Abuse by Staff.................................52-55

VI.  Dr. Lee's Patients Suffered Retaliation After Reporting Him for
     Staff Sexual Misconduct ........................................................................55-56

VII.  Defendants Failed to Take Appropriate Action Against Dr. Lee to
      Prevent Further Harm to Plaintiffs and the Class ...................................56-72

A. CDCR, CCHCS, and their Respective High-Ranking Officials were Jointly Responsible for Ensuring Safe Gynecology Care for Patients at CIW ........................................................... 56

B. CDCR, CCHCS, and their Respective High-Ranking Officials Shared Joint Responsibility in the Enforcement and Compliance with the Federal Prison Rape Elimination Act and the California Sexual Abuse in Detention Elimination Act at CIW .......................... 57-60

   i.   CIW has Long Been Out of Compliance with PREA's Mandate that Requires a Full-Time PREA Compliance Manager to Enforce PREA at CIW ............................................. 57-58

   ii.   CDCR and CIW Failed to Utilize the Institutional PREA Review Committee to Detect the Risk of Harm Posed by Dr. Lee .................................................................. 59-60

C. CCHCS Failed to Take Appropriate Action in Response to Allegations of Abuse by Dr. Lee .......................................... 60-64

D. The Wardens at CIW are Liable for Dr. Lee's Years of Abuse of CIW Patients and the Deprivation of Safe Gynecology Care at CIW ............................................................. 64-66

E. The Associate Director of CDCR's Female Offender Programs and Services is Liable for Years of Sexual Abuse by Dr. Lee of CIW Patients ......................................................... 66-67

F. CDCR Supervisory Officials are Liable for Dr. Lee's Abuse of Patients and the Deprivation of Safe Gynecology Care at CIW ........ 67-72

VIII.   Defendant Macomber is Sued in his Official Capacity as the CDCR Official with the Authority to Implement Injunctive Remedies that are Necessary to Ensure Safe Gynecology Care for CIW Patients ....................................................... 72-73

CLASS ALLEGATIONS .................................................... 73-78

  1. The Damages Classes ................................................ 73-78

    a. The Received Treatment Class .................................... 73-74

      i. The Examination or Procedure Subclass ....................... 73

      ii. The Nonconsensual Examination or Procedure Subclass .......... 74

b. The Deterred Class ................................................................. 74

2. The Injunctive Relief Class ..................................................... 78

CAUSES OF ACTION ........................................................... 78-103

I. First Cause of Action – Eighth Amendment Injunctive Relief ................ 78-82

II. Second Cause of Action – Eighth Amendment Cruel and Unusual Punishment ............................................................. 82-84

III. Third Cause of Action – Eighth Amendment Supervisory Liability ..... 84-88

IV. Fourth Cause of Action – Fourteenth Amendment Equal Protection ... 88-90

V. Fifth Cause of Action – Fourth Amendment Unreasonable Search, Seizure, False Imprisonment ....................................... 90-92

VI. Sixth Cause of Action – Fourth Amendment Right to Privacy ............. 92-94

VII. Seventh Cause of Action – Gender Violence ....................................... 95-96

VIII. Eighth Cause of Action – Bane Act ..................................................... 96-98

IX. Ninth Cause of Action – Ralph Act .................................................... 99

X. Tenth Cause of Action – Civil Battery ............................................. 99-100

XI. Eleventh Cause of Action – Intentional Infliction of Emotional Distress .......................................................... 100-01

XII. Twelfth Cause of Action – Negligence ............................................. 101-02

XIII. Thirteenth Cause of Action – Invasion of Privacy .......................... 102-03

JURY TRIAL DEMAND ....................................................... 103

PRAYER FOR RELIEF ...................................................... 103-105

Plaintiffs, including the California Coalition for Women Prisoners, Jane Does # 1- # 6, individually and on behalf of all women incarcerated at the California Institution for Women ("CIW") from March 2017 to May 2024, who were seen for, ducated (carceral term for "scheduled"), or requested gynecology or obstetric care by Dr. SCOTT LEE, hereby allege as follows:

## INTRODUCTION

1.       For decades, the California Department of Corrections and Rehabilitation ("CDCR") and the California Correctional Health Care Services ("CCHCS") and the individually named defendants (individually named defendants hereafter collectively referred to as "Defendants") have ignored and neglected the gynecological needs of people in women's prison[1] incarcerated in state prison. Defendants not only deprived prisoners[2] of basic gynecological needs but subjected them to horrific, sadistic, and retaliatory abuse under the guise of gynecology care.

2.       Defendants have long known, or should have known, that the majority of people in women's prisons have suffered sexual abuse prior to their incarceration, ranging from child molestation, sex trafficking or prostitution, and/or rape and sexual assault by husbands, boyfriends, pimps, or strangers.

3.       Defendants have long been obligated to provide safe gynecology care, a basic human need, to a population who were known, or should have been known, to have safety and trauma concerns with any medical staff involved with their

---

[1] The term "people in women's prisons" is used inclusively to include cisgender and transgender women, gender nonbinary people, and transgender men. The majority of people in California's women's prisons are cisgender women, but there is a significant population of gender nonbinary people and small populations of transgender men and women. Throughout this Complaint, some of DR. LEE's victims may be referred to as "he/him" if that is the person's pronoun.

[2] The term "prisoner" is intended to highlight the power differential between those incarcerated and those doho staff the prisons and not in a derogatory manner.

gynecology care.

4.     Instead, Defendants, deliberately ignored the basic needs of the incarcerated population and for far too long, subjected people incarcerated at the California Institution for Women ("CIW") to sadistic and depraved abuse by physicians who were the subjects of repeated complaints of sexual abuse during gynecology appointments. Gynecology care was known by CIW patients as something to be feared and avoided and many were forced to neglect their gynecological needs to protect themselves from further sexual abuse and trauma.

5.     For seven years, from 2016-2023, Defendant DR. SCOTT LEE was the only gynecologist available to CIW prisoners. For many years, DR. LEE remained as the sole gynecologist at CIW despite consistent and repeated complaints of his abuse during gynecology appointments. Defendants long ignored complaints that DR. LEE made inappropriate and sexualized comments, was sexually abusive with his use of the speculum and his fingers during gynecological exams; conducted examinations in a hostile, rough, and retaliatory manner; physically restrained his patients and forced them to continue his examinations despite their pleas to stop; conducted excessive or unnecessary vaginal and anal exams; and retaliated against patients who complained about him by making negative comments in their medical charts and/or withholding medical care and treatment.

6.     Defendants knew that gynecology patients at CIW were at risk of sexual abuse, retaliation, and denial of medical care by DR. LEE, yet failed to take action to remove DR. LEE from his position even though it was clear he was abusing his position and was unfit to treat patients. Defendants also knew, or should have known, that DR. LEE's continued position as the sole gynecologist at CIW, would deprive CIW prisoners of gynecology care.

7.     DR. LEE's sexual abuse and the ratification of his conduct by the remaining Defendants have caused physical pain and suffering, severe emotional

trauma, and the denial of gynecology care to Plaintiffs and the Class.

## JURISDICTION AND VENUE

8.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States. Plaintiffs allege violations of 42 U.S.C. § 1983.

9.    Venue is proper in this District under 28 U.S.C. § 1391(a)-(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

## PARTIES

**I.    Plaintiffs**

10.    Plaintiff California Coalition for Women Prisoners ("CCWP") is a 501(c)(3) grassroots advocacy organization that challenges the prison industrial complex for the institutionalized violence it imposes on women, transgender people, and communities of color. CCWP has five full time employees and is primarily supported by volunteers. CCWP has chapters in Los Angeles, California, as well as in Oakland, California, and its members include many people who are currently and formerly incarcerated at the California Institution for Women ("CIW").

11.    CCWP's mission primarily focuses on reducing the time people spend in prison. To advance these goals, CCWP regularly engages in legal visits and correspondence with incarcerated women, transgender, and gender non-conforming individuals. CCWP divides its time among several critical activities. These are: (1) post-conviction relief work; (2) advocating for clemency in specific cases; (3) resentencing assistance; (4) re-entry support; (5) statewide legislative advocacy and implementation; (6) direct advocacy of CDCR on internal policy and regulation changes; (7) leading and participating in statewide political organizing; and (8) otherwise supporting its incarcerated members.

12. CCWP expends substantial time and resources advancing the interests of incarcerated people. With respect to incarcerated member support specifically, however, CCWP focuses on advocating for policy or practice changes – for example, where prisons are not providing appropriate conditions for the elderly and disabled. CCWP also supports its incarcerated members with their individual needs, but a substantial portion of that work is post-conviction relief and assistance applying for parole. This specific work is primarily performed almost entirely by volunteers. CCWP volunteers are not trained counselors, nor are they crisis responders trained to deal with sexual assault. Neither are CCWP employees. Their role is advocacy and education – not mental health services.

13. CCWP has been injured as a direct result of Defendants' actions and omissions alleged herein because it has expended considerable resources responding to individual incidents of harm, trauma, threats, and retaliation experienced by its members and potential members, requiring volunteers and employees who would normally perform other tasks to re-orient and re-prioritize their time so that they can deal with this trauma. It also has required individuals – both volunteer and paid – who did not intend to work on issues of sexual violence to expand their capacity and become *de facto* mental health and crisis counselors where they were supposed to be serving as administrative coordinators, recruiters, legal support, parole support, and so on. CCWP must now expend substantial resources advocating for its members and constituents who are harmed and threatened by Defendants' ongoing failure to protect people incarcerated at CIW from systemic sexual abuse and retaliation. CCWP now dedicates much of its time and resources to ensuring that impacted people have access to safe methods for reporting sexual abuse and retaliation, mental health support, and in responding to CDCR's failures to provide a safe environment for those incarcerated at CIW.

14. CCWP has over 1,000 members including currently and formerly incarcerated people at multiple correctional facilities including CIW. CCWP has

several members who are currently incarcerated at CIW with life sentences, who will need gynecological care for years into the future, and who will be dependent on CIW for that gynecological care. All of CCWP's members at CIW are at continued risk of sexual abuse due to CDCR's failure to ensure safe and accessible gynecology care. CCWP can bring this action on behalf of its members because the interests at stake are germane to CCWP's mission and impact all of its members. CCWP seeks damages and declaratory and/or injunctive relief on behalf of its members.

15. More than half of the Plaintiffs and the Class are members of CCWP.

16. JANE DOES Nos. 1 to 5 are no longer incarcerated and currently reside in California.

17. JANE DOE #1 had an appointment with DR. LEE due to a worsening skin condition. Following an intense argument, DR. LEE was to perform solely an external examination of JANE DOE #1's vagina. Despite this understanding, DR. LEE jammed his fingers into JANE DOE #1's vagina with such force that he tore her open, causing her intense pain. Medical Assistant ("M.A.") MESVEEN CHAND observed DR. LEE's actions and did not intervene, or report DR. LEE's abuse. DR. LEE did not provide any treatment for JANE DOE #1's skin disease and even when JANE DOE #1 was eventually prescribed the proper topical cream by another doctor, DR. LEE withheld the treatment from her. JANE DOE #1 faced retaliation when she tried to report DR. LEE's abuse of her. JANE DOE # 1 is a survivor of sexual abuse and suffered emotionally and physically as a result of DR. LEE's actions, including permanent disfigurement of her genitalia.

18. JANE DOE # 2 told DR. LEE that she did not require a pap smear as she had no cervix. Still, DR. LEE was insistent that she allow him to conduct a pap smear. When JANE DOE #2 stated that she wanted to be seen by her primary care doctor instead, DR. LEE became visibly angry and hostile and made sexually inappropriate comments to JANE DOE #2. JANE DOE # 2 refused to be

physically examined by DR. LEE because of his behavior. At a future appointment, DR. LEE deprived JANE DOE #2 of necessary care by dismissing her medical complaints. Eventually, JANE DOE # 2 refused any future appointments with DR. LEE. Despite her need for gynecological care, JANE DOE #2 refused to be seen by DR. LEE because of her own experiences with him and those she had heard about from other prisoners. JANE DOE #2 is a survivor of child abuse; her interactions with DR. LEE were retraumatizing. As a result of DR. LEE's actions, JANE DOE #2 was unable to access essential medical care.

19.    JANE DOE # 3 requested to see a gynecologist for birth control by injection. DR. LEE refused to give her the requested contraception and became very aggressive about giving her an intrauterine device ("IUD") instead. JANE DOE # 3 felt that DR. LEE gave her no other choice than to agree to the IUD. At the appointment for IUD insertion, JANE DOE #3 told DR. LEE and M.A. CHAND that she had severe anxiety about the procedure and an extensive history of sexual trauma and asked that they go slow and announce any physical touching. DR. LEE ignored her requests and forcefully inserted a speculum inside of JANE DOE # 3 without any lubricant. When JANE DOE # 3 told him that he was hurting her, DR. LEE forced and held her legs open while ignoring her pleas for him to stop. M.A. CHAND assisted DR. LEE in forcing her legs open and watched him insert the IUD, but did not say or do anything to intervene on behalf of JANE DOE # 3.  JANE DOE #3 suffered extreme pain, excessive bleeding, and severe trauma. She remains terrified of seeing a gynecologist and has not sought gynecology care since she was released from CIW.

20.    JANE DOE #4 was seven and a half months pregnant at her first appointment with DR. LEE. DR. LEE stayed in the room while JANE DOE #4 was undressing despite her request for privacy. While measuring JANE DOE # 4's stomach, DR. LEE inappropriately touched her breast area and forcefully touched her pelvic region. DR. LEE ignored JANE DOE #4's complaints of the pain. DR.

LEE then inserted his fingers into JANE DOE #4's vagina while his other hand was on her thigh. DR. LEE was aggressive and abusive, pumped his fingers in and out of JANE DOE #4's vagina, made inappropriate comments, and continued despite JANE DOE #4's request to stop. When DR. LEE pulled his fingers out of JANE DOE #4, they were covered in blood. When JANE DOE # 4 told DR. LEE that she didn't want to see him again, he responded that he was the only gynecologist at CIW. M.A. CHAND was present during the appointment but did not chaperone or intervene during DR. LEE's abuse of JANE DOE # 4. At a later pre-natal appointment, JANE DOE # 4 refused to have a pelvic exam with DR. LEE because of his behavior and the trauma she sustained from her prior appointment. Following the birth of her child, and in need of post-partum care, JANE DOE # 4 requested reasonable accommodations. DR. LEE denied JANE DOE # 4 these basic supplies and she struggled through her post-partum recovery without the accommodations that are normally provided. JANE DOE # 4 suffered extreme pain and discomfort due to the deprivation of this post-partum care.

21.    JANE DOE # 5 was seen by DR. LEE for recurring gynecological issues. JANE DOE # 5 had seven to ten appointments with DR. LEE over a three-year period. At almost every appointment, DR. LEE was dismissive of JANE DOE #5's medical complaints and claimed that he needed to do another pap smear. At each appointment, DR. LEE required that she undress while he remained in the room, giving her no privacy. He then would use his fingers to examine JANE DOE # 5 and repeatedly inserted his fingers in and out of her vagina. DR. LEE would routinely use his hand to spread her legs open. DR. LEE was also aggressive and sexual in his use of a speculum on JANE DOE # 5, by jamming the speculum inside of her and opening it in a very rough manner and removing and re-inserting the speculum repeatedly. JANE DOE # 5 would not receive results from these examinations. On at least one occasion, DR. LEE examined JANE DOE # 5's breasts in a sexualized and inappropriate manner. The nurse chaperones

consistently failed to observe or report DR. LEE's actions. Even after refusing care from DR. LEE, JANE DOE # 5 felt that she had no other options but to see DR. LEE because her medical condition persisted and no one else was available for gynecology care. JANE DOE # 5 continued to suffer with her medical and as a survivor of sexual abuse was retraumatized by DR. LEE.

22.    JANE DOE # 6 is currently incarcerated at CIW and was seen by DR. LEE more than ten times over less than five years. At almost every appointment, DR. LEE required JANE DOE # 6 to undergo an invasive exam or procedure. JANE DOE # 6 repeatedly did not receive any results or follow up treatment from these appointments. DR. LEE was routinely hostile towards JANE DOE #6. At least once, DR. LEE used physical force to do an examination on JANE DOE # 6 by holding her legs down after she asked him to stop. At this same appointment, he inserted his fingers into her anus without notice, consent, or explanation. At another appointment he had JANE DOE # 6 straddle the floor, while she was undressed from the waist down, as he inserted his fingers inside of her. At appointments, DR. LEE routinely made sexually inappropriate comments and blamed JANE DOE # 6 for her medical condition. JANE DOE # 6 refused treatment with DR. LEE on several occasions and requested a female provider instead. Still, JANE DOE # 6 was ducated for appointments with him. DR. LEE retaliated against JANE DOE # 6 for complaining about his treatment of her. JANE DOE # 6 has suffered severe physical and emotional trauma due to the actions of DR. LEE. As a survivor of physical, emotional, and sexual abuse, each interaction with DR. LEE was retraumatizing. She has struggled with persistent bleeding, necessitating blood transfusions due to DR. LEE's failure to provide the appropriate medical interventions. Due to DR. LEE's retaliatory conduct, JANE DOE #6 has suffered physical pain, emotional trauma, and barriers to her possibility of parole.

/ / /

## II.   Defendants

23.   Defendant DR. SCOTT LEE is an adult male who is a resident of Ontario, California and a citizen of the United States. DR. LEE has been licensed with the Medical Board of California since 1984. On information and belief, DR. LEE worked as a gynecologist at CIW from around 2016 until May 2024. At all relevant times, he was responsible for ensuring that the medical care he provided was in compliance with legal standards, including the federal Prison Rape Elimination Act ("PREA") and California's Sexual Abuse in Detention Elimination Act ("SADEA") standards. DR. LEE was also obligated to ensure that his actions did not violate federal or state constitutional rights or other legal rights of any patient at CIW. DR. LEE is being sued in his individual capacity and currently resides in and/or maintains a business office in Orange County.

24.   Defendant JAMES ELLIOT is a 30-year healthcare executive who has served as the CIW Chief Executive Officer since July 2010. In that capacity, he is responsible for the operation of all CDCR medical departments, including that at CIW. He is charged with the duty to ensure that all health care provided at CIW, including gynecology care, is provided in accordance with legal standards and that gynecology care provided by medical staff to prisoners at CIW is safe and compliant with law, including PREA and SADEA. Defendant ELLIOT is responsible for ensuring that the health care grievance process at CIW operates effectively and consistently and is the reviewing authority of all health care grievances at the institutional level.  Defendant ELLIOT is being sued in both his individual and official capacity, as the CDCR official with authority to implement injunctive and equitable remedies related to medical care at CIW, as may be deemed appropriate. On information and belief, he currently resides in and/or maintains a business office in Riverside County.

25.   Defendant DR. KEN MAXWELL is the Chief Medical Executive ("CME") and Chief Physician and Surgeon for CIW and has overall responsibility

for health care services at CIW, including gynecology care. As CME, DR. MAXWELL is a member of the senior administrative team and supervises patient safety, quality of care, and patient experience. DR. MAXWELL is being sued in his individual capacity. On information and belief, he currently resides in and/or maintains a business office in Riverside County.

26. Defendant JENNIFER CORE was the Warden and Chief Executive Officer of CIW from May 2022 to August 2023 and was responsible for the custody and treatment of all CIW prisoners. As Warden, she had overall responsibility for medical care provided to the incarcerated population at CIW, including gynecology care, and ensuring that medical staff did not violate the legal rights of any CIW prisoner. She also had responsibility over the Investigative Services Unit ("ISU") at CIW, referring staff misconduct allegations to the OIA, reviewing every allegation of staff sexual misconduct, reviewing reports on staff misconduct investigations, determining investigative findings against her staff, and taking action to protect CIW prisoners from harm by CIW staff, including medical staff. As Warden, JENNIFER CORE also served as Chair of the Institutional PREA Review Committee ("IPRC") and was charged with reviewing all incidents of staff sexual misconduct. At all relevant times, JENNIFER CORE was acting under color of state law and in the course and scope of her employment. She is being sued in her individual capacity.

27. Defendant MONA HOUSTON was the Warden and Chief Executive Officer of CIW from January 2021 to March 2022. In those capacities, MONA HOUSTON had all the same duties and responsibilities described above and previously held by JENNIFER CORE. At all relevant times, she was acting under color of state law and in the course and scope of her employment. She is being sued in her individual capacity. MONA HOUSTON currently resides in and/or maintains a business office within San Bernardino County.

28. Defendant RICHARD MONTES was the Warden and Chief

Executive Officer of CIW from November 2019 to October 2020. In those capacities, RICHARD MONTES had all the same duties and responsibilities described above and previously held by JENNIFER CORE . At all relevant times, he was acting under color of state law and in the course and scope of his employment. He is being sued in her individual capacity. RICHARD MONTES currently resides in and/or maintains a business office within Riverside County.

29.    Defendant MOLLY HILL was the Warden and Chief Executive Officer of CIW from August 2016 to October 2019 and again from August-December 2023. In those capacities, MOLLY HILL had all the same duties and responsibilities described above and previously held by JENNIFER CORE. At all relevant times, she was acting under color of state law and in the course and scope of her employment. She is being sued in her individual capacity. MOLLY HILL currently resides in and/or maintains a business office within Los Angeles County.

30.    Defendant MESVEEN CHAND[3] is a Medical Assistant ("M.A.") who has worked at CIW since 2019.  She was present for many gynecology appointments with DR. LEE. At all relevant times, she was acting under color of state law and in the course and scope of her employment. She is being sued in her individual capacity. Defendant CHAND currently resides in and/or maintains a business office within Riverside County.

31.    On information and belief, Defendant ROSA LOPEZ is a registered nurse ("R.N.") who has worked at CIW since 2013. She was present for many gynecology appointments with DR. LEE. At all relevant times, she was acting under color of state law and in the course and scope of her employment. She is being sued in her individual capacity. Defendant LOPEZ currently resides in and/or maintains a business office within Riverside County.

32.    Defendant DR. DIANA TOCHE has been the Undersecretary of

---

[3] Mesveen Chand was previously named as Mesveen Kumar in the original complaint.

Health Care Services since 2014 and is responsible for planning, implementing, and evaluating the health care governance structure and processes at all California prisons, including CIW. DR. TOCHE has the duty to ensure that all medical care provided at all medical departments at CDCR, including gynecological services at CIW, are provided in compliance with legal standards, including PREA and SADEA, and that medical staff providing medical care to CDCR's incarcerated population, including those at CIW, act according to law and do not violate the rights of any CDCR prisoner. DR. TOCHE is responsible for routinely evaluating and improving program performance, holding leadership accountable for outcomes, and maintaining the quality and safety of patient care through performance evaluation and improvement including peer review, quality management, and patient safety and risk management systems. DR. TOCHE is being sued in her individual and official capacities and currently resides in and/or maintains a business office within Sacramento County.

33.    Defendant ANGELA KENT is the Associate Director of Female Offender Programs and Services ("FOPS") of the Division of Adult Institutions. She has supervisory authority over the Warden at CIW and is responsible for the review of every staff sexual misconduct allegation at CIW. As the Associate Director of FOPS, Defendant KENT also serves as the PREA Coordinator for CIW and is charged with the responsibility of ensuring CIW's compliance with the PREA and SADEA. Defendant KENT is being sued in her individual capacity and her official capacity, as the CDCR official with authority to implement injunctive and equitable remedies at CIW that may be deemed appropriate. Defendant KENT currently resides in and/or maintains a business office in Sacramento County.

34.    Defendant CONNIE GIPSON was the Director of Adult Institutions from 2018-2023 when CDCR organized its institutions by four mission-based disciplines including the Female Offender Programs & Services ("FOPS"). In that role, Defendant GIPSON had supervisory responsibilities over Female Offender

Programs including CIW and she directly supervised the Associate Director of FOPS. Defendant GIPSON is being sued in her individual capacity and on information and belief, she currently resides in and/or maintains a business office within Sacramento County.

35. Defendant JEFF MACOMBER has served as the Secretary of CDCR since 2022. As Secretary, he had overall responsibility for the custody, care, and safety of prisoners incarcerated at CIW and for maintaining zero tolerance for sexual abuse of CIW prisoners by staff. He is also responsible for supervising CDCR's Executive Staff including the Undersecretary, the Director of Adult Institutions, and the Associate Director of FOPS. JEFF MACOMBER is being sued in his individual and official capacity as the CDCR official with authority to implement injunctive and equitable remedies at CDCR, as may be deemed appropriate. JEFF MACOMBER currently resides in and/or maintains a business office within Sacramento County.

36. Defendant DOES 1-20 are/were officials, investigators, agents, employees and/or contractors of CDCR, acting under color of state law and within the course and scope of their employment. Defendant Does 1-20 are being sued by their fictitious names because their true and correct identities are not currently known. Defendant DOES 1-20 participated in some form in the violations of Plaintiffs' and Class Members' rights as alleged in this Complaint, and/or failing to take appropriate action to protect them despite notice that their rights were being violated. The correct names of Defendant Does 1-20 will be submitted once they are identified.

37. Defendants, including the individually named defendants, had a special relationship with the named plaintiffs and the class members based on the Plaintiffs' and classes' custodial status as prisoners to whom Defendants owed a duty of care.

///

**EXHAUSTION OF REMEDIES**

**I.    Prison Grievance Process**

38.    Plaintiffs Jane Doe # 1-4 are no longer incarcerated and are not subject to the requirements of the Prison Litigation Reform Act ("PLRA"). CCWP is a 501(c)(3) organization with over 1,000 members both currently and formerly incarcerated; CCWP has several full time staffers who are not incarcerated, and is not subject to the PLRA or its exhaustion requirements. Plaintiffs and the Class are therefore not subject to the PLRA or its exhaustion requirements.

39.    Due to pervasive retaliation against those who report CIW staff for sexual misconduct, and the constant threat of such retaliation, the grievance process was not an available remedy to patients of DR. LEE who suffered sexual abuse and/or were deprived of gynecology care at CIW. Plaintiffs should therefore be excused from the exhaustion requirement of the PLRA because CIW failed to make a safe administrative remedy available to prisoners at CIW.

40.    Nevertheless, JANE DOES # 1- 3 all filed health care grievances at CIW against DR. LEE prior to their release from prison and therefore have exhausted their administrative remedies. JANE DOE # 6 also filed grievances against DR. LEE and have exhausted their administrative remedies.

**II.    Compliance with Government Tort Claims Act**

41.    Plaintiffs and the Class either timely complied or substantially complied with the requirements of the Government Tort Claims Act, are excused from compliance with the requirements of the Government Tort Claims Act due to the culture of retaliation maintained at CIW as described herein or for other reasons, or Defendants have waived any objection to any defect with Plaintiffs' efforts to comply, or there is a recognized exception to the requirements of the Government Tort Claims Act such that Plaintiffs were not required to comply.

**STATUTE OF LIMITATIONS**

42.    Pursuant to Cal. Code of Civil Procedure, section 340.16, the

individual Plaintiffs' state law claims are subject to a 10-year statute of limitations for any civil action for recovery of damages suffered as a result of sexual assault.

43.    The state and federal claims for the individual Plaintiffs are subject to tolling for two years pursuant to California Code of Civil Procedure section 352.1, because their claims arose during a period of incarceration.

44.    All claims for the individual Plaintiffs are also equitably tolled by the various Defendants' actions undertaken specifically to fraudulently conceal the fact that Plaintiffs' rights were being violated by DR. LEE, including but not limited to DR. LEE's insistence that he was the doctor and knew what Plaintiffs needed; DR. LEE's refusal to allow Plaintiffs to document the reasons for their refusal of care by him; and the actions taken by supervisory Defendants to ensure that DR. LEE's misconduct would not come to light and complaints about his conduct would not be sustained, as described more fully herein.

45.    Defendants are equitably estopped from arguing the statute of limitations as a defense due to retaliatory actions they took and/or their failure to prevent retaliation against prisoners who report CIW staff for sexual misconduct. This paragraph incorporates by reference all other paragraphs that describe the pervasive retaliation against those who report CIW staff for sexual misconduct, and the constant threat of such retaliation, that made it unsafe for patients to bring complaints and or claims against staff for sexual abuse.

46.    Pursuant to Ninth Circuit law, the statute of limitations on the federal claims of individual Plaintiffs may be subject to delayed accrual of their claims until when the individual plaintiff knew or in the exercise of reasonable diligence should have known of the existence and cause of their injuries. (*Christina St. Clair v. County of Okanogan,* 154 F.4th 1154, 1158-60 (9th Cir. 2025).

///
///
///

## FACTUAL ALLEGATIONS

**I.   For Decades, CDCR Has Subjected Patients in CDCR's Prisons for Women to Sexual Abuse, Assault and Harassment Under the Guise of Gynecology Care.**

47.     As part of its duty to provide basic medical care to prisoners, CDCR is required to provide gynecological care to those incarcerated at the women's prisons in California. It is standard practice in the free world to ensure that gynecology services are provided in a way that feels safe to patients. The vast majority of patients prefer to have a female, rather than a male, gynecologist and have that freedom to choose. For survivors of sexual abuse, gynecology care is more complicated.

48.     The American College of Obstetricians and Gynecologists ("ACOG") recommends that physicians inquire about sexual abuse and rape trauma history for every patient. Such information is essential for ensuring trauma-informed gynecology care that prevents the possibility of re-traumatizing patients with a history of prior sexual abuse. The ACOG's recommendation is especially relevant in the context of gynecology care for incarcerated people, who have a disproportionately high rate of experiencing sexual abuse prior to their incarceration.

49.     A Department of Justice study found that 86% of those incarcerated in women's jails reported having experienced sexual violence in their lifetime and 77% reported partner violence.[4]  For prisons, research has shown an even higher rate (up to 94%) who experienced sexual and/or physical abuse prior to

---

[4] Shannon M. Lynch et al., Women's Pathways to Jail: The Roles and Intersections of Serious Mental Illness and Trauma (Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance, 2012), p. 32.

incarceration.[5] Such statistics were or should have been known to each of the Defendants. With such high rates of prior sexual abuse history among female prisoners, Defendants knew or should have known that trauma-informed care is essential to the provision of safe gynecology services to prisoners. Research has shown that the vast majority of people in women's prisons and jails in the United States have experienced sexual or physical abuse, sexual assault, and/or partner violence.

50.    For decades, CDCR and correctional health services have not only failed to provide trauma-informed gynecology care to prisoners, they deliberately ignored and exposed patients to sexual abuse under the guise of gynecology care.

**A.    Allegations of Sexual Abuse by Dr. Ernest Reeves, Gynecologist at the Central California Women's Facility.**

51.    The Central California Women's Facility ("CCWF") in Northern California is the largest women's prison in California and is located in Chowchilla, California. CCWF opened in 1990 and houses prisoners at all security levels, including people sentenced to death. CCWF currently incarcerates approximately 2,100 prisoners.

52.    Dr. Ernest Reeves was a gynecologist who worked at CCWF for 14 years, from 1998 to 2012.

53.    In 2011, Michann Meadows, a former patient of Dr. Reeves, filed a federal civil rights lawsuit alleging that she was sexually abused by Dr. Reeves during gynecology appointments from 2000-2012. (*Meadows v. Reeves,* Case No. 1:11-cv-00257 (JLT) (E.D.Cal. 2011). Ms. Meadows alleged that Dr. Reeves performed aggressive and unreasonably rough vaginal and anal exams on her without medical reason. (*Id.*, ECF 28 at ¶¶ 12-17.)

---

[5] Mary E. Gilfus, Women's Experiences of Abuse as a Risk Factor for Incarceration: A Research Update (VAWnet Applied Research Forum, December 2002), p. 2.

54.    When Ms. Meadows immediately complained about sexual abuse by Dr. Reeves in 2000, she was subjected to a false disciplinary violation. (*Id.*, ECF 28 at ¶¶ 13-14.)

55.    Ms. Meadows' allegations of sexual abuse against Dr. Reeves were well-supported by sworn declarations of seven other patients of Dr. Reeves, who described similar, horrific sexual abuse by Dr. Reeves over the course of the 14 years that he worked as the sole gynecologist at CCWF. (*Id.*, ECF 140.) For example, former patients of Dr. Reeves reported that he was very demeaning towards his patients, extremely rough and aggressive during vaginal and anal exams, abusive with his use of the speculum and his fingers during exams, and he physically restrained patients and refused to stop exams when patients begged him to stop. (*Id.*, ECF 140-1 to ECF 140-7.)

56.    Many of Dr. Reeves' patients were survivors of sexual abuse prior to their incarceration and had filed grievances against him that were ignored for many years. (*Id.*)

57.    Dr. Reeves was not subject to any investigation in response to numerous allegations of sexual abuse against him until many years later, in 2010. The investigation against Dr. Reeves was improperly conducted at CCWF by custody staff who were not appropriately trained to conduct staff or sexual abuse investigations and who had an inherent conflict of interest because they worked at the prison where Dr. Reeves had worked for over ten years. As a result, CCWF's investigation concluded that Dr. Reeves' actions with his gynecology patients did not violate CDCR policy. (*Id.*, ECF 28 at ¶ 20.)

58.    In addition to Dr. Reeves, Ms. Meadows sued the Chief Medical Officer and Warden for CCWF, as well as Matthew Cate, then Secretary of the California Department of Corrections and Rehabilitation ("CDCR") for the abuse she suffered from Dr. Reeves. Ms. Meadows' constitutional claims against these high-ranking officials was based on their failure to promptly report, investigate,

respond to, and prevent ongoing sexual abuse by Dr. Reeves. (*Id.*, ECF 28 at ¶¶ 22-24.) On information and belief, each of the defendants was apprised of the allegations in the case against Dr. Reeves, the theories of liability against each of the high-ranking officials who were sued, and why they were being sued for the sexual abuse by Dr. Reeves.

59.    On information and belief, Dr. Reeves and the other individually named defendants were informed about the settlement in *Meadows v. Reeves* that included a substantial amount in money damages and injunctive relief.

60.    On information and belief, the Defendants named herein were aware of the *Meadows v Reeves* case. In any event, part of the responsibilities of each Defendant herein was to be and remain informed about conditions and issues related to the well-being of prisoners in their care, including past problems in women's CDCR facilities   that would inform their ability to address issues impacting, or potentially impacting, the rights of prisoners held at CIW.

### B.    Allegations of Sexually Abusive Examinations by Dr. Robert Bowman at the Valley State Prison for Women.

61.    The Valley State Prison for Women ("VSPW") operated from 1995-2013 as a state prison for women. Like CCWF, VSPW is also located in Chowchilla, California and has operated as a men's prison since 2013.

62.    At or around the same time that patients were being abused by Dr. Reeves at CCWF, incarcerated people at VSPW were complaining about abusive gynecological exams by Dr. Robert Bowman.

63.    In 1999, at least three patients at VSPW alleged that they were sexually abused by Dr. Bowman during purported medical examinations including pap smears, pelvic and breast examinations. (*Williams v. Bowman,* Case No. CV-F-01-6003 (REC)(DLB) (E.D.Cal. 2001), ECF 92 at ¶¶ 11-14. Dr. Bowman was accused of conducting unnecessary pelvic exams, inappropriately manipulating his patients' genitalia, making offensive sexual comments, conducting unchaperoned

examinations of women, and remaining in the examination room while his patients undressed. (*Id.* at ¶¶ 15-39.) At least one patient accused Dr. Bowman of exposing his erect penis during a medical appointment and attempting to force her to perform oral sex on him. (*Williams v. Bowman,* 157 F.Supp.2d 1103, 1104 (N.D.Cal. 2001).)

64.    Patients who reported Dr. Bowman for sexual abuse alleged that they faced retaliation and harassment by medical staff after coming forward with their complaints. (*Williams v. Bowman, supra,* Case No. CV-F-01-6003, ECF 92 at ¶ 43.)

65.    On information and belief, high-ranking officials with CDCR, correctional health, and VSPW knew about the allegations against Dr. Bowman and failed to take action to protect incarcerated patients from further abuse. (*Id.* at ¶¶ 46-55.)

66.    In response to the allegations against Dr. Bowman, Anthony DiDomenico, the Chief Medical Officer at VSPW, stated his belief on national television that female patients who were incarcerated deliberately sought out unnecessary pelvic examination by medical staff "because it was the only male contact they received". Although Mr. DiDomenico was allegedly reassigned as result of his offensive statements, there was no disciplinary action taken against him. (*Id.* at ¶¶ 48-51.)

67.    In 2001, one of Dr. Bowman's former patients filed a federal civil rights lawsuit against Dr. Bowman and the highest-ranking officials of the California Department of Corrections ("CDC"), the Health Care Division of CDC, VSPW, and the Chief Medical Officer at VSPW. (*Williams v. Bowman, supra,* Case No. CV-F-01-6003.) On information and belief, each of the defendants was apprised of the allegations in the case against Dr. Bowman, the theories of liability against each of the high-ranking officials who were sued, and why they were being sued for Dr. Bowman's alleged abuse.

68.    In 2003, the defendants settled the civil rights claims by Dr. Bowman's former patient.

69.    As with Dr. Reeves, each Defendant herein knew or should have known of the incidents giving rise to the claims against Dr. Bowman and their resolution, further putting them on notice of the need to ensure that women prisoners were not subject to sexual assault and abuse, including by prison medical providers.

### C.    For Years, Defendants Ignored Complaints by Patients at the California Institution for Women about Sexually Abusive Gynecology Care.

70.    The California Institution for Women ("CIW") in Southern California was opened in 1952. CIW is located in Corona, California and currently incarcerates approximately 1,200 prisoners of all security levels.

71.    CIW is the only women's prison in California that provides medical care to pregnant prisoners. On information and belief, all female prisoners who were pregnant were transferred to CIW so they could receive prenatal care.

72.    Over many years, several prisoners courageously reported sexually abusive and sadistic conduct during gynecological examinations at CIW, despite the real threat of retaliation such as transfers to another prison, being placed in solitary confinement, or disciplinary violations that potentially extended one's prison term.

73.    Defendants knew or should have known about the allegations of sexual abuse during gynecology exams. Instead of taking action to prevent further harm to the incarcerated population, these Defendants ignored continued complaints against multiple physicians performing horrific examinations on patients at CIW, including Defendant DR. LEE.

74.    In or around 2016, gynecology services at CIW were provided by the primary care physicians. As early as 2016, CIW, CCHCS, and CDCR had notice of

complaints that a primary care provider was performing abusive pap smears on incarcerated patients at CIW. On information and belief, Defendants knew or should have known of these complaints.

75.    On information and belief, two patients complained in 2016 about abusive and sadistic vaginal and/or anal exams by a primary care physician who was providing gynecology services at CIW. The complaints against that physician included allegations of extremely rough, sadistic pap smears on patients and unnecessary anal exams intended to humiliate patients. Patients also complained that the physician performed abusive exams on patients as a weapon of retaliation and that gynecology exams were done without any nurse or chaperone present in the examination room.

76.    Defendants knew or should have known about these complaints of abusive and sadistic gynecology services and failed to take any action to protect CIW patients from further harm. Defendants also knew that the patient population at CIW had a high percentage of prisoners who suffered sexual abuse prior to their incarceration and were especially vulnerable to trauma from further sexual abuse.

77.    On information and belief, a staff misconduct and/or PREA investigation was conducted against that physician, during which time she was temporarily removed from CIW. After the investigation was completed, that physician was allowed to return to CIW and continued to practice medicine with the population of prisoners that she was accused of abusing.

78.    On information and belief, high-ranking officials at CIW, CCHCS, CDCR  - including the Defendants named herein – each knew or should have known about the allegations of abusive gynecological exams, yet failed to take appropriate action to prevent future harm to gynecology patients incarcerated at CIW.

**D.      Defendants had Prior Notice that Dr. Scott Lee was Sexually Abusing Patients and Failed to Take Action to Prevent Further Harm to Patients.**

79.      On information and belief, DR. SCOTT LEE began working at CIW in 2016 as the sole gynecologist. In light of prior litigation and allegations of sexually abusive gynecology care, Defendants knew or should have known to be on the alert for any warning signs of similar behavior by DR. LEE.

80.      To the contrary, Defendants ignored obvious red flags that DR. LEE was performing abusive, sadistic, and retaliatory gynecological exams on patients at CIW.

81.      On information and belief, multiple complaints were brought against DR. LEE for abusive conduct throughout the years that he worked as the sole gynecologist at CIW.

82.      In 2017, patients at CIW began complaining about gynecological exams and/or procedures performed by DR. LEE that should have raised red flags for Defendants that he could potentially pose a risk of harm to patients.

83.      In 2017, Julie Daugherty reported that DR. LEE had mutilated her genitals under the pretense of performing a biopsy. (*Daugherty v. Lee,* Case No. 5:17-cv-00972 (C.D.Cal. April 24, 2017), ECF 8 at p.19.) Ms. Daugherty complained about DR. LEE by filing a grievance, reporting him to the medical director, and then filing a federal lawsuit. (*Id.* at ECF 8.) She reported widespread concerns that DR. LEE was performing unwanted surgeries on his patients during purported biopsies and pleaded the following: "Please stop this Dr. Scott Lee from harming, mutilating, and traumatizing the women here at CIW." (*Id.*, ECF 8 at p.15.)

84.      The allegations by Ms. Daughtery should have prompted an immediate investigation against DR. LEE, pursuant to the federal Prison Rape Elimination Act ("PREA").

85.    On information and belief, Defendants ELLIOT, MAXWELL, and HILL failed to take appropriate action in response to Ms. Daugherty's complaints, thereby exposing the incarcerated population at CIW to an unreasonable risk of harm by DR. LEE and depriving them of safe gynecological care.

86.    Patients continued to complain about abusive conduct by DR. LEE in the following years, to no avail. In 2018, CIW received an allegation from a patient that she was sexually assaulted by DR. LEE. Contrary to CDCR regulations and policy, PREA, and SADEA, Defendant Warden HILL authorized the Investigative Services Unit ("ISU") at CIW to conduct an investigation into this patient's allegations of staff sexual misconduct. Defendant HILL approved the ISU's investigation, which concluded that the patient's allegation was unfounded. On information and belief, Defendant HILL failed to refer this matter to the Office of Internal Affairs, in violation of CDCR regulations and CIW's standard practices.

87.    On information and belief, Defendants ELLIOTT, MAXWELL, TOCHE, and HILL were notified about this patient's complaint against DR. LEE yet failed to take appropriate action to protect patients from further harm by the prison's sole gynecologist. The Office of the Inspector General was also notified about this patient's complaint in 2018 against DR. LEE, yet failed to take action to protect gynecology patients from further harm by him.

88.    In 2020, CIW received another allegation from a patient that she was sexually assaulted by DR. LEE. As the Warden of CIW at the time, Defendant MONTES improperly allowed the ISU at CIW to conduct an investigation into this allegation of staff sexual abuse. After conducting an inadequate investigation, the ISU concluded that the allegation was unfounded and closed its investigation, with the approval of Defendant MONTES. On information and belief, Defendant MONTES failed to take any further action on this patient's complaint against Dr. Lee and failed to refer the matter to the Office of Internal Affairs, in violation of CDCR regulations and CIW's standard practices.

89.     On information and belief, Defendants MACOMBER, ELLIOTT, MAXWELL, TOCHE, and MONTES were notified about this patient's complaint against DR. LEE yet failed to take appropriate action to protect patients from further harm by the prison's sole gynecologist. The Office of the Inspector General was also notified about this patient's complaint in 2020 against DR. LEE, yet failed to take action to protect gynecology patients from further harm by him.

90.     In 2022, DR. LEE was reported to the Medical Board of California for sexually abusing a pregnant prisoner and then delaying her transport to a hospital when she went into labor. Defendants MACOMBER, TOCHE, and GIPSON were notified about these allegations against DR. LEE and failed to take appropriate action to protect patients at CIW from further harm by him.

91.     From 2022-23, Defendant CORE was notified of at least three grievances from patients against DR. LEE.  Defendants ELLIOT, MAXWELL, HOUSTON, CORE, and HILL knew or should have known about these allegations against DR. LEE and failed to take action to protect the prisoner population at CIW from further sexual abuse by him.  Despite repeated complaints of abuse against DR. LEE, he continued to work as the sole gynecologist at CIW for an entire seven years.

92.     The Inmate Advisory Council ("IAC") at CIW is a board comprised of incarcerated members who represent the interests of the incarcerated population to prison administration. The IAC at CIW meets on a monthly basis and has separate meetings with medical staff representatives and with the Warden's office.

93.     The incarcerated population at CIW often approached IAC members to raise issues of concern.  Although the IAC was not intended to address individual incidents or concerns, IAC members would address with prison administration issues that affected a wider population of incarcerated people.

94.     For several years, IAC members heard widespread complaints about DR. LEE and frustrations that their complaints were being ignored by correctional

health administrators and/or the Warden's Office. Some IAC members also shared that they had personally experienced abuse from DR. LEE as his patients. IAC members were also concerned that DR. LEE's abusive conduct during gynecology appointments was causing many patients to deprive themselves of necessary gynecology care.

95.    In recent years, correctional health administrators sought the assistance of the IAC at CIW to help improve the low rate of cervical cancer screenings completed by the incarcerated population at CIW. When the IAC was asked what correctional health could do to improve their metrics on cervical cancer screenings at CIW, IAC members reported that DR. LEE's continued abuse of patients and his ongoing role as the sole gynecologist at CIW was contributing to the low rates of cervical cancer screenings among CIW patients.

96.    By 2023, complaints about DR. LEE's abuse became so widespread that the IAC repeatedly raised concerns about the gynecologist over the course of several IAC meetings with Defendants ELLIOT, MAXWELL, CORE, and HILL. IAC members notified Defendants that DR. LEE was abusive with his patients, made inappropriate comments, did excessive and unnecessary pap smears, and refused postpartum care to patients. During one IAC meeting, at least three IAC members shared their personal experiences with inappropriate and abusive gynecological care by DR. LEE and expressed concern that the gynecologist had been the subject of continued complaints for many years.

97.    During an IAC meeting on July 17, 2023, IAC members again raised concerns from the incarcerated population about DR. LEE's abusive conduct and advised that many patients are refusing gynecology care because he is the only gynecologist at CIW. Defendant CORE responded at this meeting that the administration was aware of these concerns about DR. LEE and that she had discussed these concerns with medical leadership and headquarters at that time. On information and belief, CORE discussed concerns about DR. LEE with Defendants

ELLIOTT, MAXWELL, KENT, GIPSON, TOCHE, and MACOMBER.

98.    In response, JIM ELLIOT and DR. MAXWELL advised the IAC that they had known about complaints against DR. LEE for years and that there was not anything they could do about the situation. IAC members repeatedly requested to have a female gynecologist available to patients at CIW. At an IAC meeting on July 5, 2023, JIM ELLIOT advised that CIW has staffing approved for only one OB-GYN, who currently happens to be male. He stated that when DR. LEE retires, the hiring preference will be for a female gynecologist.

99.    On information and belief, all or almost all of CIW prisoners who saw DR. LEE, depending on the treatment or medical condition for which the class member sought DR. LEE's services, were subjected to one or more of his standard and routine practices of abusive pelvic exams; sexualized digital penetration; abusive Pap smears, biopsies, or other procedures; coerced exams or procedures; excessive exams;  unnecessary or abusive anal exams; exams without a chaperone; retaliatory withholding of medical treatment, inappropriate sexualized comments; abusive breast exams; failure to provide trauma informed care; and failure to provide privacy, among other abuses.

100.    On information and belief, numerous CIW prisoners declined appointments for gynecological or obstetric care because they were aware of Dr. Lee's reputation for sexually abusive (and worse) treatment of his patients.

II.    PLAINTIFF JANE DOES # 1-6

101.    A summary of specific conduct that DR. LEE inflicted on JANE DOES # 1-7 is reflected herein.

**A. JANE DOE # 1**

102.    On December 13, 2022, Jane Doe #1 had an appointment with DR. LEE due to a rare skin disease for which she required gynecological care. DR. LEE argued intensely with JANE DOE #1 about her request for care and was very insulting and aggressive towards her. DR. LEE began typing negative comments

into JANE DOE #1's medical chart and read his comments out loud to her as he typed. JANE DOE #1 became upset and left the appointment in tears, without receiving any care for her disease.

103.   After a few minutes, JANE DOE #1 returned to the appointment because she was desperate to get medical care for her worsening condition. Upon her return, DR. LEE insisted that he needed to examine JANE DOE # 1 and assured that he would only touch the upper part of her vagina. JANE DOE # 1 agreed to an exterior examination but refused a pap smear, speculum examination, and vulva biopsy. JANE DOE # 1's skin was very sensitive at the time due to her skin condition.

104.   Initially, DR. LEE visually examined the exterior of JANE DOE # 1's vagina. Then suddenly, he jammed his fingers into JANE DOE # 1's vagina with such force that he tore her open, causing her intense pain that made her body jerk on the table. DR. LEE's actions caused M.A. CHAND to gasp and take a step back. DR. LEE abruptly left the exam table and went back to his desk without explanation. JANE DOE # 1 looked to M.A. CHAND for help, but she did nothing to address DR. LEE's abusive conduct. DR. LEE did not provide any treatment for JANE DOE # 1's skin disease.

105.   As a witness to DR. LEE's conduct, M.A. CHAND was obligated under federal and state law, as well as CDCR regulations and CCHCS policy, to report DR. LEE for sexual misconduct. On information and belief, M.A. CHAND failed to report DR. LEE's conduct to anyone.

106.   For months after, JANE DOE # 1 was deprived of gynecological care even though her skin disease was very painful and getting worse. In or around July 2023, she reported DR. LEE's abusive conduct to a CIW Associate Warden, who urged her to file a grievance against DR. LEE. JANE DOE # 1 was afraid to file a grievance because CIW is known to retaliate against prisoners who report staff misconduct with disciplinary charges, transfer to another prison, or other

retaliatory actions. With an upcoming date for release from prison, JANE DOE # 1 was afraid to risk the possibility of receiving retaliatory disciplinary charges that would prolong her incarceration. The Associate Warden assured JANE DOE # 1 that she would not face retaliation if she filed a grievance.

107.    JANE DOE # 1 filed a grievance on or around July 19, 2023, reporting DR. LEE's abuse and requesting to see a female gynecologist outside of the prison. In response to her grievance, a nurse informed JANE DOE # 1 that she had to schedule an appointment with DR. LEE if she required further treatment.

108.    On July 28, 2023, R.N. ROSA LOPEZ called JANE DOE # 1 to the gynecology office and requested to examine her, under the guise of providing her with medical care and treatment. Instead, Defendant LOPEZ conducted a vaginal examination of JANE DOE # 1, at which time Defendant LOPEZ questioned JANE DOE # 1 about the scars on her vagina. JANE DOE # 1 informed Defendant LOPEZ that the scars were caused by Dr. Lee's sexual abuse. Defendant LOPEZ was expected to document those injuries on a CDCR Form 7219 (Medical Report of Injury).

109.    The medical records produced by CIW for JANE DOE # 1 did not include any record of either Defendant LOPEZ's appointment with JANE DOE # 1 on July 28, 2023 or any CDCR Form 7219 completed by Defendant LOPEZ.

110.    It was not until on or around September 18, 2023, that JANE DOE # 1 was finally scheduled for an appointment with a female gynecologist at Riverside Hospital, which is hospital that is independent of CDCR. After a visual examination, the female gynecologist prescribed JANE DOE # 1 a steroid cream without requiring a vaginal exam.

111.    On or around September 21, 2023, JANE DOE # 1 requested the steroid cream that was prescribed to her by the outside gynecologist. In response, CIW gynecology insisted that she needed to be physically examined by DR. LEE before her prescription could be filled. On or around September 28, 2023, JANE

DOE # 1 filed a grievance requesting the prescribed steroid cream. On October 2, 2023, JANE DOE # 1 received an appointment request from CIW gynecology, at which time a nurse advised that her prescription would not be filled unless she agreed to be examined by DR. LEE. JANE DOE # 1 again refused to see DR. LEE, reminding nursing staff that DR. LEE had physically abused her during the December 13, 2022 appointment and that she had a pending grievance against him for staff sexual abuse.

112.    Later on October 2, 2023, JANE DOE # 1 met with the Associate Warden about her issues with DR. LEE and his refusal to fill her prescribed steroid cream. In response, the Associate Warden initiated an investigation for sexual misconduct and/or retaliation against DR. LEE pursuant to the Prison Rape Elimination Act ("PREA").

113.    On October 6, 2023, JANE DOE # 1 received another appointment request from CIW gynecology. At this appointment, a nurse advised JANE DOE # 1 that she had to be examined by DR. LEE again in order to get the prescribed steroid cream. JANE DOE # 1 reminded the nurse that she had already been seen by a female gynecologist at Riverside Hospital, who prescribed the steroid cream, and that she was referred to the female gynecologist because of her grievance against DR. LEE for abuse. At the insistence of the nurse, JANE DOE # 1 was required to speak with DR. LEE about her prescription. DR. LEE stated that he would not provide JANE DOE # 1 with the prescribed steroid cream unless she let him examine her again.

114.    JANE DOE # 1 did not receive the steroid cream until nearly one month after it was prescribed to her and after she sought intervention from the Associate Warden. Within a few days after using the steroid cream, JANE DOE # 1's skin condition finally began to improve, nearly eight months after she first sought gynecology care from DR. LEE.

115.    As a result of the actions described above, JANE DOE # 1 suffered

prolonged and unnecessary pain and suffering, permanent disfigurement of her genitalia, severe emotional distress and humiliation, and retaliation that caused further emotional distress and prolonged her incarceration. As a survivor of sexual abuse prior to her incarceration, DR. LEE's actions were severely re-traumatizing.

116.   Pursuant to CDCR regulations and policy, as well as PREA and SADEA, all CIW staff were required to immediately report allegations of staff sexual misconduct to the Office of Internal Affairs ("OIA") for independent investigation. Instead of reporting the allegations against DR. LEE for investigation by the OIA, Defendant HILL and DOE DEFENDANTS 1-20 referred JANE DOE # 1's complaint to the Investigative Services Unit ("ISU") at CIW.

117.   In response to JANE DOE # 1's complaints against DR. LEE, the ISU at CIW conducted its own investigation of DR. LEE. In or around November 2023, JANE DOE # 1 was interviewed by the ISU at CIW in response to her complaints against DR. LEE. ISU staff at CIW were not properly trained to conduct investigations into allegations of staff sexual abuse. Also, ISU staff was comprised of custody staff who previously worked at CIW for many years and often had personal relationships with staff members accused of sexual abuse. As such, ISU staff had an inherent conflict of interest in conducting investigations of staff sexual abuse.

118.   In violation of PREA National Standard § 115.73 and CDCR regulations and policy, JANE DOE # 1 was never informed about the results of any investigation against DR. LEE, whether he remained employed at CIW, and whether he was indicted or convicted for his sexual abuse of her.

119.   In 2024, JANE DOE # 1 twice requested her medical records from CIW. The medical file provided to JANE DOE # 1 omitted key medical records, including the examination conducted by R.N. ROSA LOPEZ on July 28, 2023.

120.   In April 2024, JANE DOE # 1 requested her central file from CIW. The records provided to her by CIW omitted key documents, including records

related to her grievances filed against DR. LEE and the PREA investigation initiated by the Associate Warden.

121.   JANE DOE # 1 was released from custody in December 2024 and discharged from parole in February 2026, and is no longer subject to the exhaustion requirements of the Prison Litigation Reform Act ("PLRA"). Nevertheless, JANE DOE # 1 exhausted her administrative remedies while she was incarcerated.

**B. JANE DOE # 2**

122.   JANE DOE # 2 first saw DR. LEE after she arrived to CIW in 2022. DR. LEE was adamant that he wanted to do a pap smear on her. When JANE DOE # 2 informed DR. LEE that a pap smear was unnecessary because she previously had a hysterectomy, but he claimed that he needed to do a pap smear to confirm that she had no cervix.

123.   JANE DOE # 2 informed DR. LEE that she preferred to have her primary care physician do the pap smear.

124.   In response, DR. LEE became visibly angry and hostile, he began slamming things, and started to shake. He was extremely rude and told JANE DOE # 2, "I don't know why you wouldn't let me examine you – I know you don't have a problem having anything inside of you." He insisted that he examine JANE DOE # 2 to determine if she had a cervix.

125.   JANE DOE # 2 refused to be physically examined by DR. LEE because she got a creepy feeling from him and felt violated by his comments.

126.   Approximately one month later, gynecology requested another appointment for JANE DOE # 2 to see DR. LEE again. When JANE DOE # 2 complained of hot flashes, DR. LEE was dismissive of her complaints and told her that she was having hot flashes because she was wearing a sweater.

127.   A few months later, DR. LEE again saw JANE DOE # 2 and said he wanted to schedule another appointment with her. At that appointment, JANE

DOE # 2 told DR. LEE that she was refusing any future appointments with him and that he should forward all of her medical records to her primary care doctor. JANE DOE # 2 refused all further appointments with DR. LEE, despite her need for gynecological care, because of her own experiences with him and those she had heard about from other patients of DR. LEE.

128. As a result of the above-described actions, JANE DOE # 2 avoided getting gynecology care that she needed, for over three years, because she was afraid to be seen by DR. LEE.

129. JANE DOE # 2 was released from custody in January 2025 and is no longer subject to the exhaustion requirements of the PLRA. Nevertheless, JANE DOE # 2 exhausted her administrative remedies while she was incarcerated.

### C. JANE DOE # 3

130. JANE DOE # 3 requested to see a gynecologist upon arriving at CIW in 2023 for a refill of her birth control by injection, which had proven effective in managing her menstrual cycles.

131. At her appointment with DR. LEE on June 9, 2023, JANE DOE # 3 requested to continue on her birth control by injection but DR. LEE refused to give her the requested contraception and became very aggressive about giving her an intrauterine device ("IUD") instead. When JANE DOE # 3 asked questions about his refusal, DR. LEE reminded her that he was the doctor and that she did not need to understand.

132. At JANE DOE # 3's first appointment with DR. LEE, he commented on her blonde hair and told her it was pretty.

133. JANE DOE # 3 was reluctant to try an IUD and preferred contraception by injection due to its less invasive nature. However, she felt that DR. LEE gave her no other choice than to agree to the IUD.

134. On or around August 18, 2023, JANE DOE # 3 had an appointment with DR. LEE for insertion of the IUD. M.A. CHAND was present for the

appointment. JANE DOE # 3 informed M.A. CHAND and DR. LEE that she had severe anxiety about the procedure and an extensive history of sexual trauma and asked that they go slow and take their time. She also asked them to announce any physical touching as they conducted the IUD insertion procedure. DR. LEE ignored JANE DOE # 3's questions about pain management options during the procedure and told her not to worry. DR. LEE was so insistent that JANE DOE # 3 try the IUD that she felt she had no other choice.

135.   DR. LEE forcefully inserted a speculum inside of JANE DOE # 3 without any lubricant. When JANE DOE # 3 told him that he was hurting her, DR. LEE forced and held her legs open while ignoring her pleas for him to stop. M.A. CHAND assisted DR. LEE in forcing her legs open and watched him insert the IUD, but did not say or do anything to intervene on behalf of JANE DOE # 3.

136.   DR. LEE continued to probe inside of JANE DOE # 3 for approximately ten minutes without any explanation of what he was doing. As JANE DOE # 3 was visibly crying, DR. LEE then caused her to suffer excruciating pain when he painfully inserted the IUD inside of her. After the insertion, DR. LEE immediately made JANE DOE # 3 sit up and get dressed, before throwing the contraceptive informational card on her lap.

137.   DR. LEE caused JANE DOE # 3 to suffer severe physical pain and suffering and emotional trauma. As a survivor of severe sexual abuse throughout her childhood, DR. LEE caused JANE DOE # 3 to suffer severe trauma as if she was being raped once again.

138.   JANE DOE # 3 suffered a lot of abnormal pain from the IUD that DR. LEE inserted. She felt that DR. LEE did not insert the IUD correctly because she had a lot of pain when she sat down and had severe and excessive bleeding.  JANE DOE # 3 wanted to return to gynecology to have the IUD removed but she was so terrified by the thought of returning to see DR. LEE that she opted instead to endure the pain and suffering from the IUD that DR. LEE had inserted incorrectly.

139.    When JANE DOE # 3 learned that DR. LEE was removed from CIW, she requested an appointment in February 2024 with a female gynecologist at CIW to have her IUD removed. JANE DOE # 3 had a panic attack after she returned to the gynecology office six months later, just from walking down the same hallway where she had last seen DR. LEE and seeing his name on the wall. It took a while for JANE DOE # 3 to calm down and feel safe again so that she could proceed with the IUD removal.

140.    JANE DOE # 3 remains terrified of seeing a gynecologist and has not sought gynecology care since she was released from CIW.

141.    JANE DOE # 3 was released from custody in March 2024 and discharged from parole in March 2026, and is no longer subject to the exhaustion requirements of the PLRA. Nevertheless, JANE DOE # 3 exhausted her administrative remedies while she was incarcerated.

### D. JANE DOE # 4

142.    Jane Doe # 4 was transferred to CIW from CCWF in April 2023 and was seen by DR. LEE on April 7, 2023. JANE DOE # 4 was approximately seven and a half months pregnant at the time.

143.    When JANE DOE # 4 entered the examination room, DR. LEE instructed her to undress from the waist down while he remained in the room.

144.    JANE DOE # 4 asked DR. LEE for privacy as she undressed, and DR. LEE responded that he was the doctor and that he had done this before. He stayed in the room despite her request so JANE DOE # 4 turned her back to DR. LEE as she undressed.

145.    DR. LEE measured her stomach and without explanation, he touched under JANE DOE # 4's breasts, lifted her shirt up, and fondled and felt around her breasts.

146.    When JANE DOE # 4 questioned why he was touching her breasts, DR. LEE asserted that he was the doctor. He then started feeling below her

stomach and pressed on her pelvic and vaginal areas with force. JANE DOE # 4 told DR. LEE he was hurting her but he was dismissive and told her he was doing his job.

147. Without explanation, DR. LEE inserted his fingers into JANE DOE # 4's vagina and grabbed her thigh with his other hand. While JANE DOE # 4 shifted in discomfort and pain, DR. LEE held her thigh and said under his breath and without explanation, "Oh yeah, this is good" While his fingers were inside her, DR. LEE asked JANE DOE # 4 who was the father of her unborn child.

148. In a sexualized and aggressive manner, DR. LEE pumped his fingers in and out of JANE DOE # 4's vagina. He shoved his fingers inside JANE DOE # 4 with such force that she moved back on the exam table. JANE DOE # 4 asked DR. LEE to stop. DR. LEE yelled at JANE DOE # 4 to sit back down and held her leg down on the table. When he finally pulled his fingers out of her, they were covered in blood.

149. JANE DOE # 4 was scared and disturbed seeing the blood because she was in the late stage of her pregnancy. Up until that point, JANE DOE # 4 had not bled during her pregnancy.

150. DR. LEE did not say anything to JANE DOE # 4 about the exam or address JANE DOE # 4's bleeding in any way. JANE DOE # 4 told DR. LEE that she didn't want to see him again and he responded that he was the only gynecologist at CIW.

151. M.A. CHAND was present during the appointment but remained behind a computer during the exam and did not chaperone or intervene during DR. LEE's abuse of JANE DOE # 4.

152. For days after the April 7, 2023, exam, JANE DOE # 4 continued bleeding and lived in fear for the well-being of her unborn child.

153. Approximately a week later, JANE DOE # 4 was requested to see DR. LEE again. DR. LEE again measured her stomach in a sexualized and

inappropriate manner, touching around her breasts and near her vaginal area.

154.   When JANE DOE # 4 tried asking questions about her pregnancy, DR. LEE was dismissive and snapped, "I already explained this to you."

155.   When DR. LEE insisted doing another pelvic exam on her, JANE DOE # 4 refused because of the trauma she sustained from her prior appointment. DR. LEE became more aggressive when JANE DOE # 4 refused the examination.

156.   At later appointments, JANE DOE # 4 attempted to document her refusal of care from DR. LEE. At least once, DR. LEE refused to allow JANE DOE # 4 fill in the reason for her refusal and insisted that she sign the refusal form but allow him to fill in the reason for the refusal. Out of concern that she would face disciplinary action, JANE DOE # 4 signed the blank refusal form.

157.   On information and belief, DR. LEE was not working at CIW when JANE DOE # 4 went into labor. After giving birth to her child on May 6, 2023, JANE DOE # 4 returned to CIW two days later.

158.   JANE DOE # 4 refused to be housed in the Outpatient Housing Unit ("OPHU"), despite the comfort and convenience after giving birth, because that was where DR. LEE worked.

159.   In need of post-partum care, JANE DOE # 4 requested reasonable accommodations including a breast pump, post-partum pads, disposable bed pads, and a wheelchair. DR. LEE denied JANE DOE # 4 these basic supplies and she struggled through her post-partum recovery without the accommodations that would normally be provided to post-partum patients.

160.   JANE DOE # 4 suffered extreme pain and discomfort due to the deprivation of this post-partum care, including severe breast engorgement, difficulty walking, and excessive bleeding.

161.   Due to DR. LEE's failure to provide JANE DOE #4 with the necessary accommodations, she was not permitted pads or other necessities when she was transported outside of CIW. Because of this, JANE DOE #4 was forced to

sit, saturated in blood whenever she was transported to and from CIW.

162.   As a result of the actions described above, JANE DOE # 4 suffered extreme and unnecessary physical pain and suffering and severe emotional distress.

163.   JANE DOE # 4 was released from custody in October 2024 and was no longer subject to the exhaustion requirements of the PLRA. Nevertheless, JANE DOE # 4 exhausted her administrative remedies while she was incarcerated.

**E. JANE DOE # 5**

164.   JANE DOE # 5 arrived at CIW in or around April 2021. Soon after her arrival, she was seen by DR. LEE for recurring gynecological issues.

165.   JANE DOE # 5 had seven to ten appointments with DR. LEE over a three-year period. At almost every appointment, he claimed that he needed to do another pap smear.

166.   At JANE DOE # 5's first visit with DR. LEE, she told him that she thought she may have fibroids, knowing that African American women have a higher likelihood of having fibroids. DR. LEE mocked JANE DOE # 5 in response and asked her, "How are you going to tell me? I am the doctor."

167.   At each appointment, DR. LEE required that she undress for the appointment while he remained in the room, giving her no privacy to undress.

168.   At each appointment, DR. LEE used his fingers to examine JANE DOE # 5 and repeatedly inserted his fingers in and out of her vagina. On multiple occasions, when she began to feel uncomfortable, DR. LEE would use his hand to spread her legs open.

169.   DR. LEE was also very aggressive in his use of a speculum on JANE DOE # 5, by jamming the speculum inside of her and opening it in a very rough manner. DR. LEE would routinely remove and re-insert the speculum in a sexualized manner.

170.   On at least one occasion, DR. LEE examined JANE DOE # 5's breasts in a sexualized and inappropriate manner. JANE DOE # 5 was naked on the

exam table wearing only a bra, until it was lifted, and was covered by a sheet. DR. LEE caressed and rubbed JANE DOE #5's—using both hands at the same time.

171.   JANE DOE # 5 attempted to refuse appointments with DR. LEE. In response, DR. LEE would tell her that he was the only gynecologist at CIW. When JANE DOE # 5 requested to document her refusals of his care, DR. LEE would not let her specify the reason for her refusal on the form.

172.   During several of her appointments with DR. LEE, the nurse or medical assistant (including M.A. CHAND) would exit the room, leaving DR. LEE unchaperoned and alone with JANE DOE # 5. Even when a chaperone was present, they consistently failed to observe DR. LEE's actions and typically remained behind a desk.

173.   DR. LEE insisted on doing what he claimed was a pap smear at almost every appointment with JANE DOE # 5.

174.   JANE DOE # 5 did not ever receive any lab results from any of the pap smears that DR. LEE purportedly performed on her. On multiple occasions, DR. LEE claimed that there were no available test results or claimed that he had no recollection of a prior appointment with her.

175.   Eventually, JANE DOE # 5 signed a documented refusal of care from DR. LEE because she was being subjected to repeated invasive and sexualized exams without follow-up care or effective treatment.

176.   Even after refusing care from DR. LEE, JANE DOE # 5 felt that she had no other options but to see DR. LEE because her medical condition persisted and no one else was available for gynecology care.

177.   JANE DOE # 5 was released from custody in August 2024 and was not subject to the exhaustion requirements of the PLRA. Nevertheless, JANE DOE # 5 exhausted her administrative remedies while she was incarcerated.

### F.  JANE DOE # 6

178.   JANE DOE # 6 is currently incarcerated at CIW. She has had more

than ten interactions with DR. LEE over a three-to-five-year period, her last interaction being late in 2023.

179.   JANE DOE # 6 requires gynecological care primarily due to fibroids and abnormal uterine bleeding ("AUB").

180.   At almost every appointment, DR. LEE required that JANE DOE # 6 get an invasive exam or procedure, including a pelvic exam, pap smear, and/or biopsy. JANE DOE # 6 routinely did not receive any results or follow-up treatment from these exams, thereby necessitating further invasive examinations by DR. LEE.

181.   After asking JANE DOE # 6 to undress, DR. LEE typically remained in the room while she undressed.

182.   DR. LEE pressured JANE DOE #6 into repeated invasive physical exams. When JANE DOE # 6 told DR. LEE that the exams were excessive and unnecessary, DR. LEE told JANE DOE # 6 that "people like her" didn't care about their health. When JANE DOE # 6 asked if this comment was in relation to her race or gender (JANE DOE # 6 is African American), DR. LEE became hostile. This hostility and aggression pervaded all of JANE DOE # 6's appointments with DR. LEE.

183.   DR. LEE was routinely physically and verbally hostile towards JANE DOE # 6. His procedures on JANE DOE # 6 were aggressive and painful. Despite JANE DOE # 6's request to use a smaller speculum and to be gentle, DR. LEE used a large speculum on her and struggled to insert it into JANE DOE # 6. This resulted in extreme discomfort and pain for DOE # 6.

184.   At an appointment for AUB, DR. LEE told JANE DOE #6 that she would not have these problems if she "wasn't so fat". He also commented that JANE DOE #6 should shave her pubic area to avoid such problems.

185.   At least once, DR. LEE made JANE DOE # 6 stand up from the exam table, while undressed from the waist down. He put his fingers inside her vagina

while her legs were straddled and pressed on her stomach. When JANE DOE #6 voiced her discomfort with this procedure, DR. LEE became angry.

186.    DR. LEE made sexually inappropriate comments to JANE DOE #6, including asking her what positions she has had sex in. When JANE DOE # 6 confronted DR. LEE about the nature of his questioning, he was defensive and raised his voice at her.

187.    Due to JANE DOE # 6's ongoing problem with fibroids and AUB, she requires frequent medical care. She has had to receive biopsies in the past, however, the biopsies by DR. LEE were excessively painful in comparison to any other biopsy. The frequency of biopsies and exams was also excessive in comparison to prior medical providers.

188.    On one occasion, when JANE DOE # 6 asked DR. LEE to stop, he responded, "God dammit, I need to do this exam." He then forced JANE DOE # 6's legs open and asked a nurse to help him hold her down. JANE DOE # 6 objected. DR. LEE held JANE DOE # 6's legs open with such force that he left bruise marks on her thighs. DR. LEE forced JANE DOE # 6 to complete the biopsy despite her request to stop.

189.    During this same appointment, without explanation, warning, or obtaining consent, DR. LEE put his finger in JANE DOE #6's anus. When she questioned him about what he was doing, DR. LEE became very upset, hostile, and was inappropriately crass towards JANE DOE # 6.

190.    JANE DOE # 6's medical problems persisted. Her uterine bleeding was so heavy that she was anemic and required repeated blood transfusions. DR. LEE still insisted on repeated examinations.

191.    On several occasions, JANE DOE # 6 expressed her preference for a female gynecologist in writing. Still, she continued to be summoned for repeated appointments with DR. LEE. JANE DOE # 6 was told she cannot choose her own doctor.

192.    JANE DOE #6 tried to refuse visits with DR. LEE on several occasions and asked to sign a documented refusal. DR. LEE and his staff did not allow JANE DOE #6 to write in the reason for her refusal. Despite repeatedly refusing examinations by DR. LEE, JANE DOE # 6 continued to be summoned for repeated appointments with DR. LEE.

193.    M.A. CHAND and R.N. LOPEZ were usually the medical staff present at JANE DOE # 6's appointments with DR. LEE. Both M.A. CHAND and R.N. LOPEZ  witnessed DR. LEE's sexual abuse of his patients yet failed to intervene and/or report his abuse, and repeatedly failed to chaperone DR. LEE during his gynecology appointments.

194.    At times, DR. LEE served as both JANE DOE # 6's provider for the Medication Assistance Treatment ("MAT") Program for Substance Use Disorders and as her primary care physician. The hostile nature of DR. LEE's relationship with JANE DOE # 6 impacted her care in these areas as well.

195.    JANE DOE # 6 had an existing reasonable accommodation for mobility impaired vest approved by two other doctors. In October of 2019, DR. LEE revoked JANE DOE #6's reasonable accommodation without any change in diagnosis despite her noted chronic back issues. JANE DOE # 6 filed a grievance regarding DR. LEE's conduct at that time.

196.    DR. LEE documented retaliatory and false information in JANE DOE # 6's medical chart including false information about the severity of her substance abuse. DR. LEE's false documentation in her medical chart led JANE DOE # 6 to postpone her parole hearing and will likely impact her future possibility for parole in a negative manner.

197.    JANE DOE # 6 filed several grievances against DR. LEE over the years, yet she continued to be ducated for appointments with DR. LEE.

198.    In late 2023, JANE DOE # 6 was ducated for an appointment with DR. LEE. She refused, stating that she would no longer be seen by DR. LEE. M.A.

CHAND told JANE DOE # 6 that DR. LEE would not be present. When JANE DOE # 6 arrived for the appointment, DR. LEE was the doctor present in the examination room. JANE DOE # 6 refused to be examined by DR. LEE.

199.    JANE DOE # 6 has suffered severe physical and emotional trauma due to the actions of DR. LEE. As a survivor of physical, emotional, and sexual abuse, each interaction with DR. LEE was retraumatizing. She has struggled with persistent bleeding, necessitating blood transfusions due to DR. LEE's failure to provide the appropriate medical interventions. Due to DR. LEE's retaliatory conduct, JANE DOE #6 has suffered physical pain, emotional trauma, and faces challenges in her possibility of parole.

**III.    For Years, Dr. Lee Subjected Patients at CIW to Sexual and Physical Abuse, Sexual Assault, Emotional Trauma and Retrauma, Unlawful Restraint, Withholding and Deprivation of Safe Gynecology Care, and Retaliation for Complaining about his Abuse.**

200.    As with any patient who consents to a gynecological examination or procedure, gynecology patients who were seen by DR. LEE at CIW consented to gynecological care – not sexual abuse, assault, degradation, or humiliation. Below are non-exhaustive examples of the many ways that DR. LEE took actions that went far beyond the scope of any implied consent from his patients.

    a.  Abusive pelvic exams and sexualized digital penetration:

        1.  DR. LEE's pelvic exams were sexualized in nature and deviated from medically justifiable practices.

        2.  During pelvic exams, DR. LEE routinely removed and reinsert his fingers. Repeated digital penetration is not normal practice during a pelvic exam.

        3.  DR. LEE 's normal practice was to aggressively insert his fingers.

Patients described his insertion as a "slamming," "jerking," "pumping," or "shoving" motion. DR. LEE 's digital penetration was so deep and aggressive that his hand would hit patients' pelvic bone. This exceeds the scope of a pelvic exam as full digital penetration is not normal procedure.

4. When patients expressed discomfort or pain, Lee became hostile and aggressive and typically became more aggressive and rough with his movements. With many patients, DR. LEE refused to stop the exam when patients pleaded with him to stop and became increasingly hostile and aggressive and in some instances, he forcibly restrained his patients' legs and forced them to open wider.

5. DR. LEE routinely left his fingers inserted longer than necessary, even making pulsing movements with his fingers while they were inserted.

6. DR. LEE routinely made sexually inappropriate comments while digitally penetrating patients including commenting on patients' vaginal "tightness", "wetness", commenting on how "pretty" or "beautiful" patient's vaginas are, and commenting on patients' sexual history.

7. On multiple occasions, DR. LEE also touched or "flicked" patients' clitoris, which is not normal practice.

8. DR. LEE did not inform patients of his physical movements, the purpose of any irregular touching, or obtain their consent when conducting pelvic exams.

b. Abusive pap smears, biopsies, or other procedures

1. When conducting Pap smears, biopsies, or other invasive procedures DR. LEE was aggressive and abusive.

2. DR. LEE routinely used a larger speculum even when a smaller one was specifically requested by the patient and routinely used the speculum in such an aggressive manner that the patient was injured and bled excessively afterwards. He routinely inserted and removed the speculum multiple times during a single pap smear, which is not normal procedure.

3. DR. LEE routinely inserted and removed the speculum multiple times in a single pap smear. Patients have described his use of the speculum as though it was an artificial phallus.

4. After patients attempted to refuse gynecology care by DR. LEE, he became increasingly hostile, aggressive, and callous.

c. Coerced exams or procedures

1. When patients expressed apprehension about being examined or indicated that they did not consent to a physical exam or procedure, DR. LEE pressured his patients into allowing him to complete the exam or procedure.

2. During exams and procedures when patients pleaded with DR. LEE to stop and expressed pain and discomfort, often through tears or screams, DR. LEE often physically restrained his patients by forcibly spreading their legs and/or holding down their thighs. At times, M.A. CHAND physically helped DR. LEE to restrain his patients. DR. LEE's restraint was so forceful that he left bruising on several of his patients.

3. Many times, in an attempt to convince patients to allow him to do an exam or procedure, DR. LEE criticized or blamed his patients by saying they did not care about their health, that their medical condition was their own fault, and/or that they would die if they failed to take his advice.

4. DR. LEE also told patients that the only way to receive treatment for their symptoms was to be physically examined by him. DR. LEE routinely withheld essential treatment, even if prescribed by other health care providers, if patients did not submit to a pelvic exam or Pap smear. DR. LEE told many patients that he was transgender when they expressed discomfort at being treated by him. For instance, DR. LEE told his patients, "Just imagine I'm a transgender" or "What if I told you I was a woman?" On information and belief, DR. LEE is not transgender.

d. Excessive or unnecessary examinations

1. Patients in CDCR custody are called to medical appointments either by "ducat", a request by the doctor or prison for an appointment, or by "co-pay", a patient request to be seen. Patients are not free to ignore medical ducats, and are disciplined if they fail to obey the ducat.

2. DR. LEE repeatedly and excessively ducated patients for invasive examinations and procedures including pelvic exams, Pap smears, and biopsies.

3. Performing bimonthly or quarterly exams is not standard—and is a sign that a doctor is preying on the patient. DR. LEE frequently required patients to return at two- to three-month intervals to obtain refills for their oral contraceptive prescriptions as a pretext to allow him to conduct additional pelvic exams.

4. Even after refusing to be treated by DR. LEE, patients were repeatedly ducated, required to report in person to the medical clinic to refuse care from DR. LEE, often resulting in uncomfortable or hostile arguments with DR. LEE.

5. DR. LEE ducated patients for unnecessary or misleading exams, under the guise that their previous procedure or exam necessitated a

follow-up exam or procedure.

6. DR. LEE often claimed that his biopsies yielded inconclusive results and necessitated a repeated invasive exam or procedure, although the lab results were normal.

e. Anal examinations

1. Anal exams are not necessary for a complete pelvic exam or pap smear.

2. DR. LEE repeatedly conducted anal exams without need and without obtaining informed consent from patients.

3. DR. LEE did not even warn patients that he would be conducting an anal exam. His patients often did not know that he would be conducting such an exam until they felt his fingers or a swab in their anus.

f. Examinations and procedures without the presence of or observation by a chaperone

1. Chaperones are intended to serve as observers and potential witnesses during sensitive examinations and treatments. The American Medical Association Code of Medical Ethics requires physicians to allow patients to request chaperones, to communicate the option of having a chaperone to patients, and to always honor a patient's request for a chaperone.

2. DR. LEE routinely failed to have chaperones in the room during sensitive examinations or procedures. Even when a nurse or chaperone was present in the room, they were often positioned behind a computer or screen, unable to observe the examination. In other instances, the chaperone would walk in and out of the exam room repeatedly, leaving the patient without a witness to DR. LEE's conduct.

g. Withholding medical treatment

1. DR. LEE withheld necessary medical treatment in retaliation against patients who advocated for themselves for proper care, expressed concerns with DR. LEE's conduct, or refused repeated or excessive exams.

2. At times, DR. LEE withheld medical care or treatment unless and until patients allowed him to conduct a pelvic exam or pap smear, even when his patients were referred to an external healthcare provider who prescribed medication or treatment.

h. Inappropriate and sexualized comments

1. While patients were undressed or during exams or procedures, DR. LEE routinely made sexualized and inappropriate comments.

2. DR. LEE made comments about patients' physical appearance or anatomy including vaginal "tightness", grooming/hair removal practices, their weight, or skin coloration.

3. While patients were unclothed, DR. LEE also made comments about their sexual history such as speculating as to how many sexual partners they had in the past based on their physical appearance.

4. DR. LEE routinely engaged in behavior that was intended to humiliate his patients. For example, DR. LEE told a patient that her decision not to shave her pubic area was not hygienic and would cause yeast infections. He was dismissive to a patient who sought care for a prolapsed vagina by saying, "it looks like an average 60-year old vagina to me".  DR. LEE accused a patient seeking hormone treatment to deal with menopause for "just wanting to orgasm easier". DR. LEE also held a used speculum in a patient's face and yelled at her, "See this? This is yeast!"

5. On multiple occasions, when patients complained of pain during

exams or procedures, DR. LEE made comments such as "You've had sex plenty of times why are you complaining about this?"

i. Abusive breast/chest exams - DR. LEE routinely conducted prolonged breast exams that included stimulating or squeezing the patient's nipples or cupping the breasts, for which there was no medical justification.

j. Failure to use trauma-informed gynecology care

1. On information and belief, DR. LEE failed for many years to screen his patients for sexual and physical trauma histories.

2. DR. LEE failed to provide gynecology care that was appropriate for his patients who mostly suffered sexual, physical, and emotional traumas prior to their incarceration. Instead, he routinely performed medically unnecessary exams and procedures on asymptomatic patients, with unreasonable force and aggression.

3. When his patients specifically alerted DR. LEE to their prior sexual abuse history, DR. LEE ignored his patients' requests for accommodation to be gentle or sensitive about their past trauma. For example, JANE DOE # 3 told DR. LEE that she had an extensive history of sexual abuse and asked that DR. LEE be gentle and announce his actions to her. DR. LEE ignored her request and jammed the speculum inside of her without warning.

k. Remained in exam room while patients undressed - DR. LEE instructed patients to undress prior to his examination or procedure and remained in the room while they undressed, typically without any sort of divider or modesty covering.

l. Retaliation with negative charting - When patients advocated for themselves or complain about DR. LEE's behavior, DR. LEE retaliated by inputting negative information in their medical chart including false information about substance abuse, or baselessly noting that the patient

was "malingering." When patients refused care from DR. LEE, he routinely had them sign the refusal form and did not allow them to write in the reason for their refusal. Instead, he falsely stated the reason for their refusal.

m. Falsely accused patients of dishonesty to justify more invasive exams

1. DR. LEE routinely accused patients of seeking medical care for an improper purpose. For example, DR. LEE accused a patient of selling prescribed medication to other prisoners when she requested an increased dose in her medication. DR. LEE also accused patients who reported incontinence that they were lying about their symptoms so they could access diapers. When patients requested birth control for pain or period management, DR. LEE accused them of being sexually active while incarcerated.

2. DR. LEE often used the alleged dishonesty of his patients to justify the claimed need to conduct more intrusive exams. For instance, when a patient sought treatment for incontinence, DR. LEE made her get off the examination table unclothed, spread her legs as he inserted his fingers into her vagina, and then ordered her to cough. DR. LEE made another patient who reported incontinence to squat above his face as he laid on the floor to see if she was lying about her incontinence.

## IV. Dr. Lee's Well-Known Abuse of Gynecology Patients Deprived the Incarcerated Population at CIW of Gynecology Care.

201.  Throughout DR. LEE's employment at CIW, medical and even custody staff knew, or should have known, that patients in need of gynecology care were refusing appointments with DR. LEE. Several patients, after speaking to DR. LEE initially during their visit, refused to be examined by him. Other patients initially submitted to one or more exams but subsequently began to refuse

treatment or examination by DR. LEE, and would request to be sent out to a nearby hospital to receive gynecological care instead. The number of patients who were asking for a different gynecologist and who did not want to be examined by DR. LEE specifically became a known concern to CDCR and CCHCS officials, and yet they did nothing to make safe gynecology care available to patients at CIW. For more than seven years, patients at CIW have repeatedly requested access to a female gynecologist. In response, Defendants and/or medical staff typically claimed that there was no female gynecologist available to CIW patients and that their only option for gynecology care was DR. LEE. At times, patients were also informed that if they wanted gynecology care from a provider other than DR. LEE, they would have to pay for those medical services.

202.    It was not until 2024, after DR. LEE was removed from CIW, that CIW finally made a female gynecologist available to patients at CIW on a part-time basis.

203.    Federal common law recognizes that patients have a privacy right to be selective about the gender of their gynecologist. However, on information and belief, there is no statutory, regulatory, or policy mandate that requires CIW to make available a gynecologist of the gender preferred by its patients.

204.    The refusal to provide CIW patients with access to other gynecologists, aside from DR. LEE, deterred many people at CIW from seeking necessary gynecology care. Many people incarcerated at CIW deprived themselves of necessary gynecology care for many years, despite serious medical risks and consequences, to ensure their safety and protect themselves from further abuse and trauma by DR. LEE.

205.    Defendants JENNIFER CORE, MOLLY HILL, JIM ELLIOT, and DR. MAXWELL knew, or should have known, for many years that the incarcerated population at CIW were depriving themselves of gynecology care and failed to take action to make safe gynecology care available at CIW.

**V.    The California Institution for Women is Known for Protecting its Staff who are Accused of Sexual Misconduct and for Retaliating Against Those who Report Sexual Abuse by Staff.**

206.    CIW is notorious not only for its rampant sexual abuse by prison staff, but for protecting its staff who are accused of sexual misconduct and retaliating against anyone who reports the sexual abuse.

207.    For example, Keiana Aldrich was incarcerated at CIW after she was prosecuted as an adult at 17 years old for a crime directly related to her sexual exploitation and trafficking. At CIW, she was targeted for sexual abuse by predatory staff who knew about her criminal history in the sex industry and was sexually abused by four different prison staff over a period of 1 ½ years. Ms. Aldrich was afraid to report the sexual abuse out of fear of retaliation by CIW staff. In 2018, when she reported sexual abuse by her work supervisors, she was immediately fired from her prison job and not allowed to work anywhere else. Meanwhile, a supervisor who sexually abused Ms. Aldrich was allowed to return back to his job where he continued to supervise incarcerated workers. (*Aldrich v. Romo, et al.,* Case No. 5:20-cv-00974 (MCS)(KK) (C.D.Cal. 2020).)

208.    In 2019, a corrections officer at CIW, David Sanches, was bringing food and jewelry to Ms. Aldrich in exchange for sexual acts. CO Sanches turned himself in for sexual misconduct and claimed himself to be the victim. CIW immediately charged Ms. Aldrich with extortion and locked her in solitary confinement, during which time she twice attempted suicide. CIW also referred Ms. Aldrich for criminal prosecution. Meanwhile, Mr. Sanches was paid his full salary for one year while he was under investigation. After the investigation sustained findings against Mr. Sanches for sexual misconduct, CIW allowed him to resign from CDCR and he was never criminally charged for his sexual abuse. (*Aldrich v. Sanches, et al.,* Case No. 2:21-cv-02864 (MCS)(KK) (C.D.Cal. 2021).)

209.    Gina Caruso was incarcerated at CIW while she was litigating *pro se* a

strip search case against ISU staff at the Central California Women's Facility ("CCWF") in Northern California. (*Caruso v. Solorio, et al.,* Case No. 1:15-cv-00780 (AWI)(EPG) (E.D.Cal. 2015).) CIW began interfering with Ms. Caruso's right of access to the courts and then transferred her back to CCWF, after Ms. Caruso exposed misconduct by CIW's Warden. Ms. Caruso was locked in solitary confinement at CCWF for 1 ½ years, during which time a separate retaliation lawsuit was required to compel her return to CIW. (*Caruso v. Hill, et al.,* Case No. 1:20-cv-00084 (AWI)(EPG) (E.D.Cal. 2000).)

210.   The culture of retaliation at CIW and CCWF against those who report staff sexual misconduct was well-documented in a March 2024 community report to the California Legislature by the Sexual Abuse Response and Prevention Working Group, created by the Budget Act of 2023 (SEC. 176., Item 5225-024-0001).[6] After conducting Town Halls at CIW and CCWF, with input from more than 700 incarcerated participants, the report details pervasive acts of retaliation that are commonly inflicted on those who report staff sexual misconduct, including physical violence, sexually abusive strip and pat searches, immediate placement in restrictive housing, loss of job assignments and visiting rights, and involuntary transfers to another prison.

211.   People who are incarcerated at CIW have known for many years that they face a serious risk of being falsely accused of disciplinary violations, possible criminal charges, loss of programming, job assignments, and visiting privileges, isolation in solitary confinement or transfer to another prison far from their families and support networks, negative impacts on parole opportunities, and additional time added to their sentence. It is well-documented that survivors of

---

[6] Community Report by the Legislative Working Group on the Response and Prevention of Sexual Abuse in California Women's Prisons, March 2024, at pp. 10-11, 12-13, 43-48, 60-61 (available online at https://www.sisterwarriors.org/prison_sexualassault_report).

sexual abuse who remain incarcerated will often stay silent about staff sexual abuse, as a reasonable choice to prevent retaliation.[7] It is also well known that CIW staff who are accused of sexual misconduct are rarely held accountable and will be protected by CIW.[8]

212.   The Prison Rape Elimination Act ("PREA") requires CIW to document and immediately report allegations of sexual abuse to the Office of Internal Affairs, a division of CDCR that is not housed at CIW which specializes in interviewing witnesses to suspected sexual abuse or assault. However, CIW routinely fails to report complaints regarding staff sexual misconduct to the OIA, instead referring such complaints to its own on-site Investigative Services Unit ("ISU"). ISU staff at CIW are not properly trained to conduct investigations into allegations of staff sexual abuse. Also, ISU staff is comprised of custody staff who previously worked at CIW for many years and often have personal relationships with staff members accused of sexual abuse. As such, ISU staff have an inherent conflict of interest in conducting investigations of staff sexual abuse. The effect of CIW's practice is to ensure that prisoners do not feel safe reporting staff for sexual misconduct.

213.   Upon receipt of a complaint regarding staff sexual misconduct, ISU staff – not custody staff – pull the complaining party out of their cell, advise them that they will be subject to a strip search, and then escort them throughout the entire facility to a location for an interview. This is always done during the day, when large numbers of staff and prisoners are able to observe the process, which reveals that the prisoner made a complaint of sexual misconduct. This ensures retaliation by both other prisoners and staff, and it is commonly believed by the overwhelming majority of prisoners that this practice creates a risk of physical

---

[7] Community Report, *supra,* at pp. 12-13, 60-61.

[8] "A prison guard confessed to sexual misconduct. He got a year of paid time off and no charges" by Sam Levin, *The Guardian*, Oct. 30, 2023.

harm to the complaining prisoner.

## VI. Dr. Lee's Patients Suffered Retaliation After Reporting Him for Staff Sexual Misconduct.

214. As detailed in paragraphs above, DR. LEE retaliated against his patients for complaining about his treatment towards them by becoming physically violent during gynecological examinations, withholding medical treatment and/or prescribed medications, documenting knowingly false and harmful information in their medical charts, and requiring unnecessary further examinations by him.

215. Patients of DR. LEE also suffered retaliation by other medical staff after they complained about DR. LEE. M.A. CHAND, R.N. LOPEZ, and other medical staff who ignored patient complaints about misconduct by DR. LEE, insisted that patients who complained about DR. LEE had to continue seeing him if they wanted gynecology care, thereby depriving patients of safe gynecology care. Medical staff also advised gynecology patients that they would have to pay for their gynecology care if they sought care outside of CIW.

216. In late November 2023, ISU retaliated against many of the patients who made written complaints about DR. LEE, including JANE DOES # 1-2, and 6 and many members of the Damages Classes, by targeting them in their housing units and loudly threatening that they were going to be strip searched after they were escorted to the gymnasium. ISU paraded these patients very publicly through the yard for everyone to see and then required them to undergo medical and mental examinations in the gymnasium even though many of the abusive incidents reported by them occurred years before.

217. Despite repeated grievances complaining about ISU's inappropriate actions and mishandling of staff investigations, ISU continues to harass and intimidate patients of DR. LEE who report his sexual abuse with threats of conducting strip searches on those who report staff sexual abuse. Such threats are traumatizing for survivors of sexual abuse and deter reporting of staff sexual

misconduct.[9]

218.   In September 2024, JANE DOE # 1 was singled out and required to isolate alone in a crisis bed for weeks without any access to her property. During her period of isolation, medical staff repeatedly harassed JANE DOE # 1 by falsely claiming that she had cancer in her right breast and that she was likely to suffer from a stroke. As a result of this prolonged isolation, JANE DOE # 1 suffered severe emotional distress, extreme fear for her safety, and suicidal thoughts.

## VII.   Defendants Failed to Take Appropriate Action Against Dr. Lee to Prevent Further Harm to Plaintiffs and the Class.

### A.   CDCR, CCHCS, and their Respective High-Ranking Officials were Jointly Responsible for Ensuring Safe Gynecology Care for Patients at CIW.

219.   CDCR, CCHCS, Defendants MACOMBER, and TOCHE share joint responsibility in ensuring the delivery of appropriate, quality health care in a cost-effective manner with minimized risk to patients. (Health Care Department Operations Manual ("HC-DOM") § 1.1.) Since the responsibility over medical care at CIW was returned back to CDCR in March 2017, after a federal receivership, CDCR and Defendants MACOMBER and TOCHE have primary responsibility over the gynecology care provided at CIW.

220.   CCHCS is required to maintain a standardized governance structure, known as its Governing Body at the highest level, which consists of multidisciplinary leadership teams at CDCR headquarters and institution levels that will guide the statewide strategic vision and performance objectives of CCHCS. (*Id.*)

/ / /

/ / /

---

[9] *See,* FN 10, *infra,* at pp. 8, 10-13, 46.

**B.      CDCR, CCHCS, and their Respective High-Ranking Officials Shared Joint Responsibility in the Enforcement and Compliance with the Federal Prison Rape Elimination Act and the California Sexual Abuse in Detention Elimination Act at CIW.**

221.    The federal Prison Rape Elimination Act ("PREA") was enacted in 2003 as a zero-tolerance policy towards the sexual abuse of prisoners. (34 U.S.C. § 30302, *et seq.*) PREA required the development of national standards to respond to and prevent incidents of sexual abuse in prison.

222.    The National PREA Standards were implemented in 2012 and were immediately binding on states who receive Department of Justice grant funds for prison purposes.

223.    In 2005, California was the first state to adopt PREA as California law with the enactment of the Sexual Abuse in Detention Elimination Act ("SADEA"). (Penal Code §§ 2635-2644.) Similar to PREA, the SADEA requires CDCR to adopt policies and procedures to prevent and respond to sexual abuse by staff, it provides protection from retaliation for those who report sexual abuse, and it requires thorough investigations into allegations of staff sexual abuse.

224.    CDCR and CCHCS are obligated to comply with the federal PREA and California's SADEA laws by providing proper training, reporting, and prevention of sexual abuse by medical staff who are assigned to work at CIW.

  *1.      CIW has Long Been Out of Compliance with PREA's Mandate that Requires a Full-Time PREA Compliance Manager to Enforce PREA at CIW.*

225.    Pursuant to PREA Standards, CIW is required to designate a PREA Compliance Manager ("PCM") who is responsible for implementing and enforcing the PREA National Standards at CIW. The Warden at CIW is responsible for ensuring that the PCM is provided sufficient time and authority to ensure CIW's

compliance with the PREA National Standards. (PREA National Standard § 115.11(c).)

226. The PCM at CIW has the following responsibilities for every PREA incident at CIW, including the allegations of abuse against DR. LEE:

a. Making a good faith effort to reach judgment on whether the accused staff person's actions prior to, during, and subsequent to the reporting of the incident were in compliance with regulations, procedure, and applicable law, and determine if follow-up action is necessary;

b. Serving on the IPRC and completing all of the tasks required of the IPRC as described above for every PREA incident;

c. Scheduling every PREA incident for review by the IPRC within 60 days of the date of discovery;

d. Monitoring the conduct and treatment of PREA victims and persons who report staff for sexual misconduct for 90 days following a report of staff sexual misconduct to ensure there are no changes in the conduct and treatment that suggest retaliation;

e. Acting promptly to remedy any indication of retaliation against a PREA victim or person who reports staff sexual misconduct by initiating an investigation into retaliation by the Office of Internal Affairs; and

f. Collecting and accurately reporting data to the PREA Coordinator about investigations into staff sexual misconduct on a monthly basis.

227. Historically, the PCM role at CIW was assigned to a custody lieutenant at CIW, with many competing responsibilities. In the past, the PCM at CIW typically spent five hours or less per week on the enforcement of PREA at CIW. It was not until 2024 that CIW designated the PCM as a full-time position at CIW.

**2.      CDCR and CIW Failed to Utilize the Institutional PREA Review Committee to Detect the Risk of Harm Posed by Dr. Lee.**

228.    Pursuant to PREA National Standard § 115.86, the Warden is required to conduct an incident review of every allegation of sexual misconduct against CIW staff, including those that were not substantiated. (Department Operations Manual ("DOM") § 54040.17.) A review is not required for allegations that have been determined to be "unfounded". (*Id.*)

229.    The Institutional PREA Review Committee ("IPRC") is a committee at each prison that is chaired by the Warden and is comprised of prison staff including the PREA Compliance Manager, the In-Service Training Manager, a health care clinician, and the Incident Commander or ISU Supervisor. (DOM § 54040.17.)  The IPRC conducts PREA reviews of each allegation of staff sexual misconduct and is required to perform the following tasks as part of every PREA incident review, including each allegation of abuse against DR. LEE:

  a.  Consider whether the allegation or investigation indicated a need to change policy or practice to better prevent, detect, or respond to sexual abuse;

  b.  Consider whether the incident or allegation was motivated or caused by group dynamics at CIW;

  c.  Examine the area in the facility where the incident allegedly occurred to assess whether physical barriers in the area enabled the sexual abuse;

  d.  Assess the adequacy of staffing levels in that area during different shifts;

  e.  Assess whether monitoring technology should be deployed or augmented to supplement supervision by staff; and

  f.  Prepare a report of its findings, including but not limited to, determinations made pursuant to paragraphs (a)-(e) above, and any recommendations for improvement and submit such report to the Warden at CIW and the PREA Compliance Manager.

(DOM § 54040.17.)

230.   The PCM is expected to schedule a review by the IPRC of each PREA incident within 60 days of the date of discovery. (DOM § 54040.17.)

231.   On information and belief, Defendants CIW WARDENS, ROB  LUIS GONZALES, and JIM ELLIOT took various actions that evaded review by the IPRC for the allegations against DR. LEE, including the referral of allegations against him for internal investigation by the ISU at CIW, after which the ISU almost always conclude that the allegations were "unfounded" or "unsubstantiated".

232.   By doing so, Defendants CIW WARDENS, and JIM ELLIOT allowed DR. LEE to continue abusing his patients for many years, without consequence, until he was finally removed from CIW in November of 2023.

### C.   CCHCS Failed to Take Appropriate Action in Response to Allegations of Abuse by Dr. Lee.

233.   CCHCS is obligated to comply with PREA and SADEA, not only in providing medical care to victims of sexual abuse, but with reporting and preventing sexual abuse of CIW patients. (Health Care Department Operations Manual ("HC-DOM") § 4.1.6.)

234.   When a patient alleges that they have been the victim of sexual abuse or sexual harassment by a health care provider, CCHCS policy requires that a report be filed with the Medical Board of California, pursuant to Bus. & Prof. Code § 805.8. (HC-DOM § 4.1.6(d)(3)(C).)

235.   On information and belief, medical staff and CCHCS officials including Defendants TOCHE, ELLIOT, MAXWELL, CHAND, and LOPEZ knew or should have known that DR. LEE was sexually abusing his patients and failed to timely report him to the Medical Board of California.

236.   CCHCS also requires that allegations of sexual abuse of a patient should be reported to the watch commander at CIW.

237.   In violation of Title 15, CCHCS policy requires that allegations of sexual abuse of a patient should be reported and forwarded for investigation and review by the Investigative Services Unit ("ISU") at CIW. To the contrary, Title 15 requires that all allegations of staff misconduct should be referred to the Office of Internal Affairs ("OIA") for investigation. (15 Cal. Code of Reg. § 3486.)

238.   On information and belief, to the extent that any allegations against DR. LEE were properly reported and referred for investigation, those allegations were improperly referred to ISU for investigation, in violation of Title 15.

239.   As Chief Executive Officer of CCHCS, JIM ELLIOT is responsible for the implementing, monitoring, and evaluating the policies adopted by CCHCS pursuant to PREA and SADEA.

240.   Defendants ELLIOT and MAXWELL knew or should have known for many years that DR. LEE was abusing patients and failed to take appropriate action to protect CIW patients from harm.

241.   As CEO of CCHCS, JIM ELLIOT has served, at all relevant times, as the Chairperson of the Local Governing Body ("LGB") at CIW. The LGB is the highest-level committee that comprises the local health care governance structure and acts at the institutional level for the CDCR and CCHCS governing body. The LGB at CIW is "ultimately accountable for quality patient care, treatment, and services provided by employees and contractors at the institution." (HC-DOM § 1.1.2(d)(2).) Among other responsibilities, the LGB ensures that CIW has prepared and competent staff, ensures adequate systems are in place to continuously evaluate, improve performance, and ensure accountability of licensed clinicians. (*Id.*)

242.   Voting members of the LGB include, but are not limited to, the following staff:

        a. CEO JIM ELLIOT

        b. Warden of CIW or designee (Associate Warden Health Care)

c. Associate Warden of Health Care

d. Chief Medical Officer

e. Chief Nurse Executive

f. Chief of Mental Health

g. Health Program Manager, Quality Management

(HC DOM § 1.1.2(e)(2)(A).)

243.   CEO JIM ELLIOT is also responsible for the Quality Management Committee ("QMC"), which reviews health care areas considered to be high risk, high volume, high cost and problem prone. Among other responsibilities, the QMC identifies priority areas for improvement in the provision of health care services, develops improvement plans, evaluates performance, and collects data. (HC DOM § 1.2.5.)

244.   In addition to the Local Governing Board ("LGB") and the Quality Management Committee ("QMC"), CCHCS has a Professional Practice Evaluation ("PPE") program with the purpose of ensuring all patients receive health care services from competent and qualified licensed medical providers. The PPE program is designed to follow a set of core competency standards. If a provider's ability to provide safe patient care is called into question, the PPE program includes several focused assessment steps by the physician's supervisor to assist him/her with the appropriate skills. (HC DOM § 1.4.2.5.) At each level of assessment, the clinician, his/her supervisor, and CEO JIM ELLIOT will sign off on the assessment. (*Id.*)

245.   If there are safety concerns with a clinician's performance or conduct issues, the Health Care DOM provides for automatic modification of a physician's privileges. (HC DOM § 1.4.3.3.)  All health care staff, including but not limited to, the institutional leaderships such as CEO JIM ELLIOT, CMO DR. MAXWELL, the Chief of Mental Health, and the Chief Nursing Executive, are obligated to refer safety concerns regarding clinical performance to the attention of the institutional

supervisor and/or regional or headquarters executive leadership. (HC DOM § 1.4.3.3(b)(1).)

246.    The clinician who is the subject of allegations that are the basis for modification of his/her privileges may request an informal hearing, which provides an opportunity for the clinician to respond to the allegations. If the modification of privileges is upheld after the informal hearing, a Medical Peer Review Committee ("MPRC") will conduct a formal peer review investigation into the clinical performance and/or conduct of the provider that falls below the applicable standard of care. Among other actions, the MPRC may take remedial action (such as education, proctoring, performance monitoring, or referral for mental evaluation and treatment); modify or restrict clinical privileges; issue a letter of admonition, reprimand or warning; and suspend or revoke privileges. (HC DOM § 1.4.3.5(c)(2)(I).) If the provider's privileges are suspended or revoked, he/she no longer meets the minimum qualifications for the position and is therefore separated.

247.    As Chief Physician & Surgeon at CIW, DR. MAXWELL was responsible for conducting an annual physician competency assessment and performance evaluation of Dr. Lee, also known as the Ongoing Professional Practice Evaluation ("OPPE") and/or the Focused Professional Practice Evaluation ("FPPE").  Competent assessments and evaluations of DR. LEE on an annual basis either did or should have raised competency concerns about him that should have been subject to Peer Review. On information and belief, DR. MAXWELL failed to reasonably conduct the OPPE or FPPE for DR. LEE on an annual basis and/or failed to reasonably respond to red flags concerning his competency and safety to patients.

248.    On information and belief, various structures were in place throughout DR. LEE's employment to respond to the multiple complaints of abusive gynecological services and take action to protect CIW patients from the risk of

further harm by DR. LEE.

249. From 2019-2023, CCHCS received at least 27 health care grievances against DR. LEE.

250. On information and belief, Defendants MACOMBER, TOCHE, ELLIOT and MAXWELL failed to utilize LGB, QMC, or PPE processes described above to (1) ensure quality patient care, treatment, and services by DR. LEE, and (2) ensure that all patients at CIW receive gynecology care from a competent, qualified, and safe medical provider.

251. Defendants ANGELA KENT, CIW WARDENS, JIM ELLIOT, and DR. MAXWELL failed to utilize the PREA process described above to ensure that safe and non-abusive gynecology care was being provided by DR. LEE.

### D. The Wardens at CIW are Liable for Dr. Lee's Years of Abuse of Patients and the Deprivation of Safe Gynecology Care at CIW.

252. As CIW Warden, Defendants LAVELLE PARKER, JENNIFER CORE, MONA HOUSTON, MOLLY HILL, and RICHARD MONTES (collectively referred to as "CIW Wardens" knew or should have known about every complaint brought against DR. LEE. The CIW Wardens, as well as Defendant JIM ELLIOT, were responsible for ensuring that gynecology care at CIW was compliant with PREA and SADEA, referring the allegations against DR. LEE for independent investigation by the Office of Internal Affairs, reporting allegations of sexual misconduct against DR. LEE to the Medical Board of California, and protecting the incarcerated population at CIW from the risk of sexual abuse by DR. LEE.

253. The CIW Wardens had overall responsibility for protecting the incarcerated population at CIW from harm or abuse by staff assigned to work at CIW, regardless of whether the staff member is employed by CDCR or contracted by another agency and assigned to work at CIW.

254. In violation of PREA National Standard §§ 115.22, 115.34(a), SADEA, and CDCR regulations and policy, the CIW Wardens either ignored allegations of staff misconduct by DR. LEE or improperly referred, or authorized the referral of, such allegations against DR. LEE to the Investigative Services Unit ("ISU") at CIW for internal investigation by prison investigators. ISU staff have an inherent bias because they work at the same prison where DR. LEE has been employed.

255. On information and belief, the incarcerated population at CIW brought allegations of staff misconduct against DR. LEE for many years, dating as far back as 2017, that were either ignored, disbelieved, discredited, or mishandled by CIW Wardens.

256. On information and belief, to the extent that any CIW Warden referred any allegations against DR. LEE for staff investigation, those allegations were improperly referred to ISU for investigation, after which the allegations were improperly found to be unsubstantiated or unfounded.

257. The ISU at CIW mishandled multiple investigations against DR. LEE and improperly concluded, in one investigation after another, that the allegations of abuse against DR. LEE were either unsubstantiated or unfounded.

258. The CIW Wardens were responsible for overseeing the handling of, and any investigations into, allegations of staff misconduct by DR. LEE, and for terminating his physical contact with the incarcerated population at CIW when they knew or should have known that he posed an unreasonable risk to patients.

259. Although CIW Wardens knew about allegations of abuse by DR. LEE as early as 2017, upon information and belief, it was not until 2023 or 2024 that DR. LEE was finally reported to the OIA for a staff investigation. Over the course of seven years, the CIW Wardens allowed widespread sexual abuse by DR. LEE of CIW prisoners to continue without any care, concern, or appropriate action.

260. The CIW Wardens also failed to properly report DR. LEE to the

Medical Board of California and/or to CCHCS for reporting to the Medical Board, actions which would have resulted in removing DR. LEE from CIW prior to November 2023, thereby prevent many years of sexual abuse by DR. LEE that severely traumatized his patients and deprived the incarcerated population at CIW from safe gynecology care.

### E.    The Associate Director of CDCR's Female Offender Programs and Services is Liable for Years of Sexual Abuse by Dr. Lee of CIW Patients.

261.    As Associate Director of FOPS, Defendant ANGELA KENT is responsible for complying with and implementing the mandates of Penal Code § 3430, which created gender responsive programming within CDCR.

262.    Defendant KENT is also responsible for the overall supervision of CIW Wardens including training, retention, and recruiting of Wardens.

263.    Defendant KENT knew or should have known that CIW Wardens were failing in their responsibilities to report, respond, and prevent sexual abuse by CIW staff.

264.    Details about the institutionalized ways that CIW Wardens have failed to address rampant sexual abuse at CIW were included in a report issued by the Legislative Working Group on the Response and Prevention of Sexual Abuse in California Women's Prisons, issued in March 2024.[10]

265.    Defendant KENT was responsible for addressing the issues presented in the legislative report yet failed to take appropriate action in response to the recommendations in that report.

266.    Defendant KENT knew or should have known about longstanding practices at CIW that encouraged, ignored, and failed to prevent sexual abuse of CIW prisoners. However, Defendant KENT failed to take appropriate action to

---

[10] This Legislative Working Group report is available online at https://www.sisterwarriors.org/prison_sexualassault_report.

properly supervise CIW Wardens and to ensure their compliance with PREA and SADEA.

267.   Defendant KENT also serves as the PREA Coordinator for CIW and has grossly failed in her responsibilities to ensure that CIW is compliant with PREA and SADEA and in overseeing or supervising the PREA Compliance Manager at CIW.

### F.   CDCR Supervisory Officials are Liable for Dr. Lee's Abuse of Patients and the Deprivation of Safe Gynecology Care at CIW.

268.   In 2005, CDCR established the mission of Female Offender Programs and Services ("FOPS"), to ensure that the women's prisons operated in a gender-responsive manner to ensure that their incarcerated populations received equitable treatment and programming based on their rehabilitative needs and circumstances. As Secretary and Undersecretary, Defendants JEFF MACOMBER and DR. DIANA TOCHE had overall responsibility in supervising FOPS and its leadership.

269.   In 2008, the California Legislature enacted Penal Code § 3430, which was co-authored by the original Associate Director of FOPS, which directed CDCR to implement gender-responsive policies and practice to fulfill the mission of FOPS. Pursuant to Penal Code § 3430, CDCR was mandated to "[c]reate policies and operational practices that are designed to ensure a safe and productive institutional environment for female offenders." Among other requirements, California law requires CDCR to contract with nationally recognized gender responsive experts to develop programs and training for CDCR staff, create a gender responsive staffing pattern (including medical staff) for CDCR's prisons for women, and design and implement gender specific programs including health care and trauma treatment.

270.   Pursuant to Penal Code § 3430, CDCR established a Gender-Responsive Strategies Commission (GRSC) to assist in the development of a

Master Plan for female offenders to improve outcomes for women based on a new vision and mission for rehabilitation that is gender-responsive and trauma-informed. The 2008 Master Plan recognized that female offenders have high rates of past sexual abuse and trauma warranting different needs in incarceration, medical and mental health treatment, and rehabilitation. The Master Plan developed a new vision and mission for FOPS that included gender responsive treatment in meeting the medical care needs for female offenders.

271.   Pursuant to Penal Code § 3430, CDCR was required to seek input from gender-responsive experts for managing the unique needs of female prisoners, including Barbara Owen, Stephanie Covington, and Barbara Bloom among others. These experts served as consultants to CDCR and made many recommendations to CDCR executive staff including how to manage its prisons for women to ensure trauma informed incarceration and care in a manner that would have minimized the risk of sexual misconduct by staff.  Those recommendations were overwhelmingly ignored and neglected over the years by CDCR executive staff including Defendants KENT, GIPSON, TOCHE, MACOMBER, and Doe Defendants 1-20.

272.   For example, in or around 2008, trauma-informed experts on gender responsiveness strategies developed a program for 40 hours of training for all staff, including medical staff, at CDCR's prisons for women concerning the trauma informed needs and priorities of incarcerated female offenders. On information and belief, this training was not implemented at CIW when DR. LEE began working there in 2016. DR. LEE's training records do not document any training he received on trauma-informed medical care or incarceration of female offenders.

273.   In 2013, CDCR opened the California Health Care Facility ("CHCF") in Stockton, a 1.4 million square foot facility that includes 54 buildings that provides housing and treatment for 2,951 incarcerated patients by a professional health care staff of 2,500. CHCF is restricted to male prisoners only, it houses

incarcerated patients of all security levels, and provides intermediate, acute, and specialized medical and mental health to male offenders.

274. CDCR has no comparable medical facility that is accessible to female offenders. From 2016-2023, DR. LEE served as the sole OB-GYN to CIW's incarcerated population which ranged from 1000-3000 people.

275. In 2016, gender responsive consultants to CDCR and/or CCHCS created a Women's Health Care Initiative to prioritize the medical care needs at CDCR's prisons for women including gynecology, mental health, and geriatric care. These consultants created a task force comprised of women's health experts and drafted bylaws for the task force.

276. However, CDCR and CCHCS supervisory officials, including Defendants KENT, GIPSON, TOCHE, MACOMBER and Doe Defendants 1-20 repeatedly declined opportunities to implement the Women's Health Care Initiative or task force, while prioritizing the needs of those incarcerated at CDCR's prisons for men.

277. Defendants KENT, GIPSON, TOCHE, MACOMBER, and Doe Defendants 1-20 have failed to comply with Penal Code § 3430 by diluting the FOPS mission with multiple other responsibilities that benefit CDCR's prisons for men, thereby undermining the original purpose, intent, and effectiveness of the FOPS mission.

278. For example, in 2020, Defendants MACOMBER, GIPSON, TOCHE and Doe Defendants 1-20  recommended and/or approved giving FOPS the responsibility of overseeing and implementing COVID protocols in all state prisons in 2020 with the onset of COVID. At a time when staff sexual abuse at the women's prisons was rampant, FOPS had the overwhelming responsibility of managing COVID in all of the state prisons.

279. Defendant MACOMBER has neglected to ensure that leadership of FOPS has the education, skills, and experience necessary to lead a gender-

responsive mission at both the headquarters and institutional levels. For example, four of the past five Associate Directors in charge of FOPS have had no experience in services or operations for women's prisons.

280. Likewise, Defendants MACOMBER and KENT have failed to ensure that the women's prisons, including CIW, is led by Wardens who have the education, skills, and experience necessary to implement a gender-responsive mission at the institutional level.

281. Defendant MACOMBER also failed to properly monitor and oversee the Associate Directors of FOPS, including Defendant KENT, who have overall responsibility for operations and administration at CIW, thereby subjecting CIW patients to physical abuse, emotional trauma, and the deprivation of safe gynecology care.

282. In January 2023, Barbara Owen wrote to Defendant MACOMBER out of concern for staff sexual misconduct at one of CDCR's prisons for women. Dr. Owen attributed the unacceptable levels of staff sex misconduct to CDCR's failure to comply with Penal Code section 3430 and the original mission of FOPS. Dr. Owen stated, "It is my view that CDCR does not fulfill the requirements and intent of this state law nor the original purpose of FOPS. The failure to comply with PC 3430 and the lack of support for FOPS and the women's mission has created the climate for staff mistreatment of women under their supervision."

283. Dr. Owen made recommendations to Defendants MACOMBER, GIPSON, and KENT on how to address recent incidents of staff sexual misconduct within CDCR's prisons for women, including the following:

a. CDCR executive staff should receiving training and education on the importance of gender and trauma responsive practices in managing CDCR's prisons for women;

b. The FOPS mission should be managed by a person with experience working in CDCR's prisons for women and a commitment to

equitable treatment of women in CDCR custody;

    c.  Develop a high-level working group to develop a gender-based approach to women's services with an initial emphasis on sexual safety; and

    d.  Immediate training of staff at all levels on sexual safety.

284.    Defendant GIPSON received the recommendations of Dr. Owen and assured that keeping the population at both of CDCR's prisons for women, including CIW, is the primary objective of FOPS.

285.    Despite the recommendations of Dr. Owen, Defendants MACOMBER, TOCHE, and Doe Defendants 1-20 reorganized the structure of CDCR leadership into a regional leadership structure. As of January 1, 2025, Defendants MACOMBER, TOCHE, and Doe Defendants 1-20 disbanded the FOPS mission in its entirety, in violation of Penal Code § 3430.

286.    On information and belief, Defendants MACOMBER, TOCHE, GIPSON, KENT, and Doe Defendants 1-20 have failed to implement any of Dr. Owen's recommendations to ensure the sexual safety of CIW's incarcerated population and has instead prioritized the needs of those incarcerated at CDCR's prisons for men

287.    In September 2024, JEFF MACOMBER's deliberate indifference towards rampant sexual abuse at the women's prison was evidenced by the United States Department of Justice's ("DOJ") announcement of its federal civil rights investigation into staff sexual abuse at both of CDCR's women's prisons, including CIW:

    Based on an extensive review of publicly available information and information gathered from stakeholders, the department has found significant justification to open this investigation. The investigation will evaluate whether CDCR protects people incarcerated at Central

California Women's Facility and the California Institution for Women from sexual abuse by correctional staff.

Press Release, dated 9/4/24 by the U.S. DOJ (press release for the DOJ's pending investigation is available online at https://www.justice.gov/opa/pr/justice-department-announces-civil-rights-investigation-correctional-staff-sexual-abuse-two).

288.   Defendants MACOMBER, GIPSON, KENT, and TOCHE have long been, and continue to be, aware of, the risk of sexual abuse for CIW prisoners, and has encouraged, condoned, or been deliberately indifferent to such risk of harm. Despite rampant sexual abuse by staff that has plagued the women's prisons, Defendants MACOMBER, GIPSON, KENT, and TOCHE have failed to utilize national and internal CDCR experts with the expertise in California's women's prisons to respond to and remedy the risk of sexual abuse to CIW prisoners.

**VIII. Defendant Macomber is Sued in His Official Capacity as the CDCR Official with the Authority to Implement Injunctive Remedies that are Necessary to Ensure Safe Gynecology Care for CIW Patients.**

289.   Most of the Class remain incarcerated at CIW, where patients continue to deprive themselves of necessary gynecology care in the interest of protecting themselves from abusive and traumatizing gynecology appointments.

290.   Defendants have maintained, and continue to maintain, a custom or policy of failing to enforce and comply with the PREA and SADEA at CIW, thereby causing an ongoing risk to the Class of further abuse by medical staff providing gynecology services at CIW.

291.   Defendant JEFF MACOMBER is the Secretary of CDCR and has overall responsibility for the provision of medical care to California prisoners, including gynecology care for people incarcerated at the CIW. He also has authority over all CDCR staff assigned to work at CIW, including medical staff, and for the training, prevention, detection, response, and investigation of staff

sexual misconduct.  As Secretary, JEFF MACOMBER has line authority over his executive staff, including the Undersecretary of Health Care Services, Associate Director of FOPS and the PREA Coordinator.  He is responsible for implementing and complying with the mandates of Penal Code § 3430, which requires CDCR to ensure a safe environment for people in women's prisons and gender-responsive staffing for women's prisons. He is also responsible for ensuring that CDCR complies with the federal PREA and California's SADEA. As of March 2017, the primary responsibility over medical care at CIW was delegated to the Secretary of CDCR and became JEFF MACOMBER's responsibility.

## CLASS ALLEGATIONS

292.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and the following Classes:

### I.    The Damages Classes

293.    There are two Damages Classes. The first (the "Received Treatment Class") is defined as follows:

> Any person incarcerated at the California Institution for Women ("CIW") who was seen by Dr. Scott Lee for obstetric or gynecological medical care between March 2017 and May 2024.

294.    The Received Treatment Damages Classes has two subclasses.  The first Received Treatment Damages Subclass is the "Examination or Procedure Subclass" and is defined as follows:

> Any person incarcerated at the California Institution for Women ("CIW") who was seen by Dr. Scott Lee for gynecological or obstetric care, and whose visit involved a pelvic exam, rectovaginal exam (or rectal exam), or breast/chest exam and/or any gynecological or obstetric procedure involving the pelvic, rectal or breast areas between March 2017 and May 2024.

295. The second Received Treatment Damages Subclass is the "Nonconsensual Examination or Procedure Subclass," and is defined as follows:

> Any person incarcerated at the California Institution for Women ("CIW") who was seen by Dr. Scott Lee and received any gynecological or obstetric exam or procedure for which DR. LEE failed to obtain informed consent.

296. The second Damages Classes (the "Deterred Class") is defined as follows:

> Any person incarcerated at the California Institution for Women ("CIW") between March 2017 and May 2024, who was scheduled by the CIW to see Dr. Scott Lee for gynecological or obstetric care, and who declined to see him and/or declined treatment he recommended.

297. Plaintiffs CCWP and Jane Doe # 6 seek certification of an "Injunctive Relief Class" defined as:

> Current and future prisoners at CIW who are in need of or seek obstetric or gynecological care.

298. The Damages Classes and subclasses consists of at least hundreds and potentially thousands of people currently or formerly incarcerated at CIW, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Damages Classes and the identities of the individual members are ascertainable through records maintained by CIW. The size of the Injunctive is in the hundreds or thousands.

299. The claims of Plaintiffs are typical of the Damages Classes. The claims of the Plaintiffs and the Damages Classes are based on the same legal theories and arise from the same unlawful pattern and practice of sexual harassment and assault.

300. There are many questions of law and fact common to the claims of Plaintiffs and the Damages Classes, and those questions predominate over any

questions that may affect only individual Damages Classes members within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Aside from certification under 23(b)(2) and (b)(3), class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

301. Common questions of fact and law affecting members of the Damages Classes include, but are not limited to, the following:

a. Whether DR. LEE regularly engaged in physical, sexual, and/or emotional abuse, assault or harassment of his patients during gynecology appointments;

b. Whether DR. LEE engaged in a course of conduct of physical, sexual, and/or emotional abuse, assault or harassment of his patients during gynecology appointments;

c. Whether DR. LEE's abuse, assault or harassment of his patients was committed within the course and scope of his employment;

d. Whether DR. LEE's patients gave informed consent to his actions of sexual abuse, assault and harassment during medical appointments that caused injury;

e. Whether Defendants had actual or constructive knowledge of DR. LEE's abuse, assault or harassment of patients at CIW, or were otherwise on notice of DR. LEE's course of conduct of sexual abuse, assault and harassment as alleged herein;

f. Whether Defendants took reasonable action, or failed to take

reasonable action, to protect CIW patients from further harm by DR. LEE;

g.  Whether Defendants took action, or failed to take action, that assisted, encouraged, or facilitated DR. LEE's course of conduct of sexual abuse, assault or harassment as alleged herein;

h.  Whether Defendants failed to take action to protect Plaintiffs and class members from DR. LEE's course of conduct of sexual abuse, assault or harassment as alleged herein;

i.  Whether Defendants engaged in a course of conduct designed or intended to suppress complaints or reports regarding DR. LEE's conduct as alleged herein, or in fact otherwise suppressed complaints or reports regarding DR. LEE's conduct as alleged herein;

j.  Whether Defendants violated the Prison Rape Elimination Act ("PREA") and California's Sexual Abuse in Detention Elimination Act ("SADEA") by failing to timely initiate an investigation against DR. LEE for sexual misconduct;

k.  Whether Defendants breached their duty to ensure quality patient care, treatment, and services by DR. LEE;

l.  Whether Defendants breached their duty to ensure that all patients at CIW receive gynecology care from competent and qualified licensed medical providers;

m. Whether Defendants took any action – including reporting DR. LEE to the Medical Board of California – to ensure that persons under their protection and care were protected from sexual abuse, assault or harassment from DR. LEE.

302. The foregoing common questions predominate over individual issues. Plaintiffs Jane Doe # 1-5, as a lesser alternative to certification under Rule 23(b)(3), seek issue certification under Rule 23(c)(4) on the foregoing common questions in the event that the Court concludes that common questions do not predominate under Rule 23(b)(3).

303. Absent a class action, most of the members of the Damages Classes would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to the Defendants' legal responsibility for Lee's actions, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. This action is manageable in that the common and predominant questions identified above can be answered on a class wide basis, and, to the extent necessary, individual issues related to liability or damages could be addressed individually; in that event, class certification and resolution would have addressed the most important questions related to liability, and mechanisms are available to the extent necessary, to resolve individual damages

304. Plaintiffs Jane Doe # 1-5 will fairly and adequately represent and protect the interests of the Damages Classes. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other respective Damages Classes members, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to

those of the other members of the Damages Classes.

## II.    The Injunctive Relief Class

305.    Without an order from this Court, Plaintiffs CCWP and its members, Jane Doe # 6 and Injunctive Relief Class Members currently incarcerated, are and will continue to be, subject to the unlawful conduct of sexual assault and harassment alleged in this Complaint.

306.    Without an order from this Court, Plaintiffs CCWP, Jane Doe # 6 and Injunctive Relief Class Members currently incarcerated will continue to suffer sweeping and irreparable harm.

307.    Defendants will continue their aforementioned policies and practices unless enjoined and restrained by this Court. Without injunctive relief, applicable to the Injunctive Relief Class as a whole, the class members will suffer irreparable harm for which there is no adequate remedy at law in that their constitutional and statutory rights will be systematically violated. Without the intervention of this Court, Defendants will continue the unconstitutional practices alleged in this Complaint.

## CAUSES OF ACTION

308.    In the following causes of action, the allegations of each and every paragraph of this complaint (both already and yet to be stated) are incorporated into each cause of action without repeating them or restating their incorporation.

## I.    FIRST CAUSE OF ACTION – EIGHTH AMENDMENT VIOLATION
### (DELIBERATE INDIFFERENCE)
### 42 U.S.C § 1983
### (Injunctive Relief Only)
### (By Plaintiffs CCWP, Jane Doe # 6, and the Injunctive Relief Class Against Defendant MACOMBER in his Official Capacity)

309.    Plaintiffs restate and incorporate herein by reference the preceding and subsequent paragraphs as if fully set forth herein.

310.    On information and belief, DR. LEE is currently under investigation by CDCR for staff sexual misconduct and was temporarily removed from his position as the primary OB-GYN at CIW, pending investigation. DR. LEE continues to be employed by CCHCS and/or CDCR and is currently working at the CCHCS office in Rancho Cucamonga doing telemedicine among other work. On information and belief, DR. LEE is eligible to be returned to his position as the full-time OB-GYN at CIW depending on the outcome of CDCR's investigation.

311.    On information and belief, patients at CIW do not now have, and have not previously had, reasonable access to a gynecologist with the gender of their preference to ensure trauma informed medical care to a population of prisoners who are known to suffer from an exceedingly high rate of sexual, physical, and emotional abuse prior to incarceration.

312.    Defendant MACOMBER has a non-delegable duty to ensure that the conditions of confinement at CIW are compliant with the Eighth Amendment constitutional right to be free from cruel and unusual punishment, sexual abuse, and retaliation.

313.    Defendant MACOMBER knew or should have known of the substantial risk of serious harm to the health and physical safety of CIW prisoners and failed to take reasonable action to prevent sexual abuse by CIW staff and further traumatization of a prisoner population known to suffer from an exceedingly high rate of sexual, physical, and emotional abuse prior to incarceration.

314.    Defendant MACOMBER was deliberately indifferent and acted with reckless disregard towards the physical safety of Plaintiffs CCWP and Jane Does # 6 and the Injunctive Relief Class in the following ways:

   a.    failing to properly monitor, oversee, and administer CIW's compliance with the Prison Rape Elimination Act ("PREA") and the Sexual Abuse in Detention Elimination Act ("SADEA"). These

failures constituted culpable inaction, which subjected CIW prisoners, including members of CCWP and JANE DOE # 6 and the Class to sexually, physically, and emotionally abusive gynecology care;

b. failing to comply with California Penal Code § 3430, which mandates a mission for the women's prisons within CDCR and requires CDCR to do the following:

    i. create policies and practices designed to ensure a safe environment at the women's prisons;

    ii. implement the recommendations of nationally recognized gender responsive consultants on issues such as gender responsive staffing, trauma treatment services, gender responsive training of CDCR executive staff, sexual safety training of staff at CDCR's prisons for women, reinforcement of FOPS, and gender responsive supervision of CDCR's prisons for women;

    iii. implement a gender responsive staffing pattern that includes medical staff;

    iv. implement a needs-based case and risk management tool at the women's prisons that assesses upon intake a prisoner's health care needs, among other needs;

    v. design and implement evidence-based gender specific rehabilitative programs that includes health care needs and trauma treatment programs designed to reduce recidivism; and

    vi. the reorganization of CDCR leadership in 2024 and disbanding of FOPS.

c. failing to properly investigate, respond to, and oversee the investigations of all allegations of sexual misconduct against DR. LEE, M.A. CHAND, and R.N. LOPEZ;

d. permitting local investigators at CIW (the Investigative Services Unit) to conduct investigations on allegations of staff sexual misconduct;

e. failing to properly screen, train, evaluate, supervise, and discipline prison staff assigned to work at CIW, including DR. LEE, M.A. CHAND, and R.N. LOPEZ to prevent staff from sexually abusing incarcerated persons.

315. Alternatively, Defendant MACOMBER was deliberately indifferent and acted with reckless disregard towards the medical needs of patients incarcerated at CIW by depriving them of gynecology care, an essential and basic need for the incarcerated population at CIW.

316. The above-listed failures constituted culpable action or inaction by Defendant MACOMBER.

317. By routinely ignoring and/or failing to properly respond to allegations of staff sexual misconduct, Defendant MACOMBER subjected, and continue to subject, Plaintiffs CCWP and Jane Doe # 6 to unnecessary and wanton infliction of physical injury, severe emotional trauma and re-traumatization, and a substantial risk of serious harm including behaviors such as substance abuse, disciplinary violations, and mental health issues that were all reasonably likely to result in restricted or prolonged incarceration.

318. These failures constituted culpable inaction, which caused harm to Plaintiffs CCWP and Jane Doe # 6 and the Injunctive Relief Class.

319. All of the failures alleged above have posed an unreasonable and unconstitutional risk of serious harm to Plaintiffs CCWP and Jane Doe # 6 and the Injunctive Relief Class and are the proximate cause of continued violations of their Eighth Amendment rights.

320. Defendant MACOMBER has long been, and continues to be, aware of, the risk of sexual abuse for CIW prisoners, including the members of Plaintiff CCWP, Jane Doe # 6, and the Injunctive Relief Class, and has encouraged,

condoned, or been deliberately indifferent to such risk of harm.

321.   As a direct and proximate result of unlawful actions by the Defendant MACOMBER, Plaintiff CCWP, its members, Jane Doe # 6, and the Injunctive Relief Class suffered and continue to suffer injuries and continued violations of their Eighth Amendment rights.

## II.    SECOND CAUSE OF ACTION – EIGHTH AMENDMENT VIOLATION (CRUEL AND UNUSUAL PUNISHMENT)
## 42 U.S.C § 1983
## (For Damages)
## (Plaintiffs Jane Does # 1, 3-5, CCWP, and the Damages Classes Against Defendants DR. LEE, M.A. CHAND, R.N. LOPEZ, and DOE DEFENDANTS 1-20)

322.   Plaintiffs restate and incorporate herein by reference the preceding and subsequent paragraphs as if fully set forth herein.

323.   At all relevant times to this action, Plaintiff's Jane Does # 1, 3-5, members of CCWP, and the members of the Damages Classes were incarcerated at CIW, and had no freedom to direct their own medical care, set their own appointments, or choose their own gynecologist.

324.   At all relevant times, DR. LEE was the only gynecologist on staff at CIW. When CIW patients in need of gynecology care requested to see a female gynecologist, they were repeatedly told that DR. LEE was their only option for gynecology care.

325.   Defendants M.A. CHAND and R.N. LOPEZ were present for most appointments with DR. LEE and either actively assisted in restraining patients' legs when they asked DR. LEE to stop his examination, remained behind a desk or computer for some of or the entire appointment and failed to chaperone DR. LEE, failed to intervene or assist on the patient's behalf when they witnessed DR. LEE's abuse, and/or failed to properly report DR. LEE to his work supervisors, CCHCS,

the Medical Board of California, and to CDCR.

326.   With all Plaintiffs, DR. LEE did not provide constitutionally appropriate gynecological or obstetric care, but instead he abused his position of authority to sexually, physically, and emotionally abuse Plaintiffs Jane Does # 1, 3-5, members of CCWP, and members of the Received Treatment Damages Classes and its subclasses by engaging in:

    a.  Sexually inappropriate comments in connection with examinations and procedures;

    b.  Abusive and/or sexualized digital penetration of Plaintiffs;

    c.  Abusive and/or sexualized use of a speculum;

    d.  Unwarranted anal exams without warning or consent;

    e.  Abusive and/or sexualized breast examinations;

    f.  Coerced examinations or procedures;

    g.  Unwarranted and/or excessive examinations or procedures;

    h.  Forcing Plaintiffs to undress in front of him or to go without a modesty covering;

    i.  Conducting examinations and/or procedures without the presence of a mandated female chaperone;

    j.  Arbitrary withholding of gynecological care and treatment without medical justification.

    k.  Other conduct as described throughout this Complaint.

327.   Each of the above-described actions and omissions by DR. LEE independently constitutes cruel and unusual punishment of Plaintiffs and the Damages Classes.

328.   Defendant DR. LEE's conduct was offensive to human dignity, intentional or undertaken with reckless disregard for the rights of Plaintiffs and the Class, undertaken with deliberate indifference, and deprived Plaintiffs and the Class of their rights under the Eighth Amendment to be free from cruel and

unusual punishment, causing them damages in an amount to be proven at trial. Plaintiffs and the Class are entitled to compensation for physical injury, emotional trauma and retraumatization, and restricted or prolonged incarceration they experienced as a result of DR. LEE's conduct, costs and reasonable attorneys' fees incurred in prosecuting the claim for relief; and punitive damages, since DR. LEE's conduct was willful, malicious, and in reckless disregard of the rights of Plaintiffs and the Class.

## III.    THIRD CAUSE OF ACTION – EIGHTH AMENDMENT VIOLATION – CRUEL AND UNUSUAL PUNISHMENT

### 42 U.S.C § 1983

### (For Damages)

### (Plaintiffs Jane Does # 1, 3-5, CCWP, and Damages Classes Against Defendants MACOMBER, TOCHE, GIPSON, KENT, ELLIOT, MAXWELL, CORE, HOUSTON, MONTES, HILL, and DOE DEFENDANTS 1-20)

329.    Plaintiffs restate and incorporate herein by reference the preceding and subsequent paragraphs as if fully set forth herein.

330.    On information and belief, the above-described acts and omissions by Defendants MACOMBER, TOCHE, GIPSON, KENT, ELLIOT, MAXWELL, CORE, HOUSTON, MONTES, HILL, and DOE DEFENDANTS 1-20 violated the constitutional rights of Plaintiffs and the Class under the Eighth Amendment to the United States Constitution. (Defendants CORE, HOUSTON, MONTES, and HILL are hereinafter referred to collectively as "CIW WARDENS"; Defendants MACOMBER, TOCHE, GIPSON, and KENT are hereinafter referred to collectively as "CDCR OFFICIALS".)

331.    At all relevant times, Defendants ELLIOT, MAXWELL, CIW WARDENS, CDCR OFFICIALS, and DOE DEFENDANTS 1-20 had a duty and responsibility to ensure that Plaintiffs and class members were not the subjects of

sexual assault or abuse, or other wrongful acts alleged herein, by DR. LEE, and to protect them from sexual assault or abuse, or other wrongful acts alleged herein

332.    At all relevant times, Defendants ELLIOT, MAXWELL, CIW WARDENS, CDCR OFFICIALS, and DOE DEFENDANTS 1-20 were acting under color and pretense of law and under color of the statutes, ordinances, regulations, policies, practices, customs, and usages of CDCR and CCHCS.

333.    At all relevant times, Defendants ELLIOT, MAXWELL, CIW WARDENS, CDCR OFFICIALS, and DOE DEFENDANTS 1-20 knew or should have known of the substantial risk of serious harm to the health and physical safety of CIW prisoners and failed to take reasonable action to prevent sexual abuse by CIW staff and further traumatization of a prisoner population known to suffer from an exceedingly high rate of sexual, physical, and emotional abuse prior to incarceration.

334.    Defendants ELLIOT, MAXWELL, CIW WARDENS, CDCR OFFICIALS, and DOE DEFENDANTS 1-20 were each deliberately indifferent and acted with reckless disregard towards the rights of the Plaintiff's Jane Does # 1, 3-5, members of CCWP, and the Damages Classes to be free from cruel and unusual punishment, as alleged throughout the Complaint, and based on the following:

a. Defendants ELLIOT, MAXWELL, CIW WARDENS, and DOE DEFENDANTS 1-20 failed to properly respond to allegations of staff sexual misconduct, including allegations against DR. LEE, by failing to refer the allegations for investigation by CDCR's Office of Internal Affairs, an agency that is charged with conducting complete, objective, and independent investigations into allegations of staff sexual misconduct.  Instead, Defendants ELLIOT, MAXWELL, CIW WARDENS, and DOE DEFENDANTS 1-20 repeatedly withheld investigations from OIA and had CIW's Investigative Services Unit,

comprised of CIW staff, to improperly conduct investigations against DR. LEE;

b. Defendants ELLIOT, MAXWELL, and DOE DEFENDANTS 1-20, with deliberate indifference and reckless disregard of the rights of Plaintiffs and the Class, refused to take quality review action, peer review action, corrective action, disciplinary action and/or or terminate medical staff who sexually abused CIW prisoners, including DR. LEE;

c. Defendants ELLIOT, MAXWELL, CIW WARDENS, and DOE DEFENDANTS 1-20 knew that CIW patients, including JANE DOES # 1, 3-5, members of CCWP, and Damages Classes members were repeatedly subjected to sexual abuse by staff and, with deliberate indifference and reckless disregard of the rights of Plaintiffs and the Damages Classes, failed to take action to prevent harm to CIW patients;

d. ELLIOT, MAXWELL, CIW WARDENS, and DOE DEFENDANTS 1-20 were deliberately indifferent to their responsibilities as Chair or members of the IPRC and the enforcement of PREA and SADEA at CIW; and

e. Defendants ELLIOT, MAXWELL, CIW WARDENS, and DOE DEFENDANTS 1-20 showed deliberate indifference and reckless disregard of the constitutional deprivation of rights held by JANE DOES # 1, 3-5, members of CCWP and the Damages Classes members to be free from sexual abuse and to safe, non-abusive gynecology care.

f. Defendants CDCR OFFICIALS and DOE DEFENDANTS 1-20 were each notified about rampant sexual abuse by staff against incarcerated people at CDCR's prisons for women, yet failed to take policy and

other reasonable actions to protect those populations from the risk of sexual abuse. The CDCR OFFICIALS violated Penal Code § 3430 by (i) failing to implement CDCR's Master Plan adopted pursuant to Penal Code § 3430, (ii) failing to implement the recommendations by its gender responsive consultants, and (iii) participating in the deterioration and recent abolishment of FOPS and its mission for gender responsive management of CDCR's prisons for women.

335. As a direct and proximate result of the unlawful and culpable actions and inaction by Defendants ELLIOT, MAXWELL, CIW WARDENS, CDCR OFFICIALS, and DOE DEFENDANTS 1-20, JANE DOES # 1, 3-5, members of CCWP, and Class members suffered and continue to suffer injuries and damages as alleged herein.

336. Defendants ELLIOT, MAXWELL, CIW WARDENS, CDCR OFFICIALS, and DOE DEFENDANTS 1-20 tacitly encouraged and condoned actions by DR. LEE and M.A. CHAND that were offensive to human dignity, and ratified said conduct, by ignoring complaints and obvious red flags, and refusing to enforce PREA, SADEA, and California Penal Code § 3430.

337. With knowledge that DR. LEE and M.A. CHAND were abusing patients at CIW, Defendants ELLIOT, MAXWELL, CIW WARDENS, CDCR OFFICIALS and DOE DEFENDANTS 1-20 failed to take reasonable action to prevent the substantial risk of harm to CIW patients, including the risk of retraumatization and resulting behaviors such as substance abuse, disciplinary violations, and mental health issues that were reasonably likely to cause restricted or prolonged incarceration.

338. Defendants ELLIOT, MAXWELL, CIW WARDENS, CDCR OFFICIALS, and DOE DEFENDANTS 1-20 failed to take appropriate disciplinary action against DR. LEE, M.A. CHAND, and R.N. LOPEZ, which would have prevented harm to Plaintiffs and the Damages Classes. Instead, DR.

LEE was allowed to have unchaperoned contact with CIW patients for many years, thereby causing preventable harm to Plaintiffs and the Damages Classes.

## IV. FOURTH CAUSE OF ACTION - FOURTEENTH AMENDMENT VIOLATION – EQUAL PROTECTION CLAIM

### 42 U.S.C § 1983

**(For Damages and Injunctive Relief)**

**(By All Plaintiffs and Classes Against Defendants MACOMBER, TOCHE, GIPSON, KENT, and DOE DEFENDANTS 1-20 in their Individual and Official Capacities)**

339. Plaintiffs restate and incorporate herein by reference the preceding and subsequent paragraphs as if fully set forth herein.

340. Defendants MACOMBER, TOCHE, GIPSON, KENT, (hereinafter referred to collectively as "CDCR Officials") and Doe Defendants 1-20 are sued in their individual capacities for damages and in their official capacities for injunctive relief.

341. As of 2008, the Secretary of CDCR has been mandated to comply with California Penal Code § 3430, which established the mission of Female Offender Programs and Services ("FOPS"), to ensure that the women's prisons operated in a gender-responsive manner to ensure that those incarcerated populations received equitable treatment, including health care, based on their rehabilitative needs and circumstances.

342. Since 2008, CDCR has long ignored the mandates of Penal Code § 3430 and its own Master Plan, by failing to manage and operate its women's prisons in a gender-responsive manner. The CDCR Officials ignored the recommendations of its own consultants on gender-responsive strategies on specific actions needed to prioritize the health care needs and sexual safety of those incarcerated at CDCR's prisons for women. Had the CDCR Officials implemented its Master Plan and the recommendations of its own consultants, which would have

required a bona fide occupational qualification for gynecologists and trauma-informed gynecology care, the seven years of sexual abuse and dangerous gynecology care by Defendant DR. LEE would have been prevented.

343.   The CDCR Officials knew or should have known about CDCR's past failures to comply with Penal Code § 3430 and the resulting and severe risk of sexual, physical, and emotional abuse to the incarcerated population at CIW, yet intentionally failed to take reasonable action to restore and implement the FOPS mission.

344.   On information and belief, the CDCR Officials repeatedly took action to dilute the FOPS mission by saddling FOPS with oversight of facilities for men.

345.   On information and belief, the CDCR Officials repeatedly prioritized the needs of the incarcerated population at facilities for men, including medical needs, while intentionally diluting the FOPS mission or diverting resources away from FOPS in ways that predominantly benefit the men's prisons.

346.   In 2024, the CDCR Officials and Doe Defendants 1-20 participated in the restructuring of CDCR leadership in a manner that entirely disposed of the FOPS mission as of January 1, 2025, in violation of Penal Code § 3430.

347.   By the actions and inactions described above, the CDCR Officials intentionally discriminated, and/or continue to discriminate, against CDCR prisoners on the basis of their gender. CDCR Officials have failed to provide patients at CDCR's prisons for women with safe access to medical care in parity with that provided to patients at CDCR's prisons for men. While male prisoners have had access to the male only Health Care Facility in Stockton for their medical needs, CIW had staff approval for only one gynecologist for the entire prison. This disparate treatment by CDCR Officials on the basis of gender is unrelated to any important government objective.

348.   Plaintiff Jane Does # 1-5, members of CCWP, and the Damages Classes were all incarcerated at CIW and suffered physical injury, emotional

trauma and/or retraumatization, and in some cases, restricted or prolonged incarceration, as a result of the CDCR Officials' intentional actions or inactions. CCWP also suffered financial costs and a substantial loss of resources due to the actions of the CDCR Officials.

349.   Plaintiff members of CCWP, Jane Doe # 6, and the Injunctive Relief Class remain incarcerated at CIW and continue to be deprived of safe and accessible gynecology care by an OB-GYN with the gender of the patient's choosing and continue to face a substantial risk of harm posed by the lack of trauma informed gynecology care and appropriate policies and practices to detect, respond, report, and investigate sexual, physical, and/or emotional abuse by medical staff.

## V.    FIFTH CAUSE OF ACTION – FOURTH AMENDMENT

### 42 U.S.C § 1983

### Fourth Amendment Violation

### Unreasonable Search, Seizure, False Imprisonment

### (For Damages)

**(Plaintiff Jane Does # 1, 3-5 and the Damages Classes Against Defendants DR. LEE, M.A. CHAND, R.N. LOPEZ and DOE DEFENDANTS 1-20)**

350.   Plaintiffs restate and incorporate herein by reference the preceding and subsequent paragraphs as if fully set forth herein.

351.   Plaintiffs Jane Does # 1, 3-5, members of CCWP, and the Damages Classes, as state prisoners, retain some Fourth Amendment rights to bodily privacy, and specifically retain the right to be free from sexual abuse, sexual assault, and sexual harassment.

352.   Even in the context of managing a prison and providing obstetric or gynecological care to prisoners, the conduct of DR. LEE, M.A. CHAND, R.N. LOPEZ, and DOE DEFENDANTS 1-20 violated Plaintiffs' limited Fourth Amendment rights.

353.   With all Plaintiffs, DR. LEE did not provide constitutionally appropriate gynecological care, but instead he abused his position of authority to unreasonably search, seize, and falsely imprison them by sexually, physically, and emotionally abusing Plaintiff Jane Does # 1, 3-5 and each member of the Damages Classes by engaging in:

     a.   Sexually inappropriate comments in connection with examinations and procedures;

     b.   Abusive and/or sexualized digital penetration of Plaintiffs;

     c.   Abusive and/or sexualized use of a speculum;

     d.   Unwarranted anal exams without warning or consent;

     e.   Abusive and/or sexualized breast examinations;

     f.   Coerced examinations or procedures;

     g.   Unwarranted and/or excessive examinations or procedures;

     h.   Using force to restrain patients by their legs and forcing their legs open;

     i.   Forcing Plaintiffs to undress in front of him or to go without a modesty covering;

     j.   Conducting examinations and/or procedures without the presence of a mandated female chaperone;

     k.   Other conduct as described throughout this Complaint.

354.   Each of the above-described actions and omissions by DR. LEE independently constitutes an unreasonable search, seizure, or false imprisonment of Plaintiffs and the Damages Classes.

355.   Defendants M.A. CHAND and R.N. LOPEZ were present for most appointments with DR. LEE and either actively assisted or failed to intervene in the above-listed conduct by DR. LEE.  They typically remained behind a desk or computer for the entire appointment, failed to chaperone DR. LEE, failed to intervene or assist on the patient's behalf when she witnessed DR. LEE's abuse,

and/or failed to properly report DR. LEE to his work supervisors, CCHCS, the Medical Board of California, and to CDCR.

356.    The conduct by Defendants DR. LEE, M.A. CHAND, and R.N. LOPEZ was intentional or undertaken with reckless disregard for the rights of Plaintiffs and the Damages Classes, and undertaken with deliberate indifference, and his conduct deprived Plaintiffs and the Damages Classes of their rights under the Fourth Amendment to bodily privacy, causing them damages in an amount to be proven at trial. Plaintiffs and the Damages Classes are entitled to compensation for physical injury and emotional distress they experienced as a result of DR. LEE's conduct, any restricted or prolonged incarceration caused by DR. LEE's conduct, costs and reasonable attorneys' fees incurred in prosecuting the claim for relief; and punitive damages, since DR. LEE's conduct was willful, malicious, and in reckless disregard of the rights of Plaintiffs and the Class.

## VI.    SIXTH CAUSE OF ACTION – FOURTH AMENDMENT
## 42 U.S.C § 1983
### Fourth Amendment Violation – Violation of Right to Privacy
### (For Damages)
### (Plaintiff Jane Does # 1, 3-5, CCWP, and the Damages Classes Against Defendants ELLIOT, MAXWELL, TOCHE, CORE, HOUSTON, MONTES, HILL, and DOE DEFENDANTS 1-20)

357.    Plaintiffs restate and incorporate herein by reference the preceding and subsequent paragraphs as if fully set forth herein.

358.    On information and belief, the above-described acts and omissions by Defendants ELLIOT, MAXWELL, TOCHE, CIW WARDENS, and DOE DEFENDANTS 1-20 violated the constitutional right to privacy of Plaintiffs and the Damages Classes under the Fourth Amendment to the United States Constitution.

359.    At all relevant times, Defendants ELLIOT, MAXWELL, TOCHE,

CIW WARDENS, and DOE DEFENDANTS 1-20 were acting under color and pretense of law and under color of the statutes, ordinances, regulations, policies, practices, customs, and usages of CDCR and CCHCS.

360.   Defendants ELLIOT, MAXWELL, TOCHE, CIW WARDENS, and DOE DEFENDANTS 1-20 knew or should have known that their failure to supervise, monitor, report DR. LEE and respond to allegations of sexual abuse against him, constituted culpable inaction as alleged herein, based on the following:

a. Defendants ELLIOT, MAXWELL, TOCHE, CIW WARDENS, and DOE DEFENDANTS 1-20 failed to properly respond to allegations of staff sexual misconduct, including allegations against DR. LEE, by failing to refer the allegations for investigation by CDCR's Office of Internal Affairs, an agency that is charged with conducting complete, objective, and independent investigations into allegations of staff sexual misconduct.  Instead, Defendants ELLIOT, MAXWELL, TOCHE, CIW WARDENS, and DOE DEFENDANTS 1-20 repeatedly withheld investigations from OIA and had CIW's Investigative Services Unit, comprised of CIW staff, to improperly conduct investigations against DR. LEE;

b. Defendants ELLIOT, MAXWELL, and DOE DEFENDANTS 1-20, refused to take quality review action, peer review action, corrective action, disciplinary action and/or or terminate medical staff who sexually abused CIW prisoners, including DR. LEE;

c. Defendants ELLIOT, MAXWELL, TOCHE, CIW WARDENS, and DOE DEFENDANTS 1-20 knew that CIW patients, including JANE DOES # 1, 3-5, members of CCWP, and Class members were repeatedly subjected to sexual abuse by staff and, with

deliberate indifference and reckless disregard of the rights of Plaintiffs and the Class, failed to take action to prevent harm to CIW patients;

d. ELLIOT, MAXWELL, CIW WARDENS, and DOE DEFENDANTS 1-20 grossly failed in their responsibilities as Chair or members of the IPRC and the enforcement of PREA and SADEA at CIW;

e. Defendants ELLIOT, MAXWELL, TOCHE, CIW WARDENS, and DOE DEFENDANTS 1-20 failed to take reasonable steps to protect the constitutional rights of privacy, bodily integrity, and bodily privacy held by JANE DOES # 1, 3-5, members of CCWP, and Class members.

361. As a direct and proximate result of the unlawful and culpable actions and culpable inaction by Defendants ELLIOT, MAXWELL, TOCHE, CIW WARDENS, and DOE DEFENDANTS 1-20, JANE DOES # 1, 3-5, members of CCWP, and Class members suffered and continue to suffer injuries and damages as alleged herein.

362. Defendants ELLIOT, MAXWELL, TOCHE, CIW WARDENS, and DOE DEFENDANTS 1-20 encouraged and condoned DR. LEE's conduct, by ignoring complaints and obvious red flags, and refusing to enforce federally mandated procedures intended to prevent misconduct of the type engaged in by DR. LEE.

363. With knowledge of DR. LEE's sexual misconduct, no disciplinary action was taken and he was allowed to be unchaperoned with patients who were incarcerated at CIW. Defendants ELLIOT, MAXWELL, TOCHE, CIW WARDENS, and DOE DEFENDANTS 1-20 are therefore responsible for DR. LEE's acts and omissions, which could have been prevented.

/ / /

## VII.   SEVENTH CAUSE OF ACTION – GENDER VIOLENCE

### [CAL. CIV. CODE § 52.4]

### (For Damages)

### (Plaintiff Jane Does # 1, 3-5, CCWP, and the Damages Classes Against Defendant DR. LEE)

364.   Plaintiffs restate and incorporate herein by reference the preceding and subsequent paragraphs as if fully set forth herein.

365.   California Civil Code § 52.4 provides that gender violence is a form of sex discrimination and includes "[a] physical intrusion or physical invasion of a sexual nature under coercive conditions . . . ." *Id.* at §52.4(c)(2).

366.   California Civil Code § 52.4 incorporates the definition of "gender" from California Civil Code § 51, which provides: "'Gender' means sex, and includes a person's gender identity and gender expression."

367.   Plaintiffs and the Class members are women, gender non-binary, and transgender.

368.   DR. LEE physically intruded and/or invaded the bodies of Plaintiffs and Class members during medical examinations in a sexual manner. The conditions were coercive in that Plaintiffs and Class members were required to place their trust in their physician because he was held out to be an expert in gynecology by CIW.CDCR participated in the physical intrusion and/or invasion of the bodies of Plaintiffs and Class members during medical examinations by being physically present in the room through agent chaperones or other staff members and/or by bringing Plaintiffs and the Class members into the examination rooms and providing instructions to remove their clothing knowing that Lee would assault them in a sexual manner.

369.   Plaintiffs were injured as a result of the gender violence, and seek all remedies provided for in Civil Code Section 52.4(a), including, but not limited to, actual damages, compensatory, damages, punitive damages, injunctive relief, costs,

attorneys' fees, and any other appropriate relief.

## VIII.    EIGHTH CAUSE OF ACTION – BANE ACT

## [CAL. CIV. CODE § 52.1]

## (For Damages)

## (Plaintiff Jane Does # 1, 3-5, CCWP, and the Damages Classes Against Defendants ELLIOT, MAXWELL, KENT, PARKER, CORE, HOUSTON, MONTES, HILL, DR. LEE, M.A. CHAND, R.N. LOPEZ, and DOE DEFENDANTS 1-20)

370.   Plaintiffs restate and incorporate herein by reference the preceding and subsequent paragraphs as if fully set forth herein.

371.   DR. LEE sexually abused Plaintiffs through the use of coercion, physical restraint, intimidation, threats, and with reckless disregard and deliberate indifference or disregard of constitutional rights protected by the Eighth and Fourteenth Amendments to the U.S. Constitution and California Constitution, Article I, §§ 13, 17.

372.   M.A. CHAND, R.N. LOPEZ, and DOE DEFENDANTS 1-20 assisted in DR. LEE's sexual abuse of patients by assisting him with the physical restraint of patients who asked that he stop his examination and by failing to intervene and stop his abuse of patients.

373.   DR. LEE used his position as the sole gynecologist at a state prison to ensure physical access to the Received Treatment Class. In some cases, the Received Treatment Class was coerced into seeing Lee because he issued ducats to appear before him for examinations, and procedures, which they were not free to ignore or refuse without consequences up to and including written discipline. Even those Class members who affirmatively sought treatment from DR. LEE were coerced into doing so in spite of his reputation or their own past negative experiences with him, because they had no other option to obtain needed gynecological care. Thus, the Received Treatment Class was coerced, threatened,

and intimidated into appearing before DR. LEE at all.

374. During those coercive visits, examinations, and procedures, DR. LEE, M.A. CHAND, R.N. LOPEZ, and DOE DEFENDANTS 1-20 violated the rights of the Received Treatment Class under Civil Code 52.1 as described above. Because the Received Treatment Class was coerced into seeing DR. LEE, the violation was accomplished by means of "threats, intimidation, or coercion."

375. The Deterred Class was likewise coerced into obtaining their gynecological care from DR. LEE, or not at all. They were not free to see the gynecologist of their choosing, or in fact, as far as they were made aware, any gynecologist other than DR. LEE. Thus, if they were unable to obtain appropriate gynecological care from DR. LEE, which was a violation of their right under the Eighth Amendment to the United States Constitution, that violation was accomplished by means of "threats, intimidation, or coercion."

376. Defendants ELLIOT, MAXWELL, and KENT were each were each deliberately indifferent and acted with reckless disregard towards the safety and medical needs of the Plaintiff's Jane Does # 1, 3-5, members of CCWP, and the Damages Classes and their rights to be free from cruel and unusual punishment, as alleged throughout the Complaint. By their actions and inactions, Defendants ELLIOT, MAXWELL, and KENT coerced Plaintiff's Jane Does # 1, 3-5, members of CCWP, and the Damages Classes into obtaining gynecological care from DR. LEE, or not at all.

377. Defendants PARKER, CORE, HOUSTON, MONTES, HILL (collectively referred to hereinafter as "CIW WARDENS"), and DOE DEFENDANTS 1-20 were each deliberately indifferent and acted with reckless disregard towards the safety of Plaintiff's Jane Does # 1, 3-5, members of CCWP, and the Damages Classes and their rights to be free retaliation and cruel and unusual punishment, as alleged throughout the Complaint. By their actions and inactions, Defendants CIW WARDENS, and DOE DEFENDANTS 1-20 coerced

Plaintiff's Jane Does # 1, 3-5, members of CCWP, and the Damages Classes into obtaining gynecological care from DR. LEE, or not at all.

378.   All Defendants named in this cause of action interfered with the legal rights conferred by the Prison Rape Elimination Act ("PREA"), 42 U.S.C. § 15601, the PREA National Standards, 28 Code of Fed. Reg. Part 115, and the Sexual Abuse in Detention Elimination Act ("SADEA"), Cal. Penal Code §§ 2635-2644, through the use of threats, intimidation and coercion by subjecting members of the Received Treatment Class to sexual abuse and/or sexual assault within the prison setting, failing to properly report staff sexual misconduct, and/or retaliating against those who report staff for sexual misconduct.

379.   By the use of threats, intimidation and coercion, all Defendants named in this cause of action interfered with the legal rights conferred by Cal. Penal Code § 3430 by denying the members of the Damages Classes by providing trauma-informed gynecology care to a patient population known to have experienced an exceedingly high rate of sexual, physical, or emotional abuse prior to incarceration.

380.   As a direct and proximate result the above-described conduct by All Defendants named in this cause of action, the members of the Damages Classes sustained injuries and damages including physical injury, emotional trauma and retraumatization, and restricted or prolonged incarceration.

381.   Plaintiffs are entitled to costs and reasonable attorneys' fees in seeking relief.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## IX.   NINTH CAUSE OF ACTION – RALPH ACT

## [CAL. CIV. CODE § 51.7]

### (For Damages)

### (Plaintiff Jane Does # 1, 3-5, CCWP, and the Damages Classes Against Defendants DR. LEE, and DOE DEFENDANTS 1-20)

382.   Plaintiffs restate and incorporate herein by reference the preceding and subsequent paragraphs as if fully set forth herein.

383.   California Civil Code § 51.7 prohibits acts of violence based on sex.

384.   DR. LEE and DOE DEFENDANTS 1-20 committed violent acts against the Direct Abuse Class.

385.   A substantial motivating reason for Lee's violent acts was their sex.

386.   The Direct Abuse Class was harmed, and violent acts by DR. LEE and DOE DEFENDANTS 1-20 were a substantial factor in causing their harm.

387.   The conduct by DR. LEE and DOE DEFENDANTS 1-20 was committed within the scope of their employment with CDCR and CCHCS. CDCR and CCHCS are vicariously liable for the conduct by DR. LEE and DOE DEFENDANTS 1-20.

## X.   TENTH CAUSE OF ACTION – CIVIL BATTERY

## CIVIL BATTERY

### (For Damages)

### (Plaintiff Jane Does # 1, 3-5, CCWP, and the Damages Classes Against Defendants DR. LEE, M.A. CHAND, R.N. LOPEZ, and DOE DEFENDANTS 1-20)

388.   Plaintiffs restate and incorporate herein by reference the preceding and subsequent paragraphs as if fully set forth herein.

389.   DR. LEE, M.A. CHAND, R.N. LOPEZ and DOE DEFENDANTS 1-20 intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiff Class members. They did so by, *inter*

*alia*:

  a. Isolating Plaintiff Class members in closed quarters and dismissing any bystanders; and

  b. Causing sexual contact.

390. DR. LEE, M.A. CHAND, R.N. LOPEZ and DOE DEFENDANTS 1-20 did commit an unwanted contact with Plaintiffs and each Direct Abuse Class member's person or property in a harmful or offensive manner, including, but not limited to, by causing molestation or sexual contact between Lee and each Direct Abuse Class member.

391. The battery of Plaintiffs by DR. LEE, M.A. CHAND, R.N. LOPEZ and DOE DEFENDANTS 1-20 and the Received Treatment Damages Class members caused harm, including physical, mental, and/or emotional harm of each Direct Abuse Class Member.

## XI. ELEVENTH CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (For Damages)

### (Plaintiff Jane Does # 1-5, CCWP, and the Damages Classes Against Defendants DR. LEE, M.A. CHAND, R.N. LOPEZ and DOE DEFENDANTS 1-20)

392. Plaintiffs restate and incorporate herein by reference the preceding and subsequent paragraphs as if fully set forth herein.

393. The extreme and outrageous conduct by Defendants DR. LEE, M.A. CHAND, R.N. LOPEZ, and DOE DEFENDANTS 1-20 intentionally or recklessly caused severe emotional distress to Plaintiffs and the Class members.

394. DR. LEE, R.N. LOPEZ, and M.A. CHAND's outrageous conduct was not the type of ordinary gynecology examination or even rude or obnoxious behavior that patients should be expected to tolerate. Rather, Lee's conduct exceeded all possible bounds of decency.

395.   DR. LEE, R.N. LOPEZ, and M.A. CHAND acted with intent or recklessness, knowing that his victims were likely to endure emotional distress given prisoners' dependence on them for medical care. In fact, they used this dependence to coerce patients into submitting to DR. LEE's abuse, and to prevent them from complaining. He did so with deliberate disregard as to the high probability that severe emotional distress would occur.

396.   The conduct by Defendants DR. LEE, M.A. CHAND, R.N. LOPEZ, and DOE DEFENDANTS 1-20 caused suffering for Plaintiffs and the Class members at levels that no reasonable person should have to endure.

## XII.    TWELFTH CAUSE OF ACTION-NEGLIGENCE

**(Plaintiff Jane Does # 1, 3-5, CCWP, and the Damages Classes against Defendants DR. LEE, M.A. CHAND, R.N. LOPEZ, and DOE DEFENDANTS 1-20)**

397.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

398.   By seeking medical treatment from Lee in the course of his employment with CDCR and CCHCS, a special, confidential, and fiduciary relationship between Plaintiffs and DR. LEE, R.N. LOPEZ, and M.A. CHAND was created, resulting in DR. LEE, R.N. LOPEZ, and M.A. CHAND owing Plaintiffs a duty to use due care to ensure they received appropriate, non-abusive medical treatment as needed.

399.   DR. LEE, R.N. LOPEZ, and M.A. CHAND's conduct in abusing Plaintiffs in the course of their employment with CDCR and CCHCS and under the guise of rendering "medical treatment" was negligent.

400.   DR. LEE, R.N. LOPEZ, and M.A. CHAND's conduct in abusing Plaintiffs in the course of their employment with CDCR and CCHCS and under the guise of rendering "medical treatment" negligently inflicted serious and intolerable emotional distress upon Plaintiffs.

401.    As a direct and/or proximate result of Defendants' actions and/or inactions,  Plaintiffs and members of the Damages Classes were damaged.

**XIII. THIRTEENTH CAUSE OF ACTION - INVASION OF PRIVACY**

**(Cal. Const. Art. I Sec. 1)**

**(For Damages)**

**(Plaintiff Jane Does # 1, 3-5, CCWP, and the Damages Classes against Defendants MACOMBER, TOCHE, ELLIOT, MAXWELL, DR. LEE, CHAND, LOPEZ and DOE DEFENDANTS 1-20)**

402.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

403.    Doctors must obtain informed consent in order to provide medical treatment. "Consent is based on the disclosure of information and a sharing of interpretations of its meaning by a medical professional. The accuracy of disclosure, insofar as it is possible, is governed by the ethical requirement of truth-telling."[11]

404.    Plaintiffs, even as convicted prisoners, still retain a legally protected interest in bodily privacy that prevents them from being viewed, touched, groped, manipulated, tested, or otherwise intruded upon without cause.

405.    Plaintiffs hold a reasonable expectation of privacy in that they will not be required to permit sensitive areas to be viewed, touched, groped, manipulated, tested, or otherwise intruded upon without cause.

406.    Defendant DR. LEE examined Plaintiffs without obtaining informed consent or by exceeding the scope of consent. Absent informed consent, Lee's conduct in viewing, physically manipulating, groping, and touching Plaintiffs' bodies invaded Plaintiffs' privacy.

---

[11] American College of Obstetricians and Gynecologists, Committee Opinion No. 439 (2009), https://www.acog.org/Clinical-Guidance-and-Publications/Committee-Opinions/Committee-on-Ethics/Informed-Consent.

407.   Defendant M.A. CHAND and R.N. LOPEZ assisted DR. LEE with his examinations without informed consent by misrepresenting to patients the scope of his examinations, participating in his examinations knowing that he was not providing appropriate gynecology care, and failing to intervene or assist on the patient's behalf when she witnessed DR. LEE invade a patient's privacy.

408.   DR. LEE, M.A. CHAND, R.N. LOPEZ, and DOE DEFENDANTS 1-20 intentionally intruded into Plaintiffs' privacy in a manner that constituted a serious invasion of their privacy.

409.   The intrusion by DR. LEE, M.A. CHAND, R.N. LOPEZ, and DOE DEFENDANTS 1-20 would be highly offensive to a reasonable person.

410.   Defendants MACOMBER, TOCHE, ELLIOT, and MAXWELL knew or should have known that DR. LEE was invading the privacy of his patients yet failed to take reasonable action to prevent harm to his patients.

411.   Plaintiffs and the Direct Abuse Class were harmed.

412.   The conduct by DR. LEE, M.A. CHAND, R.N. LOPEZ and DOE DEFENDANTS 1-20 was a substantial factor in causing harm to the members of the Damages Classes.

## JURY TRIAL DEMAND

Plaintiffs hereby request a jury trial in this action on all claims that are triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, pray that this Court:

1) Certify the Class, name Plaintiffs as representatives of the Class, and appoint their lawyers as Class Counsel;

2) Enter judgment against Defendants in favor of Plaintiffs and the Class;

3) Issue a declaratory judgment that includes, but is not limited to, a

declaration that the acts, omissions, policies, and practices described above are in violation of the constitutional and other rights of Plaintiffs;

4) Order injunctive and equitable relief including, but not limited to, an order requiring Defendant MACOMBER to do the following at CDCR's prisons for women, including CIW and the Central California Women's Facility: (1) adopt regulations and/or policies mandating that each prison has a full-time, OB-GYN of the gender preferred by the patient available to its incarcerated population; (2) adopt regulations and/or policies to make the gender of the gynecologist a bona fide occupational qualification; (3) adopt regulations and/or policies mandating the presence of a chaperone and support person (of the gender preferred by the patient) for all gynecology exams and procedures; (4) require trauma-informed training for all OB-GYN's and medical staff involved with gynecology care including PREA/SADEA training and the definition of sexual misconduct as it applies to gynecology care, trauma-informed gynecology care, and mandated reporter requirements for sexual abuse by medical staff; (5) screen all patients for histories of trauma from sexual and physical abuse and limit access to such information to medical staff only; (6) limit routine pelvic and breast/chest exams on asymptomatic women with histories of trauma from sexual and physical abuse to prevent retraumatization; (7) adopt policies requiring California Correctional Health Care Services to (a) expedite the processing of health care grievances for allegations of sexual misconduct by medical staff, (b) immediate removal of medical staff named as subjects pending investigation into allegations of sexual misconduct, (c) immediate and simultaneous reporting of all

allegations of sexual misconduct by medical staff to the Warden, the PREA Compliance Manager, the Associate Director of the Female Offender Programs and Services, the Office of Internal Affairs, and the Office of the Inspector General; (8) mandated training of all staff involved in the processing of all health care grievances on staff sexual misconduct, the definition of staff sexual misconduct, and the policies and procedures for expedited handling of all allegations of sexual misconduct against medical staff;  (9) mandated review process and tracking of all health care grievances filed at CIW for sexual misconduct against medical staff; and (10) mandated PREA/SADEA training for all staff to clarify that (a) medical exams are not required for incidents of sexual assault that occurred more than 72 hours ago, (b) that a sexual assault medical exam is voluntary and does not prevent any investigation from going forward, (c) that custody staff should not be present during sexual assault medical exams, and (d) prohibit staff from referring to such medical exams as strips searches or unclothed body searches.

5) Award Plaintiffs and the Class members damages for pain and suffering, and compensatory and punitive damages;

6) Award Plaintiffs and the Class their reasonable attorneys' fees and costs;

7) Award Plaintiffs and the Class prejudgment interest on monetary damages to the extent permitted by law; and

8) Order any further relief that the Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

Dated: April 1, 2026                     Respectfully submitted,


                                         HADSELL STORMER RENICK & DAI LLP

                                         */s/ Morgan Ricketts*
                                         By:  Morgan Ricketts
                                              Dan Stormer

                                         JUSTICE FIRST

                                              */s/ Jenny Huang*
                                         By:  Jenny Huang


                                         McLANE, BEDNARSKI & LITT, LLP

                                              */s/ Lindsay Battles*
                                         By:  Barrett S. Litt
                                              Lindsay Battles

                                         Attorneys for Plaintiffs