# EXHIBIT A

# INVESTIGATION OF CENTRAL CALIFORNIA WOMEN'S FACILITY AND CALIFORNIA INSTITUTION FOR WOMEN

United States Department of Justice
Civil Rights Division

United States Attorney's Offices
for the
Eastern and Central Districts of California

August 13, 2026

# TABLE OF CONTENTS


I. Summary ........ 1

II. Background ........ 2

III. Central California Women's Facility and California Institution for Women ........ 3

IV. Applicable Constitutional, statutory, and Regulatory Provisions Relevant To California's Requirement to Protect Prisoners From Sexual Violence under federal law ........ 3

- A. Eighth Amendment Protection against Cruel and Unusual Punishment. ........ 3
- B. Fourteenth Amendment Protection of a Prisoner's Person. ........ 6
- C. Civil Rights of Institutionalized Persons Act. ........ 6
- D. Prison Rape Elimination Act. ........ 7

V. Conditions Identified ........ 8

- A. CDCR and CCWF Are Well Aware That Staff Have Seriously Harmed CCWF Prisoners. 8
- B. CDCR and CIW Are Well Aware That Staff Have Seriously Harmed CIW Prisoners. ..... 10
- C. Hundreds of Other Sexual Misconduct Allegations ........ 12
- D. Inadequate Prevention, Detection, and Staff Accountability Regarding Sexual Abuse and Harassment Harms Prisoners. ........ 12
  1. CDCR, CCWF, and CIW have inadequate means to detect and deter staff sexual abuse and harassment of prisoners. ........ 13
  2. Lack of confidential reporting methods and failure to protect prisoners from retaliation. 15
  3. Failure to adequately investigate reported sexual abuse. ........ 17
  4. The failures described above ultimately led to CDCR, CCWF, and CIW failing to hold staff adequately accountable for sexual abuse or harassment. ........ 21

VI. Discussion ........ 22

- A. CDCR, CCWF, and CIW's Constitutionally Objectionable Deliberate Indifference to the Risk of Serious Harm to Prisoners Is Clearly Reflected by Their Widespread Noncompliance with the PREA Regulations. ........ 22
- B. Officials at CDCR, CCWF, and CIW Knew of Risk to Prisoners from Staff Sexual Abuse and Disregarded It. ........ 26

VII. Minimal Corrective Measures ........ 28

VIII. Conclusion ........ 29

## I. SUMMARY

The Civil Rights Division of the United States Department of Justice and the United States Attorney's Offices for the Eastern and Central Districts of California (the Department) provide notice, pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq.*, (CRIPA) that there is reasonable cause to believe that the California Department of Corrections and Rehabilitation (CDCR), the Central California Women's Facility (CCWF), and the California Institution for Women (CIW) are subjecting prisoners to egregious or flagrant conditions which deprive such prisoners of their rights under the Constitution and Federal law, pursuant to a pattern or practice of resistance to prisoner enjoyment of their rights, causing such prisoners grievous harm. Specifically, CDCR, CCWF, and CIW are violating the Eighth and Fourteenth Amendment rights of prisoners.

The Special Litigation Section of the Civil Rights Division conducted an in-depth investigation into allegations of repeated sexual assaults and similar misconduct by CCWF and CIW staff against prisoners, dating as far back as the year 2000. The Section relied upon attorneys, paralegals, administrative staff, and consultants ("investigative team") to ensure a thorough and objective investigation. As a result, the Section found an unbroken pattern of often violent, sexual misconduct by staff against prisoners from 2000 through 2024, continuing to the present.

CDCR, at the Departmental level and at the prison level, has repeatedly sustained allegations[1] (that is, the State, itself, found abuse occurred) of staff sexual abuse of prisoners at CCWF and CIW. Despite notice of the substantial risk of harm to prisoners posed by staff, CDCR, CCWF, and CIW failed to take adequate measures to deter, detect, and hold accountable those who would commit such offenses. As a result, prisoners are egregiously and flagrantly subjected to grievous harm through denial of their right to be protected from cruel and unusual punishment inflicted by sexual violence and their right to bodily privacy. These failures by CDCR, CCWF, and CIW can only reasonably be described as a pattern or practice of deliberate indifference, in violation of the Constitution.

The deliberate indifference of CDCR, CCWF, and CIW is aggravated by the fact that even though they are on notice of the harm being suffered by prisoners, these entities have failed to adequately and effectively implement or follow the requirements of the Constitution and the Prison Rape Elimination Action (PREA), 34 U.S.C. Ch. 303, and its implementing regulations, 28 C.F.R. § 115, *et seq.*, which set forth practices specifically designed to deter, detect, and hold accountable those who would commit sexual violence against prisoners.

Consistent with the statutory requirements of CRIPA, this report provides the requisite notice to California and CDCR of the conclusions of our investigation with respect to these egregious and flagrant constitutional violations, the facts supporting those conclusions, and the minimum corrective measures necessary to address the identified constitutional deficiencies.

[1] The State's own investigative process reaches a finding of "sustained" or "substantiated." These mean that the State has already determined by a preponderance of evidence that the allegations were true and the employees were responsible. A finding does not mean that the State imposed any sanction on the abuser or that the State provided any remedy to the victim.

## II. BACKGROUND

On September 4, 2024, the Department of Justice notified California of the Department's intent to investigate CCWF and CIW pursuant to CRIPA. Our investigation focused on whether there is reasonable cause to believe that California egregiously or flagrantly violates the constitutional rights of women prisoners by failing to take measures to reasonably protect them during their incarceration at CCWF and CIW from the grievous harm caused by staff sexual abuse or harassment.[2]

In December 2024, the Department issued a subpoena for documents relevant to our investigation. In May 2025, the investigative team conducted a three-day, on-site review of conditions at CCWF. In July 2025, the investigative team conducted a three-day, on-site assessment of conditions at CIW. Two expert consultants in correctional operations and sexual safety of prisoners assisted the investigation and participated in the on-site reviews. During the assessments, the investigative team interviewed staff and prisoners, reviewed documents, and toured all housing units and many of the on-site work programs. The team conducted an exit conference with each facility's staff to provide technical assistance at the end of each on-site assessment. CDCR officials, CCWF and CIW staff, and their legal counsel cooperated with and facilitated the on-site assessments.

Following the on-site assessments, the investigative team requested, and California produced, additional documents relevant to the investigation. The investigative team reviewed thousands of pages of documents including policies and procedures, staffing records, staff investigation files, staff misconduct logs, and training materials. California's Office of the Inspector General (OIG) also cooperated with the Department by providing additional clarifying information. The investigation team also reviewed voluminous records of court proceedings against the State and its employees and contractors concerning sexual misconduct allegations.

The Department appreciates the State's cooperation during the investigation, which included facilitating the investigative team's onsite assessments, making staff available for virtual interviews, producing documents, and providing updated information as to its efforts to address issues related to sexual abuse of prisoners by staff.

[2] The PREA standards define "sexual abuse" by a staff member to include multiple types of conduct, with or without the consent of the prisoner, including sexual acts and contact as well as any attempt, threat, or request by a staff member to engage in sexual activities; any display of a staff member's private parts; or voyeurism by a staff member. 28 C.F.R. § 115.6. "Sexual harassment" includes "repeated verbal comments or gestures of a sexual nature" to a prisoner by a staff member, including "demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures." *Id.* Furthermore, under the Eighth Amendment, a prisoner is entitled to the presumption that sexual conduct by a staff member is not consensual. *See, e.g., Wood v. Beauclair*, 692 F.3d 1041, 1049 (9th Cir. 2012). The presumption can be rebutted by a showing that the conduct involved no coercive factors, but the prisoner is deemed to have established non-consent unless the state makes its requisite showing. *Id.*

## III. CENTRAL CALIFORNIA WOMEN'S FACILITY AND CALIFORNIA INSTITUTION FOR WOMEN

California operates two prisons for women, CCWF and CIW. CCWF, located in Chowchilla, is California's largest women's prison. It houses prisoners of all security levels. Since April 2024, Anissa De La Cruz has served as warden at CCWF. As of July 29, 2026, CCWF reported 2,189 prisoners at the facility. Covering 640 acres, CCWF is five times larger than CIW. CCWF is organized into four sectors. Locked gates separate the sectors from each other. Each sector has four housing units that share a large yard and a kitchen. There are many specialized buildings scattered throughout the grounds, including a restrictive housing building, a substance abuse program building, a parole board hearing building, and an eyeglass manufacturing work facility.

CIW, located in Chino, primarily houses prisoners who require low to medium security. From 2023 until May 2026, Lavelle Parker was the warden at CIW. Since May 2026, Sonia Padilla has been the acting warden at CIW. As of July 29, 2026, CIW reported 1,124 prisoners at the facility. CIW covers 120 acres. CIW is organized into six primary housing units. There are also many other specialized medical, mental health, educational, and work-program buildings throughout the facility.

## IV. APPLICABLE CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS RELEVANT TO CALIFORNIA'S REQUIREMENT TO PROTECT PRISONERS FROM SEXUAL VIOLENCE UNDER FEDERAL LAW

### A. Eighth Amendment Protection against Cruel and Unusual Punishment.

"The Constitution 'does not mandate comfortable prisons' but neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (*quoting Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). The Eighth Amendment prohibits cruel and unusual punishment, thereby requiring that officials provide "adequate food, clothing, shelter, and medical care, and . . . 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (*quoting Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)).

Prison officials violate the Eighth Amendment when they are deliberately indifferent to a "substantial risk of serious harm." *Farmer*, 511 U.S. at 828. Deliberate indifference requires that an official (a) knows of and disregards an excessive risk to health or safety, (b) is aware of facts that could lead to an inference of substantial risk of serious harm, and (c) makes the inference. *Id.* at 837. However, *Farmer* does not require that prison officials be specifically aware of the particular harm to a prisoner; "inference from circumstantial evidence" is sufficient. *Id.* at 842. Circumstantial evidence can include whether a state enacted legislation or prison officials implemented PREA. *Bearchild v. Cobban*, 947 F.3d 1130, 1144 (9th Cir. 2020) (finding PREA and state legislative enactments to be "reliable objective evidence of contemporary values") (citations omitted). Here, both have occurred. In 2019, California criminalized sexual activity between a correctional staff member and a prisoner, even if such activity was otherwise mutually consensual. Cal. Penal Code § 289.6. In 2003, Congress enacted PREA to combat sexual abuse

in correctional settings, 34 U.S.C. § 30301, *et seq.*[3] California has been implementing PREA and producing annual reports since 2015.[4]

The Constitution does not require prisoners to experience serious injury before finding that a substantial risk of serious harm exists. *Farmer*, 511 U.S. at 845; *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) (stating "a remedy for unsafe conditions need not await a tragic event"). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834 (*quoting Rhodes*, 452 U.S. at 347). This applies to physical abuse, including sexual abuse. *See Farmer*, 511 U.S. at 833 ("gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective") (*quoting Hudson*, 468 U.S. at 526). However, not every assault within a prison rises to the level of a constitutional violation. *See Williams v. Field*, 416 F.2d 483, 486 (9th Cir. 1969) (stating "more than an isolated incident of failure to protect is necessary" to establish deliberate indifference).

In *Helling*, the Supreme Court, when evaluating environmental conditions, stated that the line to substantial risk is crossed when the risk "violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling*, 509 U.S. at 36. Although not binding, this provides some context for the evaluation. Further, *Helling* requires a showing of "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury . . . will actually be caused" by the present risk before finding substantial risk exists. *Id.* With failure to protect from abuse claims, there is no direct answer as to when the risk of harm crosses the line into a substantial risk of serious harm. The Court in *Farmer* intentionally did not address this question, and the 9th Circuit has similarly not answered it. *See Farmer,* 511 U.S. at 834 n.3; *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1051 (9th Cir. 2002).

The Eighth Amendment protects prisoners from "[r]ape, coerced sodomy, unsolicited touching of women prisoners' vaginas, breasts and buttocks by prison employees, [which] are 'simply not part of the penalty that criminal offenders pay for their offenses against society.'" *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000) (quoting *Women Prisoners of the Dist. of Columbia Dept. of Corrections*, 877 F. Supp. 634, 665 (D.D.C. 1994)). The Eighth Amendment also protects prisoners from sexual abuse, even when there is no injury. *Bearchild*, 947 F.3d at 1144 ("[O]ur cases have clearly held that an inmate need not prove that an injury resulted from sexual assault in order to maintain a . . . claim under the Eighth Amendment" because "sexual assault is objectively 'repugnant to the conscience of mankind.'" (internal citation omitted)). The Eighth Amendment even protects prisoners from sexual conduct when there is no physical contact, if the conduct was for the staff member's "own sexual gratification, or for the purpose of

---

[3] This investigation and the PREA standards referenced in this report fit squarely within Congress' original intent—eliminating rape in prison. Other PREA standards, such as § 115.42, are currently under review as they may exceed the statutory mandate.

[4] It is noteworthy that deliberate indifference may not exist when officials take reasonable steps to prevent harm, even if those measures fail. *Compare Fisher v. Stewart*, 37 Fed. Appx 947, 948-49 (9th Cir. 2002) (taking steps, such as offering to move an individual out of a housing unit, is not deliberate indifference) *with Berg v. Kincheloe*, 794 F.2d 457, 460-61 (ignoring an individual's expressed fears when reporting to a job and ordering them to report anyway could amount to deliberate indifference).

humiliating, degrading, or demeaning the prisoner." *Id.* This means staff are precluded from voyeurism or other forms of offensive surveillance.[5]

Further, in the Ninth Circuit, the Eighth Amendment protects women prisoners from pat searches by male officers when prison security allows searches from female officers. *Jordan v. Gardner*, 986 F.2d 1521, 1525, 1531 (9th Cir. 1993) (emphasizing the high likelihood that women prisoners will be traumatized by male pat searches considering women prisoners' histories of past sexual abuse). While the Ninth Circuit has not adopted a *per se* rule that prisoners are incapable of consenting to sexual activity with correctional staff, the Circuit Court agrees with other circuits that "[t]he power dynamics between prisoners and guards make it difficult to discern consent from coercion." *Wood v. Beauclair*, 692 F.3d 1041, 1047 (9th Cir. 2012). Thus, sexual abuse allegations bring a presumption that the conduct was not consensual. *Id.* at 1049.

The rule in the Ninth Circuit is clear that a substantial risk of harm is more than an abstract fear. *See Williams v. Wood*, 223 Fed. Appx. 670, 671 (9th Cir. 2007) (finding no substantial risk of serious harm when plaintiff did not allege assaults or threats and only expressed speculative or general fears of harm); *Contreras v. Collins*, 50 Fed. Appx. 351, 352 (9th Cir. 2002) (holding that belief of being in danger while in the same location as a gang when there was no other connection was speculative and did not establish a substantial risk of harm); *but see Sweet v. Hernandez*, 107 Fed. Appx. 775, 776 (9th Cir. 2004) (finding raising fear of attack by individuals who previously targeted plaintiff raised material issue of fact to support deliberate indifference evaluation). And, as the line between risk of harm and substantial risk of serious harm is not clear, the evaluation of deliberate indifference around these claims often falls to the knowledge of prisoners' interactions, direct threats, and known history of violence. *See Labatad v. Corrections Corp. of America*, 714 F.3d 1155 (9th Cir. 2013) (finding officials were not deliberately indifferent when members of rival gangs were housed together when the individuals were housed together in general population without issues, they were not identified as enemies, and prior fights with other individuals were not identified as gang related); *C.M.V. ex rel. Martinez v. Smith*, 458 Fed. Appx. 680 (9th Cir. 2011) (officials were not deliberately indifferent when did not know or have reason to know of the risk of assault); *Romero v. Nevada Department of Corrections,* 673 Fed. Appx. 641 (9th Cir. 2016) (officials were not deliberately indifferent despite staff receiving notes threatening harm to any future cellmate when staff were not involved in housing decisions, notes were more than a year old, and cellmate had been housed with other prisoners in the interim without issue).

Of course, psychological harm and verbal harassment originating from other prisoners may not rise to the level of harm required to support a failure to protect claim. *See McCamey v. Smith*, 2017 WL 2664588, at *2 (W.D. Wash. May 17, 2017) (collecting cases);[6] *see also Austin v.*

[5] PREA limits cross-sex viewing to "routine cell checks" that allows prisoners privacy to shower, perform bodily functions, and change clothing. 28 C.F.R. § 115.15(d). PREA includes "voyeurism" as sexual abuse, defined as: "an invasion of privacy of an inmate . . . by staff for reasons unrelated to official duties, such as peering at an inmate who is using a toilet in his or her cell to perform bodily functions; requiring an inmate to expose his or her buttocks, genitals or breasts . . .." 28 C.F.R. § 115.6.

[6] "Although prisoners have a right to be free from sexual abuse, whether at the hands of fellow inmates or prison guards, the Eighth Amendment's protections do not necessarily extend to mere verbal sexual harassment." *Austin v. Terhune*, 367 F.3d 1167, 1172 (9th Cir. 2004) (internal and other citations omitted). *See, e.g., Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997) (because "verbal harassment or abuse ... is not sufficient to state a constitutional deprivation under" § 1983, prisoner failed to raise a genuine issue as to a constitutional violation on the basis of the

*Terhune*, 367 F.3d 1167, 1172 (9th Cir. 2004) ("The Eighth Amendment's protections do not necessarily extend to mere verbal sexual harassment."). To reach that level, the risk of harm must be sufficiently serious.[7]

Nonetheless, the Ninth Circuit has determined that the Eighth Amendment includes protection of a prisoner's right to be free from sexual harassment and abuse by prison employees while in confinement. *Wood*, 692 F.3d at 1046 ("Sexual harassment or abuse of an inmate by a corrections officer is a violation of the Eighth Amendment."). Sexual abuse is not part of any prisoner's punishment, regardless of the crime for which she or he was convicted. *Farmer*, 511 U.S. at 834.

**B. Fourteenth Amendment Protection of a Prisoner's Person.**

In addition, under the Fourteenth Amendment, in limited circumstances, prisoners have a right to bodily privacy—a right "to shield . . . [their] unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex." *Sepulveda v. Ramirez*, 967 F.2d 1413, 1415 n.5 (9th Cir. 1992) (quoting *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963)). The Ninth Circuit has found that a prisoner's right to privacy is violated when the view of the prisoner is "frequent[ ] and up close" or "neither obscured nor distant." *Byrd v. Maricopa Cty. Bd.*, 845 F.3d 919, 923-24 (9th Cir. 2017); *see Sepulveda,* 967 F.2d at 1416 (finding conduct where a male parole officer observed a female parolee while she used the toilet, when the officer's view was "neither obscured nor distant," violated her right to bodily privacy); *see also Foust v. Hyde*, 2025 WL 775795, at *6 (D. Or. Mar. 10, 2025) (denying summary judgment on plaintiff's right to privacy claim where a female prisoner alleged she was forced to shower in plain view of male staff and other prisoners). Furthermore, the Ninth Circuit reversed a district court's award of summary judgment to the defendants on a plaintiff's Fourteenth Amendment bodily privacy claims where the plaintiff submitted evidence that the defendant officer made sexual comments to her, groomed her for sexual abuse, and looked at her inappropriately while she was showering. *Vazquez v. Cnty. of Kern*, 949 F.3d 1153, 1157 (9th Cir. 2020).

**C. Civil Rights of Institutionalized Persons Act.**

To bring an action under CRIPA, the Attorney General must have reasonable cause to believe "egregious or flagrant conditions [exist] which deprive such persons of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States causing such persons to suffer grievous harm, and that such deprivation is pursuant to a pattern or practice of resistance to the full enjoyment of such rights, privileges, or immunities." 42 U.S.C. § 1997(a). To establish a pattern or practice of violations, the allegations must be more than "the

---

alleged abusive epithets); *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996), *amended*, 135 F.3d 1318 (9th Cir. 1998) (disrespectful and assaultive comments by prison guard not enough to implicate Eighth Amendment); *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (directing vulgar language at prisoner does not state constitutional claim). Nor are allegations of mere threats cognizable as an Eighth Amendment claim under § 1983. *See Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (mere threat does not constitute constitutional wrong).

[7] In *Jordan*, 968 F.2d at 1523, the court found a high probability of psychological harm existed when considering the impact of random cross-gender pat searches on prisoners with a history of victimization. However, the court's evaluation centered on the *facility's* unnecessary and wanton infliction of pain in violation of the Eighth Amendment, not through a failure to protect.

mere occurrence of isolated or 'accidental' or sporadic discriminatory acts;" they must show the actions are the "regular rather than the unusual practice." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977); *see also Cherosky v. Henderson,* 330 F.3d 1243, 1247 (9th Cir. 2003) ("[P]attern-or-practice claims cannot be based on 'sporadic discriminatory acts' but rather must be based on discriminatory conduct that is widespread throughout a company or that is a routine and regular part of the workplace.") (citations omitted).

The Department can show a "pattern or practice" with an expressly discriminatory policy, or through sufficient instances and statistical evidence to infer the existence of a pattern or practice. *See Teamsters*, 431 U.S. at 337 (upholding lower rulings that the Government established a pattern or practice in a Title VII case by showing numerous instances and statistical evidence); *United States v. Fresno Unified Sch. Dist.*, 592 F.2d 1088, 1096 (9th Cir. 1979) ("more than one unlawful practice" is needed "to constitute a 'pattern or practice' of employment discrimination"). Initially addressing Title VII cases, courts have read *Teamsters* as the appropriate standard in non-discrimination claims. The United States does not need to show the existence of a defendant's official policy or custom to evidence a pattern or practice. *United States v. Town of Colo. City*, 935 F.3d 804, 810 (9th Cir. 2019). However, an official policy or legislative enactment can establish a pattern or practice of misconduct. *See United States v. Cnty. of Maricopa*, 889 F.3d 648, 652 (9th Cir. 2018) (holding that "[t]he government's legislative body . . . of course" has "the power to establish official policy on the government's behalf" for purposes of liability in a case concerning a corollary pattern or practice of misconduct in violation of federal constitutional or statutory rights).

There is no minimum number of incidents or victims which the United States must allege or ultimately prove for a pattern or practice. *United States v. Garden Homes Mgmt., Corp.*, 156 F. Supp. 2d 413, 420 (D.N.J. 2001). Although "no mathematical formula is workable, nor was any intended," courts have found that discrimination against as few as two individuals was enough to establish a pattern or practice claim. *United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 227 (5th Cir. 1971). Instead, the "number of incidents necessary to show a pattern or practice depends on the nature of the right protected and the nature of the ordinary violations of such right." *United States v. Mintzes*, 304 F. Supp. 1305, 1314 (D. Md. 1969). And statistical evidence is never required. *United States v. City of N.Y.*, 713 F. Supp. 2d 300, 323 (S.D.N.Y. 2010).

**D. Prison Rape Elimination Act.**

In recognition of the right of state prisoners to be free from sexual violence, President George W. Bush signed the Prison Rape Elimination Act of 2003 into law.[8] The purposes of PREA are to: establish national standards to prevent, detect, and respond to sexual abuse in prisons, jails, juvenile facilities, police lockups, and other detention settings; improve data collection on prison rape; and, provide grants and resources to states to improve inmate safety.[9]

PREA is implemented via 28 C.F.R. § 115, et seq. C.F.R. Title 28 requires that correctional facilities develop and maintain staffing and monitoring plans to protect inmates from sexual abuse

---

[8] Public Law 108-79, enacted on Sept. 4, 2003; 34 U.S.C. § 31301, *et seq. See also* "Prison Rape Elimination Act (PREA) Overview" available at https://bja.ojp.gov/program/prea/overview.

[9] *Id.*

and harassment and that facilities limit cross gender viewing and searches. *See* 28 C.F.R. § 115.13 and § 115.15. 28 C.F.R. § 115.71(a) requires that when prisons conduct investigations into staff sexual abuse, they do so promptly and thoroughly. Moreover, investigators must gather all direct and circumstantial evidence, including processing DNA evidence and interviewing all available witnesses, pursuant to § 115.71(c). Investigators must also document in written reports the investigative facts and findings, including "the reasoning behind credibility assessments" pursuant to § 115.71(f)(2). Finally, § 115.67 requires that prisoners who report sexual abuse or harassment be protected from retaliation.

## V. CONDITIONS IDENTIFIED

The Civil Rights Division has reasonable cause to believe that California, CDCR, CCWF, and CIW engage in a pattern or practice of conduct that violates the Eighth and Fourteenth Amendments. Specifically, these entities fail to protect women prisoners at CCWF and CIW from the substantial risk of sexual abuse committed by staff. The risk of this grievous harm is well known to CDCR, CCWF, and CIW.

Our investigation uncovered numerous sexual assaults by staff that grievously harmed prisoners at CCWF and CIW. Worse still, the investigation found little, if any, evidence CDCR, CCWF, and CIW properly and adequately improved protections for prisoners despite such harm. CDCR, CCWF, and CIW knowingly exposed, and continue to expose, women prisoners to a substantial risk of serious, grievous harm from sexual abuse because the prisons: (1) have inadequate means to detect and deter staff sexual abuse and harassment; (2) lack confidential reporting methods and fail to protect prisoners from retaliation; (3) fail to adequately investigate reported abuse; and (4) ultimately fail to hold staff adequately accountable for abuse or harassment.

The natural consequence of the foregoing failures by CDCR, CCWF, and CIW is that prisoners were subjected to, and continue to be subjected to, a wide range of sexual misconduct by staff, in violation of the Constitution and Federal law. These entities were fully aware of the egregious and flagrant risks of sexual harm that staff posed to prisoners yet remained deliberately indifferent to such risks. This deliberate indifference subjected prisoners to continuing, grievous harm and violated the Constitutional rights of those prisoners. *See Farmer*, 511 U.S. at 844 (noting that prison officials may avoid violating the Constitution "if they responded reasonably to the risk, even if the harm ultimately was not averted").

### A. CDCR and CCWF Are Well Aware That Staff Have Seriously Harmed CCWF Prisoners.

The investigative team examined a substantial body of evidence establishing that: (1) CCWF staff have sexually abused and otherwise grievously harmed prisoners at CCWF, dating back to at least the year 2000; (2) CDCR and CCWF are aware of the grievous harm caused to prisoners by staff; and (3) the foregoing entities have demonstrated a pattern or practice of failing to take reasonable and adequate steps to prevent such grievous harm to prisoners, including adoption of effective practices or procedures to deter, detect, and hold accountable those staff members who would commit such misconduct.

Below is a representational sample of credible prisoner allegations that CDCR has sustained through its administrative procedures, as well as criminal charges or civil complaints, or both:

a. In 2017, CCWF reached an undisclosed settlement to resolve a complaint filed against CCWF and a CCWF staff doctor, Dr. Ernest Reeves, alleging that he had sexually abused a prisoner during gynecology appointments from 2000 to 2009. The prisoner alleged that Dr. Reeves performed unreasonably rough gynecological exams on her. Seven other prisoners alleged similar abuse by Dr. Reeves and were prepared to testify in the case. The investigative team conducted a thorough review of the detailed declarations of these additional prisoners and found the allegations to be credible. Also, in 2025, a class action lawsuit was brought against Dr. Scott Lee, alleging he performed abusive, invasive and unnecessary exams on pregnant women and others incarcerated at the CIW in Chino. That case is proceeding.

b. In 2018, CDCR sustained sexual misconduct allegations against a correctional officer, Israel Trevino Jr., after CDCR determined that in 2017 he sexually assaulted a prisoner. CDCR also determined that the same officer committed sexual misconduct against a second prisoner and intimidated her out of filing a grievance, and that this officer sexually abused a third prisoner as well. In 2023, twenty-nine former prisoners filed a lawsuit alleging the same officer sexually abused them mostly between 2010 and 2015. The lawsuit is ongoing.

c. In May 2022, CDCR sustained sexual misconduct allegations against a sergeant after a prisoner alleged he coerced her into having sex with him weekly for at least six months in 2016 and 2017. CDCR recorded the sergeant's calls in 2021 with the then-released prisoner, now parolee, to sustain sexual misconduct allegations against him. The sergeant resigned in March 2022, weeks before CDCR sustained the allegations against him.

d. In June 2023, CalPIA[10] sustained sexual abuse allegations against a custodian, including sexual intercourse occurring at least ten times and oral sex with a prisoner during 2021.

e. In April 2024, CDCR sustained numerous sexual misconduct allegations against correctional officer Gregory Rodriguez, including that he "engaged in various sexual acts" with six prisoners, sexually assaulted two other prisoners, "received oral sex" from a prisoner, and "engaged in sexual intercourse" with a prisoner. CDCR sustained the allegations based on interviews, corroborating video, and physical evidence. While CDCR received information about some of the allegations against Rodriguez as early as 2014, most allegations involved conduct occurring in 2022, when CDCR appears to have begun its investigation into Rodriguez. One victim reported that Rodriguez raped her six times in the Board of Parole Hearing (BPH) room and threatened to add time to her sentence if she did not submit to his assaults; additional victims reported similar assaults in the BPH room. Among other things, Rodriguez used the BPH room because there were no cameras in that location. The investigative team became aware of more than 65 alleged victims of Rodriguez, more than a dozen of whom the team interviewed onsite. The investigative team found detailed descriptions of the abuse the prisoners stated they experienced at the hands of Rodriguez to be credible. Multiple prisoners independently stated that

[10] Here, the Hiring Authority was the General Manager of the California Prison Industry Authority (CalPIA), now known as the California Correctional Training and Rehabilitation Authority (CALCTRA), a state agency within CDCR. CalPIA/CALCTRA coordinate with CDCR to operate work programs.

officers knew of and protected Rodriguez's crimes. CDCR referred the case to the Madera County District Attorney's Office (Madera County DA) for possible criminal prosecution and listed 21 prisoner-victims. In July 2023, the Madera County DA charged Rodriguez with 97 criminal counts including forcible rape, sodomy, and sexual battery involving 13 of those prisoners. In August 2025, Rodriguez was convicted on 62 of the counts, involving conduct in both 2014 and 2022, and was sentenced to 224 years in prison. In October 2023, the State settled a lawsuit for $3.9 million, involving seven prisoners' claims of abuse against Rodriguez.

f. In January 2025, CALCTRA sustained sexual misconduct allegations against a staff member who supervised prisoners in an eyeglass manufacturing work program, after allegations that a prisoner had given him oral sex in early 2024. CALCTRA also sustained sexual misconduct allegations against him regarding "various" other prisoners for incidents between March 2021 and February 2024. Additionally, CDCR investigators determined that he "fondl[ed another prisoner] through her clothing." CDCR submitted a criminal referral to the Madera County DA having determined that this same staff member coerced a prisoner into "touching and stroking [his] penis while working in [the eyeglass area], both inside and outside of his pants."

g. In May 2025, CDCR sustained sexual misconduct allegations against an officer, including that he forced a prisoner to "orally copulate [fellate] him inside a supply closet" in 2022, "commit[ed] several acts of oral copulation" on a second prisoner, between 2021 and 2022, and "orally copulated and digitally penetrated [a third prisoner]" in 2023. CDCR sustained the allegations based on interviews, corroborating phone records, and movement histories. CDCR referred the case to the Madera County DA for criminal prosecution and listed nine potential prisoner-victims.

h. In February 2026, CALCTRA sustained sexual misconduct allegations against a second staff member who supervised prisoners in the eyeglass manufacture work program. During interviews that led to a referral for criminal prosecution to the Madera County DA, CDCR investigators learned that a prisoner had been in a forced sexual relationship with the staff member from March 2023 until March 2024 that involved intercourse in his office and a breakroom "five of six times" and oral sex at numerous other times. Contraband recovered in prisoners' cells and corroborating testimony from prisoners and staff led to the sustained findings. CDCR investigators also noted that multiple staff members had reported to a supervisor inappropriate behavior on the part of the accused staff member. When confronted by CDCR investigators, the supervisor claimed that while he was concerned and continued to report what he heard, he did not feel his complaints were being taken seriously by his administration and he did not have the support of his management to ensure prisoners were safe around this staff person. In June 2026, the Madera County DA charged the staff member with a felony count of a "sex act with an inmate" that occurred in June 2025. This prosecution is proceeding.

**B. CDCR and CIW Are Well Aware That Staff Have Seriously Harmed CIW Prisoners.**

As with CCWF, the investigative team examined a substantial body of evidence establishing that: (1) CIW staff have sexually abused and otherwise grievously harmed prisoners at CIW, dating back to at least 2013; (2) CDCR and CIW are aware of the grievous harm caused to such prisoners by staff; and (3) CIW has demonstrated a pattern or practice of failing to take

reasonable and adequate steps to prevent such grievous harm to prisoners, including adoption of effective practices or procedures to deter, detect, and hold accountable those staff members who would commit such misconduct.

Below is a representational sample of credible prisoner allegations that CDCR sustained through its administrative procedures, as well as criminal charges or civil complaints, or both:

a. In 2013, a correctional officer, Gary Swatzell, was sentenced to two years in prison for sexually abusing and impregnating a CIW prisoner, acts which he attempted to cover up.

b. In 2015, CDCR fired an officer, Michael Ewell, for having "an inappropriate and sexual relationship with an inmate," at CIW, including having sex with her multiple times and forcing her to give him oral sex.

c. CIW officer Tony Garcia was prosecuted and pleaded guilty to forcing a prisoner to perform oral sex on him in 2017.

d. In April 2018, CDCR sustained sexual misconduct allegations from October 2017, against an officer after setting up a surveillance operation to record his misconduct. The video captured the officer sexually assaulting the complainant prisoner. CDCR also captured video evidence of the officer assaulting a second prisoner in the same cell, at the same time.

e. In August 2020, CDCR sustained sexual misconduct allegations against an officer after he admitted in August 2019 that he looked at a prisoner who was naked from outside her cell and wrote her sexually explicit letters. CDCR also determined that he had "sexual intercourse with her" in July 2019.

f. In January 2023, CDCR sustained allegations against a correctional staff cook after CDCR determined he "engaged in sexual intercourse with [an] inmate against her will" in April 2020 and "engaged in oral sex" with her in June 2020. The prisoner alleged that he forced her to have sex with him by threatening her with discipline for stealing vegetables which would have caused her to transfer to a higher-security-level prison and lose visitation with her children. CDCR sustained the allegations based on interviews and corroborating evidence from the prisoner's diary which CDCR investigators found to be "credible" because entries were "in chronological order, detailed, and consistent." CDCR submitted a referral for prosecution to the San Bernardino County District Attorney's Office in September 2022, which that office later declined to pursue for evidentiary reasons.

g. In October 2023, CDCR sustained misconduct allegations against an officer after CDCR determined he sexually harassed a prisoner in June 2023. Of note, CIW sustained the allegations that were captured on the officer's body-worn camera (BWC). CDCR suspended the officer for 38 days without pay.

h. In January 2024, CCHCS[11] sustained allegations against a staff mental health counselor after he "attempted to engage in sexual misconduct with multiple patients when [he] was overheard

[11] Here, the Hiring Authority was the Chief Executive Officer of the California Correctional Health Care Services (CCHCS), a state agency within CDCR. CCHCS provide medical and mental health services to CDCR prisoners.

requesting and making suggestive comments to view and expose patients' private areas." A prisoner had alleged in September 2022 that in August of that year, this same counselor had sexually harassed another prisoner and forced a third prisoner to expose her breasts and perform sexual acts on herself as he watched from outside her cell. Through interviews and video footage review, CCHCS confirmed that he had an "overfamiliar relationship" with the third prisoner, that he failed to document multiple extensive cell-side encounters, and that he attempted sexual misconduct, all of which led to his firing.

i. In May 2024, CDCR sustained sexual misconduct allegations against a correctional sergeant for providing contraband (cigarettes, alcohol, and lingerie) in exchange for sexual favors from prisoners, including caressing one of the prisoners' breasts between March and May 2023. Physical evidence, discovered in the sergeant's vehicle and in a prisoner's cell, supported the allegations. In addition, the sergeant turned off his BWC (against policy), creating gaps in recording during some of the encounters with prisoners. Nonetheless, the sergeant's BWC captured him "caressing" one of the prisoners' breasts. When interviewed for this investigation, one of the prisoner-victims stated that she had faced retaliation from other officers because the sergeant had been caught and held accountable. The prisoner stated that she was afraid to talk to investigators while onsite because she feared further retaliation.

j. In March 2025, CCHCS sustained sexual misconduct allegations against a nurse after CDCR caught him on camera in May 2024 for, *inter alia*, blowing kisses to a prisoner, asking her to lift her shirt up and expose her breasts, which she did, and gesturing in a way that seemed to refer to oral sex on a male.

### C. Hundreds of Other Sexual Misconduct Allegations.

According to the State's own records, between 2023 and June 2025, prisoners made more than 375 allegations of staff sexual misconduct at the two women's prisons. Overwhelmingly, prisoners who are currently incarcerated made these allegations. In addition, 320 private lawsuits have been filed, mostly by former prisoners, against CDCR/CCWF/CIW. The investigative team reviewed more than 350 prisoner allegations of sexual misconduct by staff.

In addition to the formal prisoner allegations of staff sexual misconduct that the investigative team reviewed in the facility records, many prisoners reported allegations of sexual misconduct to the investigative team during onsite visits in May and July 2025. Prisoners indicated that they had not previously reported these allegations because they feared retaliation from staff if they did so.

### D. Inadequate Prevention, Detection, and Staff Accountability Regarding Sexual Abuse and Harassment Harms Prisoners.

CDCR, CCWF, and CIW knowingly expose women prisoners to a substantial risk of serious, grievous harm from sexual abuse because the prisons: (1) have inadequate means to detect and deter staff sexual abuse and harassment; (2) lack confidential reporting methods and fail to protect prisoners from retaliation; (3) fail to adequately investigate reported abuse; and (4) ultimately fail to hold staff adequately accountable for abuse or harassment.

The foregoing failures constitute deliberate indifference to the unconstitutional conditions that exist in the prisons.

### 1. *CDCR, CCWF, and CIW have inadequate means to detect and deter staff sexual abuse and harassment of prisoners.*

Inadequate remote monitoring. CDCR, CCWF, and CIW fail to fully secure and monitor their facilities. Unmonitored areas and blind spots, and unclear or improperly enforced policies regarding the use of BWCs, create an environment in which staff engages in sexual misconduct without the means of adequate deterrence or detection.

Although the prisons have recently made improvements, these changes are insufficient to adequately address the serious risk of sexual harm perpetrated by staff against prisoners, as demonstrated by a lengthy and repeated cadence of sexual abuse dating back at least as far as 2000. For example, CCWF moved shelves in the eyeglass work program to improve line of sight and installed additional cameras in locations where several sexual misconduct incidents occurred. However, unmonitored areas and blind spots persist.

At CCWF, only a single camera is located outside Plant Operations, and there are many blind spots behind the locked gate. That area contains piles of materials and appears overgrown, all of which obstruct monitoring efforts. Additionally, CCWF's kitchen has blind spots because of the presence of numerous food carts that are frequently moved, blocking the view of cameras that have been added. At CIW, prisoners told us they were concerned about blind spots in the kitchens, especially where dishes are washed.

At both prisons, prisoners told us that kitchen storage rooms do not have cameras. The prisoners call these areas "sugar rooms," both because sugar is stored there and, more importantly, because sexual activity occurs in these spaces without detection. The investigative team confirmed the kitchen storage rooms lacked cameras, although a recently installed mirror eliminated a blind spot behind certain shelving at CIW.

Failure to properly protect prisoners' bodily privacy. Additionally, CCWF and CIW fail to protect prisoners from inappropriate viewing by staff. At both prisons, toilets and showers lack the means to protect the private body parts of prisoners from gratuitous outside view, while maintaining security within the prison. For example, at CCWF, inside the substance abuse program building, toilet doors are essentially three glass panels, separated by modest strips of framing, leaving prisoners almost completely visible when seated on the toilet, which faces the door. Also, at CCWF, prisoners told the investigative team that coverings were added to showers in the housing unit just before the investigative team arrived for an onsite visit. This represents a temporary attempt to urgently address an issue for purposes of showing improvement to the investigative team, rather than a sustainable, systemic correction of a serious physical plant inadequacy. In addition to the conditions at CCWF, at CIW, toilets in the recreation yard are built inside a concrete structure, low to the ground. The toilets are visible from directly above the concrete building, exposing prisoners using the toilets to inappropriate viewing by staff and others.

The lack of a means to protect prisoners' private body parts from inappropriate viewing is particularly noteworthy because, as the investigative team observed at both CIW and CCWF, staff

fail to announce their presence when entering into and when present in housing units. At CIW, prisoners told the investigative team officers to open doors without knocking, enabling the officers to view prisoners while they are changing clothes. At CCWF, two prisoners in restrictive housing reported the showers had been completely open until a partial barrier was installed just before the investigative team's May 2025 site visit. Again, the investigative team does not view these sorts of changes to be systemic, sustainable improvement. During the investigative team's visits, more than a dozen prisoners reported that staff purposively watch them while they (prisoners) are in the shower or when they are seated on the toilet. *See Sepulveda,* 967 F.2d at 1416 (right to bodily privacy violated when a male officer observed a female using the toilet, when the officer's view was "neither obscured nor distant"). Prisoners reported that they do not report these matters to staff because they fear retaliation.

Failure to adequately monitor staff activities. BWCs, while required for custodial staff as far back as 2021, are not consistently used, as required. Use of BWCs deters and aids in the detection of misconduct and also aids in the process of holding offenders accountable for such misconduct. *Armstrong v. Newsom*, 58 F.4th 1283, 1299 (9th Cir. 2023) ("[B]ody-worn cameras 'can provide information that stationary surveillance cameras cannot—including sound and views into remote prison spaces—that will be useful in investigating alleged misconduct by officers.'"); *Armstrong v. Newsom*, 484 F. Supp.3d 808, 837 (N.D. Cal. 2020) (finding that "body cameras are likely to improve investigations of misconduct by [correctional] staff and to reduce the incidence of violations of [prisoners'] rights"). BWCs are relatively inexpensive, readily available, and used commonly throughout law enforcement and prison environments.

Given the long-term history of staff-on-prisoner sexual violence and related misconduct within CCWF and CIW, mandatory, full-time use of BWCs by custodial staff on-duty should be an effective security measure to deter and detect misconduct by staff in the facilities. Unfortunately, as further evidence of CDCR's/CCWF's/CIW's deliberate indifference, the investigative team found that staff routinely fail to use BWCs in violation of CDCR and facility policies. Those staff face little or no consequence for this failure—a circumstance well known to CDCR, CCWF, and CIW.

Only a handful of cases that were reviewed contained relevant BWC footage. Many cases that were sustained relied on evidence other than BWC footage. Many more cases were not sustained but were also not informed by the benefit of BWC footage. Of note, CDCR sustained allegations of the misuse of BWC in connection with a sustained staff sexual misconduct allegation against a sergeant in May 2024. Clearly, the facility knew of the importance of BWC by that date. CDCR leadership explained to the investigative team that random, monthly audits are conducted to detect and deter improper BWC deactivations. However, prisoners at both prisons reported to the investigative team that officers turn off their cameras when engaged in misconduct.

The great weight of the available evidence supports the prisoners' contention—that staff are deactivating or otherwise disabling their BWCs without effective or adequate sanction from CDCR. Consequently, the evidence indicates that CDCR is failing to deter or detect grievous misconduct and/or hold perpetrators accountable despite CDCR's full knowledge of the risk of serious, grievous harm to prisoners at the hands of staff. This failure, along with the other failures described herein, constitutes deliberate indifference, given administrators' knowledge of the value of BWC in deterring/detecting misconduct and holding violators accountable. Administrators'

deliberate indifference is subjecting prisoners to grievous harm and the risk of grievous harm in violation of the Constitution.

In addition, only correctional line staff are required to wear BWCs, meaning that CDCR and the facilities are failing to undertake even minimal efforts to deter, detect, and hold accountable misconduct by various *other* staff within the prisons, including supervisors and staff who occupy investigative or non-custody roles. This practice is particularly troubling and further evidence of the deliberate indifference on the part of CDCR, CCWF, and CIW to the serious risk posed to prisoners by staff, considering that it is well known that CDCR and the facilities have sustained allegations of sexual misconduct of non-custodial staff over many years, including against a cook, a mental health counselor, a janitor, CALCTRA staff members, and facility supervisory staff.[12] Prisoners have also made allegations against a staff chaplain, a dental hygienist, and a doctor, among others. The investigative team reviewed sexual misconduct investigations involving two separate lieutenants, one who was the subject of allegations in 2024 and another in 2020. Both investigations were found to be unsubstantiated. However, it is noteworthy that insufficient evidence existed to make a more fully informed determination. Both investigations would have benefited from BWC footage produced by cameras worn by the lieutenants. Given this long history, the failure to require all staff inside the prisons to be equipped with BWCs and use them without unpermitted interruption is clear evidence of deliberate indifference to the serious, grievous harm and risk of harm posed to prisoners by staff.

The investigative team found that inadequate staffing and a disjointed, stove-piped management chain of command exacerbated inadequacies in protecting prisoners from constitutional violations. The record shows that when staffing levels are inadequate, officers have greater opportunity to engage in sexual misconduct without being observed. The investigative team observed firsthand how the facilities are understaffed. During a site visit, programs and activities were suspended due to the lack of adequate staff. Employees and prisoners confirmed this to be a frequent occurrence. When programs and activities are suspended, prisoners are secured in their housing units, often with a single officer. The lack of two or more officers present together has created an increased risk for staff-on-prisoner sexual harm. For example, CDCR investigators stated that an officer, described above, would engage in sexual misconduct when the other assigned officer in his housing unit would leave to take some of the prisoners to the dining hall.

### 2. *Lack of confidential reporting methods and failure to protect prisoners from retaliation.*

The investigative team found a general failure by CDCR, CCWF, and CIW to provide confidential reporting methods to prisoners who report sexual abuse and harassment. This failure exposes prisoners to harm by allowing staff, including those accused of misconduct, to access allegations. It also deters prisoners from reporting sexual abuse. Additionally, the investigative team found that CDCR, CCWF, and CIW fail to consistently provide prisoners who report sexual abuse or harassment access to support resources. Lack of support worsens the impacts of the other failures. Our investigation specifically revealed the following:

---

[12] Even if non-custody staff are not required to wear BWCs, they should be observed by cameras, as appropriate, when interacting with or among prisoners.

- Staff access to allegations of wrongdoing. Prisoners report staff sexual misconduct verbally or through a written grievance form, commonly referred to as a "602." Once collected, grievances are scanned into an online system. The scanned 602s are accessible by any and all staff members assigned to the respective facilities, including staff members who have purportedly been "confidentially" accused of sexual misconduct by prisoners. Prisoners are aware of this gap in confidentiality and fear retaliation as a result. While CDCR told the investigative team that only certain staff will have access to allegations of misconduct in the future, there is currently no way to prevent access by an accused staff member to allegations that have been made against him/her. Although it is possible to see which staff members view an allegation, CDCR staff indicated that auditing staff access to allegations is not a common practice. The investigative team found only one investigation where investigators audited the system to determine whether an accused staff member had accessed a prisoner's complaint. Thus, any staff member engaging in misconduct can locate allegations in which they are named and use or share this information, largely with impunity.

    - Prisoners told the investigative team that staff members have accessed "confidential" grievances filed against them. In fact, CDCR sustained allegations against one officer for accessing prisoners' online files "without operational need." In his case, the officer did it in connection with 11 prisoners, nine of whom had filed grievances against him for sexual misconduct.

- Prisoner impression of inadequate separation of investigations from facility staff. When staff are accused of sexual misconduct, an initial investigation begins with facility-based staff (either from the Investigative Services Unit (ISU) or from the PREA staff), who interview the complainant and gather initial evidence, such as BWC and fixed camera recordings. Facility-based staff write a memo of their initial findings and route their memos to CDCR's Office of Internal Affairs (OIA). After this initial investigation, OIA, a centralized division within CDCR, conducts a more fulsome investigation, which includes interviewing witnesses, gathering further evidence, and interviewing the accused staff member. (Prior to 2022, facility staff conducted the full investigations.) OIA then authors a findings-of-fact report to the prison's warden who determines whether allegations are sustained. Prisoners repeatedly told the investigative team that having facility-based staff interview complainant-prisoners during the initial investigation phase risked the accused staff member learning of allegations against him/her, including learning the identity of the accuser(s). The investigative team found these concerns to be credible given that, as discussed more fully above, accused staff members are able to access facility-based data systems to determine whether they are the subject of allegations/investigations and the identity of their accuser(s).

- Lack of Confidentiality. Additionally, the initial interviews by facility-based staff are not always done in a confidential manner. CDCR leadership and facility-based investigators told our investigative team that the initial interview of the complainant-prisoner is set up by facility-based investigators calling the prisoner's housing unit officer to request the prisoner meet them in an "admin building" or "multi-purpose room" to be interviewed. This summoning is then recorded in a computer system by the housing officer as a "ducat," which all officers can view in the online computer system. Some facility-based staff said

they try to protect the confidentiality of the investigation by not including the purpose of the ducat (i.e. a sexual misconduct investigation). However, prisoners told the investigative team that when the housing unit officer is alerted by the facility-based investigator's phone call, it flags that an investigation is occurring because that is the only reason facility-based investigators would ducat a prisoner for an interview. Common knowledge of these system vulnerabilities dissuades prisoners from filing complaints because they perceive that their allegations will lack confidentiality.

- Moreover, prisoners told the investigative team that they are sometimes interviewed in program offices that are routinely accessed by staff. A prisoner at CCWF told the team the officer she accused of retaliation was present in the area when she was interviewed. Another prisoner, who submitted a grievance alleging she was sexually assaulted by a dental hygienist, said that in 2023 she refused to be interviewed by a facility-based investigator because the investigator came to her dorm to do the interview, and did so in front of other officers and prisoners, instead of summoning her through the ducat system to a confidential interview. Still another prisoner told the investigative team that she reported sexual harassment by an officer a few months prior to the investigative team's May 2025 visit to CCWF. The prisoner said that when she was being interviewed about her allegations, a lieutenant who supervised the officer she was reporting for misconduct, kept walking into the interview.

• Failure to consistently notify reporters of sexual abuse or harassment of access to victims' advocates or mental health services. Prisoners at CCWF and CIW can request an external victim advocate for confidential support or request assistance during the investigation process. CDCR, CCWF, and CIW leadership reported that prisoners are offered contact with a victim advocate during initial interviews with facility-based investigators, but prisoners with whom the investigative team spoke onsite reported not knowing who the victim advocates were or that they even existed. Accessing mental health services is similarly difficult because mental health services are not located in areas prisoners can readily access.

- The investigative team did find some cases in which prisoners had access to victim advocates, but even these cases also demonstrated systemic inadequacies. For example, in one case that occurred in 2023, CDCR investigators interviewed a prisoner without providing a victim advocate. CDCR investigators interviewed the prisoner again a month later, after the prisoner had requested and been given a victim advocate. In the second interview, she shared new facts and greater detail than she had shared in her first interview. It appears from the investigative report that CDCR investigators concluded that her testimony was inconsistent and determined that her allegations were unsubstantiated. The investigative team found that under the circumstances, it was not appropriate to find the prisoner lacked credibility simply because she gave a more fulsome account of the alleged events after a victim advocate had been assigned.

***3. Failure to adequately investigate reported sexual abuse.***

The investigative team also found numerous examples in which CDCR, CCWF and CIW failed to adequately investigate reported sexual abuse and harassment, including the following:

- California's Office of the Inspector General (OIG) has documented that CDCR's staff misconduct investigations suffer from serious delays. In 2025, 62% of the 230 staff misconduct allegations investigated by the Allegation Investigation Unit (a unit within OIA) were not completed in a timely manner and resulted in harm because of the delays. For example, in the case of a CCWF officer, the OIG determined there was an unnecessary delay where CDCR investigators did not finish their investigation until 223 days after it had been assigned to them. This delay–compounded by delays that had occurred before the matter was assigned to the CDCR investigators—did not result in discipline against the officer because the final decision exceeded the one-year-time-limitation period provided for in the disciplinary policy and was administratively time barred. The same audit reflected systemic failures by CDCR in investigating and disciplining officers facing administrative and criminal investigations. The audit found that overall, between January and June 2025, 86% of the disciplinary and criminal investigations that CDCR conducted were "inadequate" (meaning there were significant problems with the investigation that affected its final outcome) or "needs improvement." Only 14% of cases were adequate. These statistics improved somewhat between July and December 2025: 51% were determined to be "inadequate" or "needs improvement" and 49% were deemed adequate. However, the percentage of investigations that still fail to meet the "adequate" level remains unacceptably high.

    - In the case of a CIW lieutenant accused of sexual misconduct of a CIW prisoner, investigators delayed interviewing the complainant for six months in 2024. By the time CDCR investigators attempted to interview the prisoner, who had been transferred from CIW to CCWF, she refused to participate.

- In July 2023, a prisoner submitted a grievance alleging that a CIW correctional officer told her that he had touched her inappropriately while she was under anesthesia during a procedure at an outside hospital. The officer allegedly stated to the prisoner that he should have assaulted her when he had the chance. The prisoner told investigators the officer had also groped and kissed her while escorting her to and from the hospital. She apparently gave investigators potential DNA evidence on a tissue, after he kissed her on the lips. CDCR investigators did not process the tissue for possible DNA evidence. In July 2024, Acting Warden Levelle Parker reviewed the amended report without the DNA results or any discussion of the DNA evidence and found the allegations to be unsubstantiated. CDCR did not interview the accused officer prior to that finding. The officer retired on April 28, 2024. The investigative team found this investigation to be inadequate.

    - On April 11, 2024, before CDCR concluded the above investigation, another prisoner reported to CDCR staff that the same officer sexually harassed her on multiple occasions between 2020 and 2021. The officer retired only thirteen days after she made these allegations. In August 2024, CDCR found this second prisoner's allegations to be unsubstantiated as well. Like the above case, CDCR determined the allegations of sexual harassment to be unsubstantiated without interviewing the accused officer. The investigative team also found this investigation to be inadequate.

- In November 2022, two female staff members alleged to CDCR investigators that a senior male CIW clinical laboratory technician ("lab tech") sexually harassed two prisoners. The female staff members stated in a signed letter that after "several months," he had "gone too far with his sexually explicit comments and over familiarity with inmates." They listed specific examples including one where a prisoner left a banana in the lab and the lab tech said, to another prisoner, "You should put batteries in it" and indicated that it could be used as a sex toy." The staff complainants also wrote that the lab tech told a story to the prisoners about how he was once in a communal shower in the Army but "he wasn't embarrassed because his penis was bigger than some of the other guys." CDCR investigators, to whom the initial facility-based investigative efforts were referred, found the allegations to be unsubstantiated without interviewing the complaining CIW staff members or the lab tech. Instead, they based their findings solely on the initial notes of the facility-based investigators, who only interviewed the prisoners to whom the comments allegedly were made. The investigative team found this investigation to be inadequate.

- In April 2025, a prisoner told CCWF's investigators how an officer engaged in what she referred to as "voyeurism" and that the officer "stares at them [prisoners in her housing unit] while they are in the shower and/or sleeping." The same prisoner filed a grievance in August 2025 in which she alleged the same officer entered her dorm-style housing cell, where she and numerous other prisoners are housed, and stood in the center of the cell at 5:00 AM as prisoners were sleeping in "nightgowns," "boxers," and "different stages of undress" because "temperatures were over 100 degrees." According to her grievance, one prisoner started screaming because of his presence, waking up the others. The prisoner alleged that the officer had no legitimate reason to be in the cell alone with the prisoners at that time. During the investigative team's May 2025 onsite visit, many prisoners made similar, unprompted claims about this officer. Multiple prisoners individually stated to investigative team members that this officer would make statements such as "Daddy's home" and "I want to see some live breathing flesh," during his night checks. The investigative team found the prisoners' claims to be credible due to their consistency and their detailed nature. The investigation into the April 2025 incident and the August 2025 grievance both remain open.

- In April 2025, a prisoner at CCWF submitted a grievance alleging that a CCWF chaplain sexually abused her from September 2023 to April 2024. She stated in her grievance that she sought spiritual guidance from him as a religious leader, but that he regularly molested her. She alleged that at one point he "remov[ed her] shirt and touch[ed her] breast" and "t[old her] to touch him on his penis." The chaplain reportedly told the prisoner that he would help her get her sentence reduced if she agreed to sexual contact and would place additional liberty restrictions on her if she refused. As of June 2026, 14 months later, this investigation remained open.

- From June to November 2025, a prisoner at CCWF wrote multiple grievances to CCWF that an officer had, and continued to, sexually harass her, including by requesting sexual favors, and that he wrote a letter to her describing how he wanted to have sexual intercourse with her. When the investigative team spoke with her in May 2025, she described the alleged sexual misconduct by this officer. Her description of the alleged events was

detailed and the team found her allegations to be compelling and credible. As of June 2026, 12 months after her initial grievance, this investigation remained open.

The investigative team also found that CDCR's investigations routinely fail to provide the reasoning behind their findings and their assessment of the credibility of witnesses, particularly the complainant or reporter. The following examples pertain:

- In January 2022, a prisoner alleged that a CIW correctional officer raped her in 2009 or 2010. CDCR deemed three prior allegations against this same officer not sustained, including allegations that he had sex with a prisoner, raped another prisoner, and exposed his penis to a third prisoner. The 2022 allegation investigation reflects that a CDCR investigator interviewed this alleged prisoner-victim for more than 20 minutes, asking detailed questions to gather specifics about the alleged rape. The prisoner provided a thorough description of the events surrounding the alleged rape. Her description of the officer's *modus operandi* was consistent with an allegation made previously by a different prisoner—that he exposed his penis in the officer's station, asked the prisoner if she liked it, and later got her alone in the game room where he raped her. The prisoner also said that after the rape, the officer followed her for months and told her he wanted to have sex with her again, which led to a separate sexual harassment allegation. Nowhere in the investigation reports was an assessment made of the prisoner's credibility or lack thereof. The accused officer denied ever seeing the prisoner before or even knowing who she was. CDCR did not sustain the prisoner's allegations despite having no documented assessment of her credibility. The investigative team found the prisoner's allegations to be credible based upon consistency between the allegations made by this prisoner with those previously made by another prisoner, particularly the description of the officer's *modus operandi*.

- In November 2023, a prisoner alleged that a CIW lieutenant sexually abused her multiple times in 2023. The investigative file reflects that a CDCR investigator interviewed the prisoner to gather evidence regarding the allegations. The prisoner explained that the abuse occurred in a private office without a camera and that the lieutenant did not wear a BWC. Lieutenants are not required to wear BWCs. The prisoner described that the lieutenant digitally penetrated her vagina on more than one occasion. In March 2024, CDCR investigators interviewed her two more times and her testimony remained consistent. When CDCR investigators interviewed the lieutenant, he denied all misconduct. In March 2025, CDCR found the allegations to be unsubstantiated. The CDCR investigators included three "note[s]" in their report which implicitly reflect that investigators had determined the complainant prisoner lacked credibility, including: the prisoner: was "hesitant to provide detailed information;" "provided vague information;" and, "appeared to be irritated when asked to provide details." Here again, the investigative team found that these were inappropriate bases to find the prisoner lacked credibility. The investigative team, after reviewing the available records, assessed the prisoner to be credible. Specifically, her testimony was consistent and provided details of the alleged events. CDCR found the allegations to be unsubstantiated. Of particular concern, this prisoner's allegations were part of a larger investigation of the lieutenant that involved nine other potential victims of sexual misconduct. All of these investigations were similarly found to

be unsubstantiated. This leaves open the question of whether CDCR likewise improperly reached findings without impartial analysis in those related complaints.

As further evidence of the lack of CDCR's thorough investigations, three of the five cases of alleged criminal misconduct involving officers/staff noted above, which were referred for criminal prosecution, were dropped due to evidentiary inadequacies.

#### *4. The failures described above ultimately led to CDCR, CCWF, and CIW failing to hold staff adequately accountable for sexual abuse or harassment.*

CDCR, CCWF, and CIW have three separate supervisory hierarchies responsible for investigating and disciplining respective staff accused of sexual misconduct: CCHCS health care, CALCTRA work programs, and security operations. These hierarchies do not always coordinate. Consequently, investigations of staff are often not appropriately communicated and coordinated across such hierarchies or with facility/CDCR leadership. In short, the existence of separate, stove-piped supervisory chains in a single facility creates ambiguity and confusion, which tends to undermine the consistency of investigations and staff accountability.

Additionally, the investigative team found repeated instances in which staff were permitted to avoid the full weight of the administrative sanctions available to CDCR for their egregious and flagrant sexual abuse and harassment of prisoners. Included among the examples of staff sexual misconduct discussed herein are at least nine examples in which staff were not fully held accountable once the allegations were sustained. Instead, they were allowed to retire with accrued benefits or resign without sanction.

These instances include, but are not limited to when CDCR approved: (1) CCWF officer Trevino's retirement on April 9, 2018, one day prior to CDCR's notice to dismiss him on April 10, 2018; (2) the August 25, 2020 resignation of a CIW officer days after CDCR sustained sexual misconduct allegations against him on August 17, 2020, but prior to dismissing him (he admitted in August 2019 that he looked at a prisoner who was naked from outside her cell and wrote her sexually explicit letters); (3) a CCWF sergeant's resignation in March 2022 (though his phone calls were recorded in 2021), a few weeks prior to when CDCR sustained allegations against him in May 2022 for which CDCR would have dismissed him but instead took "no action . . . due to employee resignation;" (4) CCWF officer Rodriguez's retirement in August 2022, days after facility-based investigators completed initial memos that opened more fulsome OIA investigations into his sexual abuses; (5) the retirement of a CIW sergeant effective on April 23, 2024, just days before CDCR sustained sexual misconduct allegations against him that would otherwise have led to his dismissal on April 25, 2024 (he was caught turning off his BWC and caressing a prisoners' breast); and (6) the March 15, 2025 retirement of a CCWF officer weeks prior to when CDCR sustained allegations against him on May 2, 2025 (he was referred for criminal prosecution for nine potential prisoner-victims).[13] CDCR approved each of these personnel actions "under unfavorable circumstances," but approved them nonetheless.

[13] CDCR also recently approved a CIW officer's (discussed above) retirement on June 1, 2026 "under unfavorable circumstances." Like the above investigations, CDCR approved his retirement prior to determining the outcome of voyeurism allegations which remain open since April and August 2025.

## VI. DISCUSSION

**A. CDCR, CCWF, and CIW's Constitutionally Objectionable Deliberate Indifference to the Risk of Serious Harm to Prisoners Is Clearly Reflected by Their Widespread Noncompliance with the PREA Regulations.**

As noted above, "[T]he Constitution 'does not mandate comfortable prisons' but neither does it permit inhumane ones." *Farmer,* 511 U.S. at 832 (*quoting Rhodes*, 452 U.S. at 349). The Eighth Amendment prohibits cruel and unusual punishment, therefore requiring that officials provide "adequate food, clothing, shelter, and medical care, and . . . 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (*quoting Hudson*, 468 U.S. at 526-527).

Prison officials violate the Eighth Amendment when they are deliberately indifferent to a "substantial risk of serious harm." *Farmer*, 511 U.S. at 828. Deliberate indifference requires that an official: (a) know of and disregard an excessive risk to health or safety, (b) be aware of facts that could lead to an inference of substantial risk of serious harm, and (c) make the inference. *Id.* at 837. However, *Farmer* does not require that prison officials be specifically aware of the particular harm to a prisoner; "inference from circumstantial evidence" is sufficient. *Id.* at 842. Crucially here, such circumstantial evidence includes whether a state enacted legislation or prison officials implemented the PREA. *Bearchild*, 947 F.3d at 1144 (finding PREA and state legislative enactments to be "reliable objective evidence of contemporary values"). CDCR, CCWF, and CIW have demonstrably failed in many respects to properly implement PREA and its zero tolerance for sexual abuse and sexual harassment. *See* 28 C.F.R. § 115.11.

PREA regulations further require that "each facility . . . shall develop document, and make its best efforts to comply on a regular basis with a staffing plan that provides for adequate levels of staffing and where applicable, video monitoring to protect inmates against sexual abuse." *Id.* § 115.3(a). 28 C.F.R. § 115.13 lists several considerations that facilities must take into account when determining the adequacy of its efforts in relation to the foregoing, including but not limited to: any judicial findings of inadequacy; all components of the facility's physical plant (including blind spots or areas where staff or prisoners may be isolated); the composition of the prisoner population; the prevalence of substantiated and unsubstantiated incidents of sexual abuse; and, any other relevant factors.

As explained in Section V above, CDCR, CCWF, and CIW have violated 28 C.F.R. § 115.13. The prison populations at CCWF and CIW are comprised of females, warranting security and protection measures commensurate with a female population. Among such requisite measures is the need for adequate staff and adequate measures to cover high risk areas of the respective physical plants of the facilities. Unfortunately, it is clear that inadequate staff are assigned to detect, deter, and hold accountable staff members who would commit sexual violations against prisoners at CCWF and/or CIW. The sheer breadth and depth of substantiated allegations, many of which are detailed above, speak loudly to this fact.

It is also clear that the respective physical plants of the facilities at CCWF and CIW have blind spots and lack appropriate means of oversight, creating areas where staff have grievously harmed prisoners and posing a serious risk of future harm.

Finally, the sheer number and nature of sustained sexual misconduct allegations made by prisoners against staff over the past 26 years underscore the inadequacy of the efforts undertaken by CDCR, CCWF, and/or CIW in protecting the population from sexual abuse or harassment by staff and that CDCR, CCWF, and CIW are aware of their respective failures to protect prisoners, as required by the Constitution. *See*, *e.g., Farmer*, *supra*.

Next, 28 C.F.R. § 115.15 requires, in pertinent part that: "The facility shall implement policies and procedures that enable inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks. Such policies and procedures shall require staff of the opposite gender to announce their presence when entering an inmate housing unit." As identified above, CCWF and CIW do not follow this requirement. In fact, staff routinely enter housing units without announcing their presence and facilities are not uniformly configured to protect private areas of a prisoner's body from casual viewing by the opposite gender.

Additionally, 28 C.F.R. § 115.71(a) requires that when prisons conduct investigations into staff sexual abuse, they do so promptly and thoroughly. Moreover, investigators must gather all direct and circumstantial evidence, including processing DNA evidence and interviewing all available witnesses. *See* § 115.71(c). Investigators must also document in written reports the investigative facts and findings, including "the reasoning behind credibility assessments." § 115.71(f)(2). As reflected above, CDCR, CCWF, and CIW routinely fail to comply with these PREA requirements. Indeed, as further evidence of constitutionally prohibited deliberate indifference, the investigative team found numerous examples where investigations were incomplete (e.g., they lacked basic information, failed to include interviews of all witnesses and the accused, lacked forensic evidence—including DNA examinations and BWC footage, etc.) and were untimely, in many cases taking months or years to complete.

The failure of CDCR, CCWF, and CIW to comply with the PREA regulations contained in 28 C.F.R. § 115, et seq., despite the clear, long-term knowledge of the risks of harm faced by prisoners from staff and the wide recognition that adherence to the PREA regulations greatly reduces the risk of sexual harm in prisons, reflects the deliberate indifference of CDCR, CCWF, and CIW to the unconstitutional conditions that exist in their facilities. The breadth of noncompliance with the PREA standards underscores CDCR's/CCWF's/CIW's deliberate indifference and constitutes a pattern or practice of egregiously and flagrantly violating prisoners' rights to be free from sexual abuse and sexual harassment. The impact of this pattern and practice is reflected in a general lack of trust in the entire sexual abuse and sexual harassment reporting system among the prisoner populations at CCWF and CIW.

28 C.F.R. § 115.67 requires that prisoners who report sexual abuse or harassment be protected from retaliation. This requirement is accompanied by detailed steps that facilities are required to take in order to meet the intent of the section, overall. Despite these requirements and

the duty of CCWF and CIW to implement the regulation, many prisoners credibly reported to the investigative team that they lack trust in the reporting process within CDCR, CCWF, and/or CIW due to issues described above. Many prisoners who were interviewed stated that they "are too scared" to report allegations against staff and some shared that they had been "retaliated against." During onsite visits, prisoners stated that they were scared to talk with the investigative team because staff were nearby. These concerns were seen in documents CDCR provided and in interviews CDCR conducted itself.

Many prisoners offered credible examples of alleged officer retaliation. Among these allegations were claims that officers who are the subject of misconduct allegations, or other officers/staff with whom they are close, have issued what were characterized as retaliatory disciplinary infractions ("rules violation reports" or "RVRs") to prisoners who had filed complaints of wrongdoing. Examples of such alleged infractions include: restrictive housing and the loss of property, phone, and visitation privileges, all of which can impact prisoners' chances for parole. Additionally, prisoners claimed that in response to complaints of staff misconduct, staff members who are the subjects of such complaints and their close associates have "tossed" prisoners' rooms and thrown out their property, restricted their showers, restricted their work opportunities, restricted program privileges; have created separation flags so prisoners cannot be around certain other prisoners; and, have subjected prisoners to unnecessary strip searches.

In 2025, 13 prisoners sued CCWF alleging, *inter alia*, retaliation for filing sexual misconduct complaints connected with an August 2024 use of force incident. Leaked video appeared to confirm that dozens of prisoners were held in a cafeteria while their cells were searched. They were pepper-sprayed while being held in the cafeteria. Some were later pepper-sprayed while outside with their hands restrained behind their backs. Some prisoners alleged this incident occurred after a sergeant named Isidro Arroyo threatened that large searches would happen if prisoners did not stop filing sexual misconduct complaints. In April 2026, CDCR reached a $1.9 million settlement with the 13 prisoner plaintiffs, and CDCR investigators concluded that 41 staff members violated policy, with some facing disciplinary actions including termination, transfers to other positions, and salary reductions.

Several prisoners reported to the investigative team that one particular sergeant, Ralph Contreras, Jr., retaliated against prisoners for reporting staff sexual misconduct. This is especially concerning because this sergeant was part of the ISU which is charged with conducting initial investigations of alleged staff sexual misconduct.[14]

Other examples of retaliation that the investigative team identified include:

- A prisoner at CCWF told the investigative team about an officer who allegedly pushed her into a closet and forced her to give him oral sex in 2012. She stated: (1) the officer threatened her if she reported the assault; (2) later in 2012, the same officer pulled down her underwear and tried to have oral sex with her while she was a porter cleaning at night; and (3) in 2015, the same officer grabbed her buttocks. She stated that she has never shared

---

[14] According to a June 2025 indictment for receiving child pornography, investigators discovered rape scenes that depicted adult men assaulting girls as young as six in Contreras's possession. On April 13, 2026, Contreras pled guilty to 18 U.S.C. § 2252(a)(2) – Receipt of Material Involving the Sexual Exploitation of a Minor and on July 13 was sentenced to 15 years in prison.

any of these incidents previously because, according to her, "reporting it was never an option because of the undocumented consequences." She stated that she was afraid that it might affect the Board's decision on her parole. She expressed concern when she was interviewed by the investigative team and asked to remain anonymous, even though the officer has since been banned from working at the CCWF due to other sexual abuse allegations.

- A different prisoner wrote in her grievance to CDCR in 2023: "I don't want to write too much [about my allegation] because I'm fearful." Later, CDCR sustained her allegations that a sergeant had caressed her breast in an empty program office. When the investigative team interviewed her in 2025, she explained that she continued to face retaliation, including being subjected to excessive searches where her property was taken.

- In October 2024, a prisoner alleged staff sexual misconduct to a CDCR investigator while being interviewed about an unrelated matter. The investigator encouraged her to report the misconduct to CCWF staff. As recorded in the investigator's notes, the prisoner said that she was "adamant that she did not want to report this occurrence until she [was] paroled because she did not want to paint a target on her back, which could impede her from [being] parol[ed]."

Several prisoners reported that they waited months or even years after the alleged sexual misconduct occurred before reporting, potentially allowing sexual abusers to escape prompt investigation. The investigative team's review of investigations determined that prisoners frequently waited to submit allegations until certain events occurred, including: after the prisoners were paroled, when prisoners were transferred to another prison, when prisoners secured legal representation, when it became widely known among the prison population that a particular staff member was the subject of a number of allegations, when a staff member was "banned" from interacting with the particular prisoner or transferred to another prison, or when a particular staff member had died.

Four prisoners separately told the investigative team that they had not previously reported their allegations of staff sexual abuse and they were reporting their allegations for the first time to the investigative team, because they felt that CDCR did not protect them from retaliation.

Many prisoners stated that staff who helped and protected officer Gregory Rodriguez still work at CCWF and the prisoners remain scared of retaliation. One prisoner wrote in a 2023 grievance that because of her knowledge of Rodriguez's conduct, "I fear for my life at CCWF." Similarly, prisoners told the investigative team that staff who were in the room during incidents that were alleged against a doctor remained silent despite the obvious misconduct that occurred. Another prisoner who successfully sued CDCR and alleged sexual abuse by four prison staff told the Guardian newspaper in 2023: "All officers stand together. . . . They just pass your case along, and it gets dismissed, and they don't care." Another prisoner who Rodriguez sexually abused, and who alleges that other officers continue to sexual abuse her, told the investigative team, "[e]veryone [staff] will stick up for each other."

The investigative team found a widely held belief within the prisoner population that grievances are handled by staff who are aligned with their colleagues and, therefore, are not fair

and objective investigators. More pointedly, the team uncovered a widely held belief that investigators routinely violate the integrity of investigations by alerting the subjects of investigations that a complaint has been made about them. These concerns understandably place prisoners in fear of retaliation should they report staff misconduct. The investigative team found no evidence that CDCR, CCWF, and/or CIW are adequately addressing these circumstances, even though, from their own internal investigative files, CDCR, CCWF and CIW are well aware of these fears and that prisoners are dissuaded from reporting abuse and are, instead, forced to tolerate such abuse. This failure constitutes further evidence of deliberate indifference by CDCR, CCWF, and CIW, in violation of the Constitution.

After a prisoner submits allegations, the prison has a policy of monitoring potential retaliation. While this is a laudable policy, the way CDCR implements the policy is believed by prisoners to expose them to harm rather than protect them. Staff are required to follow up with a prisoner who has alleged staff sexual misconduct 15 days and then 90 days after the initial report. CIW and CCWF have assigned this responsibility to individuals who work in ISU that are also responsible for investigating prisoner disciplinary infractions. Similar to the distrust of facility-based staff who conduct initial investigations, the investigative team heard from many prisoners that they do not trust that the retaliation monitoring process is confidential. Many fear that facility-based staff who conduct retaliation monitoring will identify the complainant-prisoners to the accused staff members, thus enabling retaliation. One prisoner told the investigative team she had reported retaliation and nothing was done. At CIW, a prisoner employed by the work program CALCTRA said officers came to her workplace to conduct the retaliation monitoring, causing both staff and peers to question her. In this instance, the intended support became a means to expose the prisoner who reported sexual misconduct and subject the prisoner to intimidation. Assigning retaliation monitoring to staff who investigate prisoner disciplinary infractions compounds the understandable impression among the prisoner population that staff so assigned lack objectivity, which undermines prisoner trust in the integrity of the process overall. Again, this dissuades prisoners from reporting abuse or harassment which, in turn, increases the risk that prisoners will be the victims of such misconduct by staff.

### B. Officials at CDCR, CCWF, and CIW Knew of Risk to Prisoners from Staff Sexual Abuse and Disregarded It.

As demonstrated throughout this official notice of findings, officials at CDCR, CCWF and CIW have been on notice of incidents of staff sexual abuse against prisoners since at least 2000 and have failed to reasonably or adequately address the deficiencies that enabled the abuse to occur. By disregarding the obvious risks to prisoner safety, officials evinced a deliberate indifference to prisoners' constitutional rights that enabled—and continues to enable—staff sexual abuse of prisoners. *Farmer*, 511 U.S. at 842.

Recent criminal sanctions do not make up for CDCR's longtime knowledge of staff sexual assault of CCWF and CIW prisoners and failure to adequately address those constitutional harms. While the 2023 criminal indictment and the 2025 conviction of officer Gregory Rodriguez focused attention on sexual abuse at CDCR's women's facilities, the problems have existed for many years. In 2013, correctional officer Gary Swatzell was sentenced to two years in prison for sexually abusing and impregnating a CIW prisoner. In 2015, CDCR fired officer Michael Ewell for having "an inappropriate and sexual relationship with an inmate" at CIW, including having sex with her

multiple times and forcing her to give him oral sex. In 2017, CCWF reached an undisclosed settlement based on the allegation that CCWF doctor Ernest Reeves sexually abused a prisoner during gynecology appointments from 2000 to 2009. CDCR sustained sexual misconduct allegations against correctional officer Trevino after CDCR determined that, in 2017, he abused three different prisoners.

In 2023 and 2024, private plaintiffs filed hundreds of lawsuits alleging staff sexual misconduct against dozens of current and former staff. In August 2023, CDCR received further notice of potential inadequacies in connection with the prevention and detection of sexual misconduct by staff when they received a letter signed by 80 advocacy organizations asking for a meaningful response to sexual abuse allegations. It does not appear that CDCR undertook effective steps to address these concerns.

Later in August 2023, the state legislature held a briefing, attended by both CDCR's Secretary and CCWF's Warden, entitled "Sexual Assault and Harassment at California's Women's Prisons and What is Being Done in Response," which included testimony from abuse survivors. California used the Budget Act of 2023 to establish a Sexual Abuse Response and Prevention (SARP) working group designed to further inform California lawmakers and the CDCR about the issues of sexual abuse occurring in the women's prisons and provide recommendations.

In March 2024, the SARP working group, composed of stakeholders led by former prisoners, published a report to the California Legislature that recommended improvements, including ensuring that victim advocates accompany prisoners to investigatory interviews; ensuring reporting methods are confidential to protect prisoners from retaliation; ensuring staff members are not improperly deactivating their body worn cameras; and taking investigations out of the hands of prison-based staff.[15]

The Budget Act did not require CDCR to implement the SARP work group recommendations. Nonetheless, the SARP working group's efforts added to the State's clear notice of the ongoing harm that CCWF and CIW prisoners suffer. CDCR could have adopted reasonable SARP work group recommendations to address ongoing harm.

Despite the longstanding notice of staff sexual abuse, CDCR has not effectively addressed known systemic problems. If CDCR does not effectively address these problems, serious, grievous harm to prisoners at the hands of staff will continue at CCWF and CIW.

---

[15] Community Report to the Legislature, "CA Women's Prisons — Sexual Abuse Response and Prevention Working Group Community Report to the Legislature," March 2024, https://assets.nationbuilder.com/swactionfund/pages/342/attachments/original/1709747546/CA_Women_Sexual_Abuse_Response_and_Prevention_Working_Group at 7-8.

## VII. MINIMAL CORRECTIVE MEASURES

The State must remediate its ongoing violations of prisoners' constitutional rights at CCWF and CIW. CDCR's efforts to address the issues outlined in this Notice have been inadequate thus far. To protect prisoners from staff sexual abuse at CCWF and CIW, it is necessary that CDCR adopt the following corrective measures:

1. Comply with PREA and its implementing regulations that pertain to and are relevant to the findings herein, the National Standards to Prevent, Detect, and Respond to Prison Rape (28 C.F.R. §§ 115 *et seq*.), including but not limited to compliance with 28 C.F.R. §§ 115.13, 115.15, 115.67, and 115.71 in order to protect prisoners from sexual abuse.

2. Ensure that all staff are trained on the prevention, detection, and response to sexual abuse and sexual harassment.

3. Ensure that all staff, including custodial officers, supervisors, investigators, and, as appropriate, non-custody staff, are equipped with and required to use BWCs with digital audio and video recording capability when interacting with or among prisoners. BWCs must be equipped with a passive recording capability that records at all times and a manual recording capability that allows staff to activate BWCs to specifically record interactions with prisoners that could result in any complaint of any nature, either by or against staff. Passive and manually activated recordings should be preserved for no fewer than 90 days, unless such recordings become evidence in an investigation of a complaint against a prisoner or staff in which case such recordings should be preserved for no fewer than three years, or longer as otherwise appropriate given the nature of the complaint and the investigation/follow-on action.

4. Conduct an inventory of all abandoned, dilapidated, or currently out-of-use structures on the CCWF and CIW compounds and develop/implement plans to secure any buildings that pose a threat to institutional security or provide opportunities for sexual abuse.

5. Prepare and implement a plan for strategic placement of additional cameras at CCWF and CIW, with appropriate monitoring, oversight, and review of camera recordings, to eliminate areas where sexual misconduct can be perpetrated outside of view.

6. Ensure that prisoners have internal and external confidential options for timely reporting sexual abuse and sexual harassment, anonymously if requested, including an option that is independent from CDCR.

7. Ensure that prisoners receive accurate and complete information and education on how to access all internal and external confidential reporting options.

8. Ensure that prisoners who report sexual abuse have access to victim advocates during evidence collection and investigative interviews.

9. Ensure that staff without a need to know do not have access to grievances of any nature and that unauthorized communication of any information related to grievances be considered an offense that carries a penalty that includes termination of employment.

10. Ensure that the investigative process is designed and implemented in a way that minimizes and mitigates the risk of compromise and encourages trust among staff and prisoner population alike.

11. Ensure that all allegations of retaliation against those who report sexual misconduct against prisoners or staff are vigorously investigated and that all cases where allegations are substantiated result in effective sanctions that hold retaliators fully and appropriately accountable, as a means to deter future retaliation and maintain trust in, and integrity of, the overall complaint process.

## VIII. CONCLUSION

The Department of Justice finds there is reasonable cause to believe that CDCR, CCWF, and CIW are subjecting prisoners to egregious or flagrant conditions which deprive such prisoners of their rights under the Constitution and Federal law, pursuant to a pattern or practice, causing such prisoners grievous harm. Specifically, CDCR, CCWF, CIW have violated and continue to violate the Eighth and Fourteenth Amendment rights of prisoners.

The Department looks forward to working cooperatively with the State of California to ensure that these violations are remedied.

The Department advises that 49 days after issuance of this letter, the Attorney General may initiate a lawsuit pursuant to CRIPA to correct the deficiencies identified in this letter if State officials have not satisfactorily addressed these concerns. 42 U.S.C. § 1997b(a)(1). Please also note that this notice is a public document. We will post this notice on the Civil Rights Division's website.